MORGAN, LEWIS & BOCKIUS LLP
NICOLE A. DILLER (SBN 154842)
ROBERTA H. VESPREMI (SBN 225067)
ndiller@morganlewis.com
rvespremi@morganlewis.com
One Market, Spear Street Tower
San Francisco, California  94105-1126
Telephone: 415.442.1000
Facsimile:  415.442.1001

MORGAN, LEWIS & BOCKIUS LLP
CHARLES JACKSON (*appearance pro hac vice*)
ALLYSON N. HO (*pro hac vice pending*)
charles.jackson@morganlewis.com
aho@morganlewis.com
77 West Wacker Drive, Fifth Floor
Chicago, Illinois 60601
Telephone: 312.324.1000
Facsimile:  312.324.1001

Attorneys for Defendants Dignity Health, Herbert J.
Vallier, and the Retirement Plans Sub-Committee
(erroneously named as the members of the Dignity
Retirement Committee)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STARLA ROLLINS on behalf of herself, individually, and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>DIGNITY HEALTH, a California non-profit corporation, HERBERT J. VALLIER, an individual, the members of the Dignity Retirement Committee, and JOHN and JANE DOES, each an individual, 1-20,<br><br>        Defendants. | CASE NO.  13-C-1450 TEH<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS WITH SUPPORTING MEMORANDUM**<br><br>Date:        October 7, 2013<br>Time:       10:00 a.m.<br>Courtroom:  Courtroom 12, 19th Floor<br>Judge:     Hon. Thelton E. Henderson<br><br>Complaint Filed:  April 1, 2013<br>Trial Date:  N/A |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOTION TO DISMISS
Case No. 13-C-1450  TEH

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ................................................ 1
I.    INTRODUCTION ................................................................................................ 1
II.   STATEMENT OF ISSUES TO BE DECIDED ................................................ 3
III.  RELEVANT BACKGROUND .......................................................................... 4
      A.    Dignity And Its Role In The Catholic Church's Healing Ministry. ...... 4
            1.    The Catholic Church's Healing Ministry. ................................... 4
            2.    CHW And Dignity: History And Operations. .............................. 4
            3.    CHW Restructures And Renames Itself Dignity. ...................... 6
      B.    The Plan And Retirement Plans Sub-Committee. ................................. 9
      C.    The Pension Plan's Favorable IRS Private Letter Rulings. ................. 9
IV.   LEGAL STANDARD ......................................................................................... 10
V.    ARGUMENT ....................................................................................................... 11
      A.    Counts I–VII Fail As A Matter Of Law Because The Plan Is A Church
            Plan. ........................................................................................................ 11
            1.    ERISA's Church Plan Exemption Applies To Plans Established Or
                  Sponsored By Non-Church Entities. .......................................... 11
            2.    The Plan Is A Church Plan Under ERISA Because Dignity Is A
                  Tax-Exempt Entity Associated With The Roman Catholic Church. ....... 12
            3.    The Plan Also Qualifies As A Church Plan Because It Is
                  Maintained By A Non-Church Entity Associated With Or
                  Controlled By A Church With The Principal Purpose Of
                  Administering A Retirement Plan. .............................................. 17
      B.    Count VIII Fails As A Matter Of Law Because ERISA's Church Plan
            Exemption Does Not Violate The Establishment Clause. ................... 18
            1.    The Exemption Satisfies The *Lemon* Test. ............................... 19
            2.    Plaintiff's Allegations Are Irrelevant To Establishment Clause
                  Concerns. .................................................................................... 23
VI.   CONCLUSION .................................................................................................... 25

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

MOTION TO DISMISS
Case No. 13-C-1450  TEH

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Fund v. U.S. Dep't of Agric.*,
499 F.3d 1036 (9th Cir. 2007) ............................................................. 20

*Arbaugh v. Y & H Corp.*,
546 U.S. 500 (2006) .............................................................................. 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................. 10

*Barron v. Reich*,
13 F.3d 1370 (9th Cir. 1994) ............................................................... 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................. 10

*Catholic Charities of Maine, Inc. v. Portland*,
304 F. Supp. 2d 77 (D. Me. 2004) ........................................... 13, 15, 18

*Chronister v. Baptist Health*,
442 F.3d 648 (8th Cir. 2006) ............................................................... 13

*Corp. of Presiding Bishop v. Amos*,
483 U.S. 327 (1987) ...................................................................... *passim*

*Cutter v. Wilkinson*,
544 U.S. 709 (2005) .............................................................................. 19

*Daft v. Advest, Inc.*,
658 F.3d 583 (6th Cir. 2011) ............................................................... 10

*Delaye v. Agripac, Inc.*,
39 F.3d 235 (9th Cir. 1994) ................................................................. 10

*Friend v. Ancilla Sys. Inc.*,
68 F. Supp. 2d 969 (N.D. Ill. 1999) ..................................................... 14

*Hall v. USAble Life*,
774 F. Supp. 2d 953 (E.D. Ark. 2011) ................................................. 14

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
132 S. Ct. 694 (U.S. 2012) ............................................................. 17, 19

*Kulinski v. Medtronic Bio–Medicus*,
21 F.3d 254 (8th Cir. 1994) ................................................................. 10

*Leeson v. Transamerica Disability Income Plan*,
671 F.3d 969 (9th Cir. 2012) ............................................................... 10

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

MOTION TO DISMISS
Case No. 13-C-1450 TEH

1
2

**TABLE OF AUTHORITIES**
(continued)

Page(s)

3

*Lemon v. Kurtzman,*
   403 U.S. 602 (1971) ................................................................................ *passim*

4

*Lown v. Continental Cas. Co.,*
   238 F.3d 543 (4th Cir. 2001) ................................................................... 13

5

*Mayweathers v. Newland,*
   314 F.3d 1062 (9th Cir. 2002) ........................................................... 20, 21

6
7

*McKeon v. Mercy Healthcare Sacramento,*
   19 Cal. 4th 321 (1998) ............................................................................ 21

8

*Mueller v. Allen,*
   463 U.S. 388 (1983) ................................................................................ 22

9
10

*NLRB v. Catholic Bishop,*
   440 U.S. 490 (1979) ................................................................................ 19

11

*Okerman v. Life Ins. of N. Am.,*
   No CIV-S-00-0186, 2001 WL 36203082 (E.D. Cal. Dec. 24, 2001) .......... 14

12
13

*Pieszak v. Glendale Adventist Med. Ctr.,*
   112 F. Supp. 2d 970 (C.D. Cal. 2000) .................................................... 22

14

*Rinehart v. Life Ins. Co. of N. Am.,*
   No. C08-5486, 2009 WL 995715 (W.D. Wash. Apr. 14, 2009) ........ 13, 14, 18

15
16

*Sams v. Yahoo!, Inc.,*
   713 F.3d 1175 (9th Cir. 2013) ................................................................ 10

17

*Shaev v. Saper,*
   320 F.3d 373 (3d Cir. 2003) .................................................................... 13

18
19

*Spencer v. World Vision, Inc.,*
   633 F.3d 723 (9th Cir. 2011) .................................................................. 25

20

*Sprewell v. Golden State Warriors,*
   266 F.3d 979 (9th Cir. 2001),
   *amended by* 275 F.3d 1187 (9th Cir. 2001) ............................................ 10

21
22

*St. Martin Evangelical Lutheran Church v. South Dakota,*
   451 U.S. 772 (1981) ................................................................................ 19

23
24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007) ................................................................................ 10

25

*Texas Monthly, Inc. v. Bullock,*
   489 U.S. 1 (1989) .................................................................................... 24

26
27

*Thorkelson v. Publ'g House of the Evangelical Lutheran Church in Am.,*
   764 F. Supp. 2d 1119 (D. Minn. 2011) ......................................... 11, 12, 13

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Tinoco v. Marine Chartering Co.*,
   311 F.3d 617 (5th Cir. 2002) .................................................................................... 10

*UIU Severance Pay Trust Fund v. Local Union No. 18–U*,
   998 F.2d 509 (7th Cir. 1993) .................................................................................... 10

*Walz v. Tax Commission*,
   397 U.S. 664 (1970) ...................................................................................... 19, 23

*Ward v. Unum Life Ins. Co. of Am.*,
   No. 09-C-431, 2010 WL 4337821 (E.D. Wisc. Oct. 25, 2010) .............................. 15

*Welsh v. Ascension Health*,
   Case No. 3:08cv348/MCR/EMT, 2009 U.S. Dist. LEXIS 45947 (N.D. Fla. 2009) ................. 18

*Williams v. Wright*,
   927 F.2d 1540 (11th Cir. 1991) ................................................................................ 13

**Statutes**

26 U.S.C. § 414(e) .............................................................................................................. 9

26 U.S.C. § 501 ........................................................................................................... 12, 14

ERISA § 1001, 29 U.S.C. § 1001 ....................................................................................... 1

ERISA § 3(33)(A), 29 U.S.C. § 1002(33)(A) ................................................................... 12

ERISA § 3(33)(C), 29 U.S.C. § 1002(33)(C) ................................................................... 11

ERISA § 3(33)(C)(i), 29 U.S.C. § 1002(33)(C)(i) ................................................... 9, 17, 18

ERISA § 3(33)(C)(ii)(II), 29 U.S.C. § 1002(33)(C)(ii)(II) ........................................ 11, 17

ERISA § 3(33)(C)(iii), 29 U.S.C. § 1002(33)(C)(iii) ....................................................... 13

ERISA § 3(33)(C)(iv), 29 U.S.C. § 1002(33)(C)(iv) ................................................. 14, 15

ERISA § 4(b)(2), 29 U.S.C. § 1003(b)(2) ................................................................... 2, 10

Public Law 96-364 § 407 ................................................................................................. 11

**Other Authorities**

Barbra Mann Wall, *Conflicts and Compromise: Catholic and Public Hospital Partnerships*, NURS. HIST. REV. 2010 ....................................................................... 4

BENEDICT M. ASHLEY, HEALTH CARE ETHICS: A CATHOLIC THEOLOGICAL ANALYSIS,
   79 (Georgetown University Press 5th ed. 2006) (1976) .......................................... 3

Pope Benedict XVI, *God Is Love* (Ignatius Press, Libreria Editrice Vaticana, 2006) ................. 3

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

MOTION TO DISMISS
Case No. 13-C-1450  TEH

| | |
|---|---|
| 1 | **TABLE OF AUTHORITIES** |
| | (continued) |
| 2 | **Page(s)** |

3  Caryle Murphy, *A Steadfast Servant of D.C. Area's Needy*, WASH. POST, Oct. 25,
4     2004...................................................................................................................... 3

5  Fr. Thomas Kopfensteiner, STD, *Responsibility and Cooperation*, HEALTH PROGRESS
      59 (Nov.–Dec. 2002)........................................................................................... 6

6  Frank Morrisey, *What Is Stable Patrimony*, HEALTH PROGRESS, Mar.-Apr. 2008...................... 16

7  KEVIN D. O'ROURKE & PHILIP BOYLE, MEDICAL ETHICS: SOURCES OF CATHOLIC
      TEACHINGS (Georgetown University Press 4th ed. 2011)................................................ 6
8
9  Kevin D. O'Rourke, Thomas Kopfen-Steiner, Ron Hamel, *A Brief History: A
      Summary of the Development of the Ethical and Religious Directives for Catholic
      Health Care Services*, HEALTH PROGRESS, Nov.–Dec. 2001........................................... 7
10
11 Peter J. Cataldo, Ph.D. & John M. Haas, Ph.D. STL, *Institutional Cooperation: The
      ERDs*, HEALTH PROGRESS 49 (Nov.–Dec. 2002)................................................... 6, 7

12 Pope John Paul II, *Health Care: Ministry in Transition* (Sept. 14, 1987), 17 Origins
      (Oct. 8, 1987) ...................................................................................................... 4
13
14 *Report on Theological Dialogue on the Principle of Cooperation*, HEALTH PROGRESS
      (Nov.–Dec. 2007).................................................................................................. 7

15 Restatement of Trusts 3rd § 2 (2003)........................................................................... 2

16 ST. THOMAS AQUINAS, SUMMA THEOLOGIAE, II-II ....................................................... 7

17 **Rules**

18 Fed. R. Civ. P. 12(b)(1)........................................................................................... 10

19 Fed. R. Civ. P. 12(b)(6)...................................................................................... 1, 10

20 Fed. R. Civ. P. 12(d) ............................................................................................. 10

21 Fed. R. Civ. P. 56 ................................................................................................. 10

22 **Constitutional Provisions**

23 Establishment Clause of the First Amendment ................................................... *passim*

24 Free Exercise Clause of the First Amendment................................................... 3, 22

25 **Legislative History**

26 119 Cong. Rec. 7421 (March 13, 1973)..................................................................... 22

27 124 Cong. Rec. H12106 (1978) ............................................................................... 21

28 S. Rep. No. 93-383, 93rd Cong., 1st Sess. 81 (1973) .................................................. 11

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v

MOTION TO DISMISS
Case No. 13-C-1450  TEH

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Administrative Agency Materials**

DOL Advisory Opinion 90-12A .................................................................. 13

IRS Gen. Coun. Mem. 39,007 .................................................................. 13

IRS Private Letter Ruling 9409042 ........................................................... 9

IRS Private Letter Ruling 9525061 ........................................................... 9

IRS Private Letter Ruling 9717039 ........................................................... 9

IRS Private Letter Ruling 200023057 ....................................................... 9

IRS Private Letter Ruling 200025061 ....................................................... 18

IRS Private Letter Ruling 200514025 ....................................................... 18

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vi

MOTION TO DISMISS
Case No. 13-C-1450  TEH

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on Monday, October 7, 2013 at 10:00 a.m. or as soon thereafter as counsel may be heard in the courtroom of the Honorable Thelton E. Henderson, United States District Judge for the Northern District of California, located at the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California 94102, defendants Dignity Health ("Dignity"), Herbert J. Vallier, and the Dignity Board of Directors' Retirement Plans Sub-Committee (erroneously named as the members of the Dignity Retirement Committee), will and hereby do move the Court for an order dismissing this action with prejudice.

Defendants bring this motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the complaint fails to state a claim upon which relief may be granted. Defendants base their motion on this notice of motion and motion, the supporting memorandum of points and authorities, their request for judicial notice, the declarations of Roberta H. Vespremi and Bernita McTernan and attached exhibits, appendix of other authorities, and such other evidence and arguments as defendants may present on reply and at oral argument.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This action, like four other cookie-cutter lawsuits filed by plaintiff's law firms against other Catholic healthcare systems in less than two months, attacks the church plan exemption from the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001–1461 ("ERISA").[1] Each, nearly carbon copy complaint, includes pages of word-for-word allegations and claims.  And each is replete with legal argument and distortions, rather than with well-pled factual allegations.

Congress exempted "church plans"—benefit plans established or maintained by a church or other religious institutions and non-profit entities associated with such institutions—from

---

[1] *See Medina v. Catholic Health Initiatives*, No. 13-cv-01249 (D. Colo.) (filed May 10, 2013) (appearances on behalf of plaintiff made by Keller Rohrback and Cohen Milstein) (Declaration of Roberta H. Vespremi ("Vespremi Decl."), Ex. A); *Kaplan v. St. Peter's Healthcare*, No. 13-cv-02941 (D.N.J.) (filed May 7, 2013) (same) (*id.*, Ex. B); *Chavies v. Catholic Health East*, No. 13-cv-01645 (E.D. Pa.) (filed Mar. 28, 2013) (same) (*id.*, Ex. C); *Overall v. Ascension Health*, No. 13-cv-11396 (E.D. Mich.) (filed Mar. 28, 2013) (same) (*id.*, Ex. D).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

NOT. OF MOT. & MOT. TO DISMISS
MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

1  ERISA to prevent impermissible entanglement by the government with religious organizations.

2  ERISA § 4(b)(2), 29 U.S.C. § 1003(b)(2) ("The provisions of this subchapter shall not apply to

3  any employee benefit plan if … (2) such plan is a church plan (as defined in section 1002(33))").

4  While excluded from ERISA's requirements, long-established principles of trust law impose

5  fiduciary obligations on trustees who protect the interests of church plan participants in their

6  retirement plan benefits.  Restatement of Trusts 3rd § 2, comment b (2003).

7      Plaintiff asserts seven claims, alleging that Dignity violated ERISA's detailed reporting,

8  disclosure, and funding requirements with respect to the Dignity Pension Plan (the "Plan").

9  Comp. ¶¶ 105–61.  Of course Dignity, like the majority of faith-based employers, has not sought

10  to conform the Plan to all of ERISA's reticulated requirements, relying instead on the church plan

11  exemption enacted almost forty years ago and expanded in 1980.  If the Plan qualifies as a church

12  plan—which it does—plaintiff's first seven claims fail as a matter of law.

13      More than three decades of agency interpretations and court rulings have affirmed and

14  clarified that the exemption can apply to plans established and maintained by non-church entities,

15  such as religious publishing houses and hospital systems.  Before a 2012 reorganization and name

16  change, Dignity, then Catholic Healthcare West ("CHW"), received a series of Internal Revenue

17  Service ("IRS") private letter rulings ("PLRs").[2]  Each confirmed the church plan status of the

18  Plan, including following CHW's acquisition of non-Catholic, community hospitals.

19      Plaintiff recognizes that her claims are contrary to all existing authority, and asserts that

20  the Department of Labor ("DOL"), IRS, and the courts have misinterpreted ERISA's church plan

21  exemption since its enactment.  Comp. ¶¶ 31, 32, 34–36.  Plaintiff also attacks Dignity's

22  Catholicity and association with the Catholic Church.  *Id.* ¶¶ 6, 85–87.  She asserts that because

23  Dignity provides medical care to patients of any faith, hires medical and support staff without

24  regard to religious affiliation, and enters into alliances with non-Catholic hospitals that provide

25  contraceptive treatments divergent from Catholic teachings, Dignity is not associated with the

26  ---

[2] A PLR is a written statement issued by the IRS that applies tax laws to specific facts upon request.
*See, e.g.,* 2013-1 I.R.B. 7.  The IRS issued PLRs confirming the church plan status of the Plan in
27  1993, 1995, 1997, and 2000.  *See infra* Section III.C.  The IRS based its findings on CHW's tax-exempt status and association with the Roman Catholic Church.  Dignity made its most recent PLR
28  request on September 27, 2012 after its corporate restructuring.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2                      MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

Catholic Church within the meaning of ERISA's church plan exemption.[3]  *Id.* ¶¶ 5, 40–42, 44–48, 50–52, 80–81.  These allegations reflect a complete lack of understanding of the Catholic Church's and CHW/Dignity's healing ministry under which the orders of sisters who initially founded or later joined CHW ("Sponsoring Congregations") have served for more than one hundred years, and continue to serve to this day.  As part of this ministry, Dignity extends God's healing presence to all—especially the poor and disenfranchised—regardless of faith.[4]

If the ERISA church plan exemption applies to Dignity (and to other Catholic-associated healthcare institutions), and if the court rulings and DOL and IRS interpretations are correct after all, plaintiff finally asserts that the exemption violates the Establishment Clause of the First Amendment to the Constitution (Comp. ¶ 88).  This alternative claim is also without merit.  The exemption is not only permissible under the Establishment Clause, but necessary under the Free Exercise Clause to prevent excessive government entanglement in religion.  Both the Supreme Court and the Ninth Circuit have repeatedly affirmed these principles and no court has ever held (or even suggested) that the church plan exemption offends the First Amendment.  Accordingly, defendants respectfully request that the Court dismiss the complaint with prejudice.

## II.       STATEMENT OF ISSUES TO BE DECIDED

Whether the Plan qualifies as a church plan within the meaning of ERISA and, if so, whether the ERISA church plan exemption violates the Establishment Clause.

---

[3] The Catholic Church distinguishes between "direct sterilizations," which are performed for the purpose of contraception, and "therapeutic sterilizations," which are "procedures that induce sterility … where their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available."  BENEDICT M. ASHLEY, HEALTH CARE ETHICS:  A CATHOLIC THEOLOGICAL ANALYSIS 79 (Georgetown University Press, 5th ed. 2006) (Appx. at A1–4).

[4] Pope Benedict XVI, *God Is Love* (Ignatius Press, Libreria Editrice Vaticana, 2006) (stating that faith backgrounds of recipients in need of charity is not an element of why Catholics provide charity) (Appx. at A16–19); Caryle Murphy, *A Steadfast Servant of D.C. Area's Needy*, WASH. POST, Oct. 25, 2004, at A1 (statement by Cardinal James Aloysius Hickey:  "We serve the homeless … not because they are Catholic, but because we are Catholic.  If we don't care for the sick, educate the young, care for the homeless, then we cannot call ourselves the church of Jesus Christ") (Appx. at 376–79).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

III.   **RELEVANT BACKGROUND**

    A.    **Dignity And Its Role In The Catholic Church's Healing Ministry.**

        1.    **The Catholic Church's Healing Ministry.**

      The healing ministry is a central component of the Catholic Church's "life and mission."[5] The Catholic Church models its healing ministry on the parable of the Good Samaritan.[6]  Also expressed as the Church's "preferential option for the poor," Catholic healthcare distinguishes itself "by service to and advocacy for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable to discrimination."  Vespremi Decl., Ex. E at 11.

        2.    **CHW And Dignity: History And Operations.**

      Dignity is a non-profit public benefit corporation headquartered in San Francisco that operates 24 Catholic and 15 non-Catholic hospitals.  Comp. ¶ 37; Vespremi Decl., Exs. F at 1–2; G at 20.  Dignity's dedication to the Catholic Church's healing ministry extends back more than 125 years.  In the late 19th and early 20th centuries, CHW/Dignity's Sponsoring Congregations established hospitals to care for the poor and the sick to further the Catholic Church's healing ministry.  Vespremi Decl., Ex. H.  In 1986, the Sisters of Mercy joined their ten hospitals to form CHW.  *Id.*  Later, five other orders of sisters joined their hospitals.  *Id.*

      Several decades ago and continuing to the present day, the number of women entering the religious life began declining, "and the Catholic Church increasingly relied on lay participation."[7]  Beginning in the early 1990s, CHW began to partner with non-Catholic community hospitals to expand the reach of its healing ministry.  *Id.*, Ex. G at p. 24.  CHW brought these hospitals into its system under a "community hospital" model with the consent of the local bishop of the diocese in which each hospital operates.  *Id.*, Exs. E at 36–37, F at 1, G at

---

[5] Pope John Paul II, *Health Care: Ministry in Transition* (Sept. 14, 1987), 17 Origins (Oct. 8, 1987) at 292-94 (Appx. at A389–93).

[6] Vespremi Decl., Ex. E at 7.  In the parable of the Good Samaritan told by Jesus, a foreign traveler came upon a victim of robbery, "poured oil and wine over his wounds and bandaged them," and then "lifted him up on his own animal and took him to an inn and cared for him."  Luke 10:25-37 (Appx. at A396–99).

[7] Barbra Mann Wall, *Conflicts and Compromise: Catholic and Public Hospital Partnerships*, p. 2 (NURS. HIST. REV. 2010) (Appx. at A361–73).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

24.  Part of this model included each community hospital's agreement to abide by CHW/Dignity's "Statement of Common Values," which mirrors the United States Conference of Catholic Bishops' ("USCCB") *Ethical and Religious Directives of Catholic Health Care* ("ERDs").  All American Catholic hospitals (including those within the Dignity system) follow the ERDs.  The Statement of Common Values is substantially similar with the main exception of not prohibiting contraceptive and sterilization services.  Vespremi Decl., Exs. E, G at 24, I.  Thus, by obtaining the community hospitals' agreement to adhere to nearly all of the ERDs, CHW/Dignity has greatly extended the Catholic Church's healing ministry of service to the poor.

Today Dignity continues to operate its facilities and deliver healthcare services to individuals in accordance with its Mission:

We are committed to furthering the healing ministry of Jesus. We dedicate our resources to:

- Delivering compassionate, high-quality, affordable health services;

- Serving and advocating for our sisters and brothers who are poor and disenfranchised; and

- Partnering with others in the community to improve the quality of life.

*Id.*, Ex. J.  In fiscal year 2012 alone, Dignity provided $1.6 *billion* in charitable community benefits and care for the poor, including more than $600 million through its community hospitals.  *Id.*, Exs. K at 4, L.  This charitable work includes providing community grants and loans,[8] rendering free or discounted medical care, and covering unpaid costs of Medicare.  *Id.*, Ex. G at 18.  As part of its mission, Dignity also develops its spiritual care services at each care facility "to include support for the variety of beliefs represented by those served."  Declaration of Bernita McTernan ("McTernan Decl."), Ex. A at 3.  And, in accordance with its Standards on Mission Integration—which provide a framework for Dignity to identify, measure, and improve the ways in which the Mission of its healthcare ministry is carried out—Dignity's care facilities "provide[] care to all persons regardless of age, gender, race, socio-economic or immigrant status, sexual orientation, gender identity or religious affiliation."  *Id.* at 5.  Catholic social teachings guide

---

[8] Examples include a grant to provide motel stays for homeless clients recovering from a medical condition and loans for construction of affordable housing.  Vespremi Decl., Ex. G at 39-42.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

Dignity's interactions with its employees, facilitated in part by an annual, system-wide values-based employee satisfaction survey.  *Id.* at 10–11.

### 3.    CHW Restructures And Renames Itself Dignity.

Years after CHW began to utilize the community hospital model to expand the reach of its Mission, the USCCB revisited its position on healthcare partnerships.  Vespremi Decl., Ex. E at 35–37.  The 2009 edition of the ERDs explained:

> This new edition of the Ethical and Religious Directives omits the appendix concerning cooperation, which was contained in the 1995 edition.  Experience has shown that the brief articulation of the principles of cooperation that was presented there did not sufficiently forestall certain possible misinterpretations and in practice gave rise to problems in concrete applications of the principles. Reliable theological experts should be consulted in interpreting and applying the principles governing cooperation, with the proviso that, as a rule, Catholic partners should avoid entering into partnerships that would involve them in cooperation with the wrongdoing of other providers.

*Id.* at 35–36.

Two complex Catholic theological principles informed the USCCB's analysis on collaboration between Catholic and non-Catholic hospitals.[9]  The first, "cooperation," means the "free and knowing assistance of an individual or an institution in an immoral act principally performed by another individual or institution (the principal agent)."[10]  There are two major types of cooperation:  (i) formal cooperation, which is "assistance provided to the immoral act of a principal agent in which the cooperator *intends* the evil" and (ii) material cooperation, which is "assistance provided to the immoral act of the principal agent in which the cooperator *does not intend* the evil."[11]  The second is "scandal," which means "leading another person into sin."[12]  "Anyone who uses the power at his disposal in such a way that it leads others to do wrong is guilty of scandal and responsible for the evils that he has directly or indirectly encouraged."[13]

[9] KEVIN D. O'ROURKE & PHILIP BOYLE, MEDICAL ETHICS: SOURCES OF CATHOLIC TEACHINGS, at p. 13 (Georgetown University Press 4th ed. 2011) (Appx. at A384–88).

[10] Peter J. Cataldo, Ph.D. & John M. Haas, Ph.D. STL, *Institutional Cooperation: The ERDs*, HEALTH PROGRESS 49 (Nov.–Dec. 2002) (Appx. at A20–29).

[11] *Id.* at p. 51 (emphasis supplied).

[12] Fr. Thomas Kopfensteiner, STD, *Responsibility and Cooperation*, HEALTH PROGRESS 59 (Nov.–Dec. 2002) (Appx. at A357–60).

[13] *Catechism of the Catholic Church* (No. 2287) (Appx. at A30–38).

1      The USCCB's prior interpretation of cooperation as set forth in the 1995 edition of the

2  ERDs caused controversy within the Church.[14]  Eventually, the Vatican's Congregation for the

3  Doctrine of Faith requested that the USCCB revise the ERD's application of the principles of

4  cooperation and scandal to require avoidance of arrangements judged to involve Catholic

5  institutions in material cooperation in the actions of non-Catholic institutions considered immoral

6  by the Catholic Church.[15]  In response, the USCCB eliminated an appendix authorizing

7  cooperation and added a new directive to the ERDs:

8               No. 70: Catholic health care organizations are not permitted to engage in
             immediate material cooperation in actions that are intrinsically immoral,
9            such as abortion, euthanasia, assisted suicide, and direct sterilization.

10  Vespremi Decl., Ex. E at 35.  The USCCB also more precisely defined "scandal," using the

11  definition contained in the Catechism of the Catholic Church.[16]  After the USCCB revised the

12  ERDs, CHW's partnerships with non-Catholic hospitals arguably placed the Sponsoring

13  Congregations in a position that could cause confusion about whether the Church permitted

14  material cooperation with hospitals that provide contraceptive services.[17]  *See id.*, Exs. E at 36–

15  37; I.  To prevent possible genuine passive scandal[18] arising from its partnerships with

16  community hospitals, CHW's board of directors, senior leadership, and the Most Rev. George H.

17  Niederauer, Archbishop Emeritus of San Francisco (the diocese of CHW's headquarters), in

18  consultation with moral theologians, "engaged in a thoughtful and extended process of research,

19  study and discernment that resulted in a structure that changed the relationship of the sponsors to

20  [14] *Report on Theological Dialogue on the Principle of Cooperation*, HEALTH PROGRESS, Nov.–Dec. 2007, at 68-69 (Appx. at A394–95).

21  [15] *Id.*; Cataldo, *supra* note 10, at 49.

22  [16] Kevin D. O'Rouke, Thomas Kopfen-Steiner, Ron Hamel, *A Brief History: A Summary of the Development of the Ethical and Religious Directives for Catholic Health Care Services*, HEALTH
23  PROGRESS, Nov.-Dec. 2001, at 20-21 (Appx. at A380–83).

24  [17] The Statement of Common Values, discussed in Section III.A.2, expresses Dignity's belief that "dignity of persons requires reverence at every stage of life's journey from conception to natural death."  Vespremi Decl., Ex. I at 1.  Accordingly, the Statement of Common Values, applicable to
25  its community hospitals, explicitly prohibits direct abortion, reproductive technologies where conception occurs outside a woman's body, and euthanasia.  *Id.*

26  [18] The *Catechism of the Catholic Church* distinguishes between genuine "active" and "passive" scandal.  *Id.*, nn. 2284, 2287 (Appx. at A30–38).  Although active scandal was not at issue, CHW
27  restructured to minimize and manage the risk of passive scandal—i.e., scandal caused accidentally or unintentionally which leads another who is "ill-disposed" into sin (by apparent acceptance of
28  sterilization).  ST. THOMAS AQUINAS, SUMMA THEOLOGIAE, II-II, q. 43, a. 7, c (Appx. at A5–15).

1  the organization, and added new components of mission oversight." *Id.*, Exs. F, G at 8;

2  McTernan Decl., Ex. B.

3      These discussions resulted in a new model that separates the canonical responsibilities of

4  the sponsors from the civil responsibilities of the board, thus eliminating the risk of genuine

5  theological scandal. *See* Vespremi Decl., Ex. E at 37.  Catholic moral theologians provided

6  opinions supporting the Catholicity of CHW's reorganization into the Dignity governance

7  structure.  McTernan Decl., Ex. C.  On November 21, 2011, Most Rev. George H. Niederauer,

8  Archbishop Emeritus of San Francisco issued a *nihil obstat*, a negative declaration, which stated,

9  among other points, that the "proposed governing restructure appropriately respects the moral

10  teaching of the Roman Catholic Church." *Id.*, Ex. B; *see also* Vespremi Decl., Ex. F (reiterating

11  that Dignity's "restructuring [was] consistent with the Catholic moral and doctrinal teachings").

12      Under the new governance structure, the Sponsoring Congregations continue to sponsor

13  the Catholic hospitals with oversight of the Church's healing ministry through a reservation of

14  rights over aspects key to the integrity of the Sisters' mission, such as proposed changes to the

15  Statement of Common Values and oversight of adherence to the Statement.  Maintaining the

16  Sponsoring Congregations' ability to serve the poor in areas reached by the community hospitals

17  was accomplished by restructuring Dignity's corporate governance model as follows:



28  Vespremi Decl., Ex. G at 9.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

**B.      The Plan And Retirement Plans Sub-Committee.**

The Plan is a non-contributory defined benefit pension plan sponsored by Dignity.  Comp. ¶¶ 53, 58.  By its express terms, the Plan is "intended to be, and has been since its establishment, a Church Plan within the meaning of Section 414(e) of the [Internal Revenue] Code and Section 3(33) of ERISA."  McTernan Decl., Ex. G at 1.[19]  The Retirement Plans Sub-Committee serves as the plan administrator of the Plan.  *Id.* § 11.08; Comp. ¶¶ 21, 63.  In its administration of the Plan, the Sub-Committee must be "mindful of [Dignity's] Judeo-Christian Philosophy and Mission and the teachings and tenets of the Roman Catholic Church …."  McTernan Decl., Ex. G § 11.07.

**C.      The Pension Plan's Favorable IRS Private Letter Rulings.**

CHW received four PLRs from the IRS confirming that the Plan qualifies as a church plan despite its acquisitions of community hospitals.  IRS PLRs 9409042, 9525061, 9717039, 200023057 (Appx. at A338–56).  CHW sought the first ruling in 1993.  IRS PLR 9409042 (Appx. at A338–43).  The IRS determined that CHW employs "church employees" as demonstrated by CHW's commitment "to involvement in health care as an extension of the Church's healing ministry," and its "long history of involvement in caring for the sick with a special concern for the health needs of the sick poor."  *Id.*  The IRS also found the committee charged with administering the Plan associated with the Catholic Church and had the primary purpose of administering the Plan within the meaning of Section 414(e)(3)(A).[20]  *Id.*  The IRS concluded that the Plan has been a church plan since its establishment.  *Id.*

Later, in 1995, 1997, and 2000 as a result of mergers with hospitals that maintained ERISA-governed pension plans, CHW sought and received PLRs from the IRS concluding that the acquired hospitals' pension plans were church plans so their merger with the Plan did not affect the Plan's church plan status.  IRS PLRs 9525061, 9717039, 200023057 (Appx. at A344–56).  In September 2012, Dignity submitted another PLR request for a ruling that the Plan continues to qualify as a church plan after CHW/Dignity's restructuring; that request is pending.  McTernan Decl. ¶ 4.

---

[19] Dignity requests that the Court consider the Plan document under the incorporation by reference doctrine.

[20] 26 U.S.C. § 414(e)(3)(A) is identical to ERISA's codified provision 29 U.S.C. § 1002(33)(C)(i).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9                                                    MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

IV.    **LEGAL STANDARD**

The Court should dismiss under Rule 12(b)(6) because plaintiff has failed to allege a plausible claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In fact, she admits that her legal claims are contrary to all settled law. Comp. ¶¶ 31, 32, 34–36.  The legal conclusions plaintiff offers that are couched as factual allegations should also not be accepted by the Court.  *Twombly*, 550 U.S. at 555 (internal citation omitted); *Sams v. Yahoo!, Inc.*, 713 F.3d 1175, 1181 (9th Cir. 2013).

When ruling on a Rule 12(b)(6) motion, a court may consider the complaint and documents incorporated into the complaint by reference.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  In addition, a court may consider facts for which judicial notice is appropriate.[21]  *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).  When there is a conflict between the allegations in a complaint and the contents of documents incorporated into or referenced in the complaint or matters properly subject to judicial notice, the court may disregard the allegations.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended by* 275 F.3d 1187 (9th Cir. 2001).

Alternatively, the Court should dismiss Counts I–VII under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if it concludes the Plan is a church plan exempt from ERISA.  ERISA § 4(b)(2), 29 U.S.C. § 1003(b)(2).[22]

[21] Should the Court decide to convert Dignity's Rule 12(b)(6) motion to a motion for summary judgment under Rule 56 for the purpose of considering materials outside of the pleadings or not judicially noticeable, Dignity requests that it be given the opportunity to present all relevant material to the motion under Rule 12(d).

[22] In *Delaye v. Agripac, Inc.*, 39 F.3d 235, 238 (9th Cir. 1994), the Ninth Circuit described the existence of an ERISA plan as a jurisdictional issue, similar to the findings of other circuits.  *See Tinoco v. Marine Chartering Co.*, 311 F.3d 617, 623 (5th Cir. 2002); *UIU Severance Pay Trust Fund v. Local Union No. 18–U*, 998 F.2d 509, 510 & n.2 (7th Cir. 1993); *Kulinski v. Medtronic Bio–Medicus*, 21 F.3d 254, 256 (8th Cir. 1994).  *But see Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 978-79 (9th Cir. 2012) (holding that so long as a plaintiff had a colorable claim that he was an ERISA plan participant, participant status was a substantive element of his claim, not a jurisdictional prerequisite) and *Daft v. Advest, Inc.*, 658 F.3d 583, 587 (6th Cir. 2011) (stating that the Supreme Court's decision in *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006)—which held that Title VII's numerosity requirement to establish employer status was not jurisdictional, but a substantive element—"abrogated the conclusion, assumed in our previous cases and explicitly adopted in the majority of our sister circuits, that the existence of an ERISA plan is a prerequisite to federal subject-matter jurisdiction").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10                        MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

1    **V.**      **ARGUMENT**

2         **A.**      **Counts I–VII Fail As A Matter Of Law Because The Plan Is A Church Plan.**

3              Whether the Plan is a church plan as defined by ERISA is dispositive of Claims I–VII,

4    which allege ERISA violations.   *Thorkelson v. Publ'g House of the Evangelical Lutheran Church*

5    *in Am.*, 764 F. Supp. 2d 1119, 1124 (D. Minn. 2011) ("Whether or not the Plan is a 'church plan'

6    as defined by ERISA is dispositive with respect to the claims asserted thereunder, as ERISA's

7    provisions do not apply to such plans").

8                   **1.**      **ERISA's Church Plan Exemption Applies To Plans Established Or**
                              **Sponsored By Non-Church Entities.**

9

10             ERISA's church plan exemption grew out of Congress' concern that imposition of

11   ERISA's requirements on church plans, coupled with the governmental monitoring ERISA

12   entails, might create unwarranted intrusions into "the confidential relationship that is believed to

13   be appropriate with regard to churches and their religious activities."  S. Rep. No. 93-383, 93rd

14   Cong., 1st Sess. 81 (1973).  When initially adopted in 1974, the church plan exemption only

15   covered plans established and maintained by churches.  ERISA § 3(33), 29 U.S.C. § 1002(33)(C)

16   (1974).  Amendments in 1980 broadened the church plan definition to include plans established

17   and maintained by non-profit entities "controlled by" or "associated with" a church through the

18   addition of Section 1002(33)(C)(ii)(II)'s definition of "employee."  Public Law 96-364 § 407.

19   ERISA's current definition of a "church plan" provides in relevant part:

20        (A)    The term "church plan" means a plan established and maintained (to the
                extent required in clause (ii) of subparagraph (B)) for its employees (or their

21              beneficiaries) by a church or by a convention or association of churches
                *which is exempt from tax under section 501 of Title 26.*

22                                      *            *            *

23        (C)    For purposes of this paragraph—

24              (i)      A plan established and maintained for its employees (or their
                beneficiaries) by a church or by a convention or association of churches

25              *includes a plan maintained by an organization,* whether a civil law
                corporation or otherwise, *the principal purpose or function of which is the*

26              *administration or funding of a plan or program for the provision of*
                *retirement benefits* or welfare benefits, or both, for the employees of a

27              church or a convention or association of churches, if such organization is
                controlled by or associated with a church or a convention or association of

28              churches.

BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                                                11                    MEM. OF POINTS & AUTHS.
                                                                      Case No. 13-C-1450 TEH

(ii)     *The term employee of a church or a convention or association of churches includes—*

    \*   \*   \*

  (II) *an employee of an organization,* whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and *which is controlled by or associated with a church* or a convention or association of churches;

    \*   \*   \*

(iii)     A church or a convention or association of churches which is exempt from tax under section 501 of Title 26 shall be deemed the employer of any individual included as an employee under clause (ii).

(iv)     *An organization*, whether a civil law corporation or otherwise, *is associated with a church* or a convention or association of churches *if it shares common religious bonds and convictions with that church* or convention or associations of churches.

29 U.S.C. § 1002(33) (emphasis added).  By the plain language of the statute, an organization may establish and maintain a church plan if it (1) has tax exempt status under 26 U.S.C. § 501, and (2) is associated with a church by "shar[ing] common religious bonds and convictions."

  Plaintiff, however, claims that an entity other than a church cannot establish or sponsor a church plan.  Comp. ¶¶ 70, 71.  Plaintiff's interpretation has been held wrong by every court to consider the issue, as well as by the IRS and DOL.

    **2.**  **The Plan Is A Church Plan Under ERISA Because Dignity Is A Tax-Exempt Entity Associated With The Roman Catholic Church.**

  To qualify as a church plan, the Plan must be (i) sponsored by a Section 501 tax-exempt organization that (ii) is controlled by or associated with a church.  29 U.S.C. § 1002(33)(A); *see also Thorkelson*, 764 F. Supp. 2d at 1127.  In *Thorkelson*, Chief Judge Michael Davis of the District of Minnesota dismissed with prejudice the exact statutory construction claim plaintiff makes here.[23]  *Id.*, 764 F. Supp. 2d at 1119.  The *Thorkelson* plaintiffs alleged that because the plan sponsor, Augsburg Fortress Publishers ("AFP"), was not a church but a publisher, its defined benefit plan failed to meet ERISA's church plan definition.  *Id.* at 1125.  AFP argued that Section

---

[23] Keller Rohrback also represented the plaintiffs in *Thorkelson*.  *Thorkelson v. Publ'g House of the Evangelical Lutheran Church in Am.*, No. 10-cv-1712, (D. Minn. Nov. 23, 2010), Dkt. No. 2.  And Cohen Milstein sought to file an amicus brief in *Thorkelson* on behalf of the Pension Rights Center, an advocacy group that in recent years has launched a campaign against the application of ERISA's church plan exemption to retirement plans sponsored or established by a non-church entity.  *Id.*, Dkt. No. 29.

1    1002(33)(C) makes clear that plans established by tax-exempt organizations that are "controlled

2    by or associated with a church" are church plans, and the court agreed.  *Id.*

3          The *Thorkelson* court looked to the plain language of the statute, case law, and agency

4    determinations to reach its conclusion.  Chief Judge Davis first found support for AFP's position

5    through the statutory text:  "the statute's plain language does not support [p]laintiffs'

6    interpretation" that only a church can establish a church plan.  *Id.* at 1128–29.  Next, the court

7    looked to case law and agency determinations and found that they too support "that the analysis

8    should focus on whether the Plan is sponsored by a tax-exempt entity, and whether such entity is

9    controlled by or associated with a church."  *Id.* at 1127; *see also Rinehart v. Life Ins. Co. of N.*

10    *Am.*, No. C08-5486, 2009 WL 995715, at *3 (W.D. Wash. Apr. 14, 2009) (Section

11    1002(33)(C)(iii)'s definition of employee brings "a plan established or maintained by a non-

12    church organization within the general definition of a 'church plan' if that organization is

13    '*controlled by*' or '*associated with*' a church"); *Catholic Charities of Maine, Inc. v. Portland*, 304

14    F. Supp. 2d 77, 85–86 (D. Me. 2004) (finding that a plan established and maintained by a non-

15    church organization was a church plan).[24]  This analysis applies with equal force here.

16               a.      **Dignity Is A Section 501(c)(3) Non-Profit Corporation.**

17          Dignity is a tax-exempt, non-profit corporation under 26 U.S.C. § 501.  Comp. ¶ 19.

18               b.      **Dignity Is Associated With The Roman Catholic Church.**

19          An organization is "associated with" a church or convention or association of churches "if

20    it shares common religious bonds and convictions with that church or convention or association

21    of churches."  29 U.S.C. § 1002(33)(C)(iv).  Courts take a fact-based approach in assessing

22    whether an entity is associated with a church.[25]  Courts consider factors such as whether the IRS

---

23    [24] *See also, e.g.*, DOL Advisory Opinion 90-12A (finding that a hospital sanatorium qualified for

24    church plan exemption because the Sisters of Mercy founded it in furtherance of the Church's
healing mission and it adheres to the Church's tenets and teachings) (Appx. at A324–27); IRS Gen.

25    Coun. Mem. 39,007 (July 1, 1983) (finding that a retirement plan established by a religious order
that operates nursing homes and hospitals is a church plan) (Appx. at A328–32).  Although agency
interpretations are not binding, they do carry weight.  *Shaev v. Saper*, 320 F.3d 373, 381 n.5 (3d

26    Cir. 2003) (observing that although not precedential, IRS private letter rulings may be deemed
instructive); *Williams v. Wright*, 927 F.2d 1540, 1545 (11th Cir. 1991) ("[T]he views of the agency

27    entrusted with interpreting and enforcing the ERISA statute carry considerable weight").

28    [25] The IRS also employs a facts and circumstances methodology to determine if an organization
meets this prong of the church plan definition.  *See, e.g.*, IRS PLR 200025061 (finding a tax exempt

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

or DOL has determined if the entity at issue is associated with a church, the involvement of a church or related religious order in the entity's governance, and the extent to which the entity promotes a church's tenets or teachings.[26] *E.g.*, *Rinehart*, 2009 WL 995715, at *4 (finding that a hospital was controlled by and associated with the Catholic Church because its bylaws stated that medical staff must adhere to the ERDs as a condition of employment, and the sponsoring order had the exclusive right to appoint and remove individuals from the board); *Okerman v. Life Ins. of N. Am.*, No CIV-S-00-0186, 2001 WL 36203082, at *4 (E.D. Cal. Dec. 24, 2001) (determining that a CHW (Dignity) hospital was associated with the Catholic Church because a religious order sponsored the hospital; the hospital operated in a manner consistent with the church's religious bonds and convictions, members of the religious order sat on the hospital's board of directors, and the hospital was listed in the Official Catholic Directory).[27]

---

university "associated with" a church because most members of its board of trustees belonged to the church, it was founded by a congregation to further an education mission, and the Official Catholic Directory listed it) (Appx. at A344–48); IRS PLR 200514025 (finding a direct care developmental disability services provider "associated with" a church because, among others, certain provisions of its bylaws cannot be amended without consent of the church) (Appx. at A333–37).

[26] The only two court of appeals decisions to consider the church plan exemption are not on point, or by negative implication support Dignity's position. *Lown v. Cont'l Cas. Co.*, 238 F.3d 543, 546-48 (4th Cir. 2001) (rejecting *plaintiffs'* claim that a disability plan was a church plan because Baptist Health Association removed itself as an agency of the South Carolina Baptist Convention years earlier, and Baptist Health and its insurer "used their best efforts [to avail themselves of ERISA's statutory option] to comply with all substantive requirements of ERISA…[and] filed all required forms to maintain its status as an ERISA plan…[and] participants …were specifically advised that the plan was subject to ERISA…[in a] benefits booklet…under a section entitled 'Your Rights Under ERISA'"; distinguishing retirement plan that was a church plan); *Chronister v. Baptist Health*, 442 F.3d 648, 652-54 (8th Cir. 2006) (also rejecting *plaintiff's* church plan status claim for disability plan; construing *Lown* as holding that there were no "common religious bonds and convictions between [Baptist Health and South Carolina Baptist Convention]"; "Arkansas Baptist State Convention has played no role in the governance of Baptist Health for nearly forty years"; plaintiff "points to no factor indicating that Baptist Health consulted with the [Arkansas Baptist State Convention] on any matter"… "Baptist churches are not hierarchically governed … Management employees are instructed to be guided by Christian principles, not specific doctrines of a Baptist church").

[27] *See also Hall v. USAble Life*, 774 F. Supp. 2d 953, 960-61 (E.D. Ark. 2011) (ruling that a medical center was associated with the Catholic Church because a religious order established it to promote religion and for nursing the sick; it adhered to the ERDs; the director of pastoral care was Catholic; priests provided sacraments; and the religious order governed the sole member of the medical center); *Friend v. Ancilla Sys. Inc.*, 68 F. Supp. 2d 969, 972 (N.D. Ill. 1999) (finding that a hospital was controlled by and associated with a church because it furthered the goals of the founding religious order, the Official Catholic Directory listed the hospital and religious order, and members of the religious order sat on the hospital's board of directors).

14                    MEM. OF POINTS & AUTHS.
                     Case No. 13-C-1450 TEH

1       For example, in *Catholic Charities of Maine, Inc.*, the court found that Catholic Charities

2   was "associated with" the Catholic Church because Catholic Charities' governing documents

3   stated that it provides services "based on Roman Catholic religious teaching that calls on

4   Catholics to serve those in need" and considers "its work a vital part of the ministry of the Roman

5   Catholic Church…." *Id.*, 304 F. Supp. 2d at 85.  As here, Catholic Charities did not require that

6   either its employees or the people it helped be Catholic.  *Id.*; *see also*, *Hernandez v. Comm'r*, 490

7   U.S. 680, 699 (1989) ("[I]t is not within the judicial ken to question the centrality of particular

8   beliefs or practices to a faith, or the validity of particular litigants' interpretations of those

9   creeds."); *Ward v. Unum Life Ins. Co. of Am.*, No. 09-C-431, 2010 WL 4337821, at *2 (E.D.

10  Wisc. Oct. 25, 2010) ("[I]t is difficult to imagine a health provider that would discriminate

11  against non-Catholic patients and hire only Catholic doctors, nurses and other staff.  In fact the

12  statutory test does not ask about the employees and patients or customers but about the

13  organization itself….").

14      Dignity unquestionably shares common religious bonds and convictions with the Roman

15  Catholic Church and thus is associated with the Church within the meaning of Section

16  1002(33)(C)(iv) for a host of reasons, including:

17  • Dignity's Mission is to perform a healing ministry based on the life and works of Jesus.
      Vespremi Decl., Exs. G, J.  This Mission applies to all of Dignity's facilities and operations
18    and did not change in the restructuring.  McTernan Decl., Ex. I § 3.2; *compare* Vespremi
      Decl., Ex. G at 2 *with* Ex. M at 2.

19  • The Sponsoring Congregations represented on the Sponsorship Council and on the Mission
      Integrity Committee (through three elected representatives) are Roman Catholic religious
20    institutes of pontifical right in communion with the Church. Vespremi Decl., Ex. N.

21  • "To strengthen the Catholic health ministry," Dignity maintains a dialogue with local bishops
      and church leaders "on matters that will have a significant impact on the ministry" and is
22    "guided by the social teachings of the Catholic Church, the [ERDs] . . . and the Dignity
      Statement of Common Values."  McTernan Decl., Ex. A at 2–4, 7.
23

24  • The Standards for Mission Integration embrace the principles addressed by the ERDs,
      including the furtherance of the healing ministry, pastoral and spiritual care, caring for the
25    seriously ill and dying, partnerships, and strategic decisions, and apply equally to the
      community and Catholic-sponsored hospitals.  *Id.*; Vespremi Decl., Ex. E.

26  • Dignity's Bylaws command the organization's healing ministry within the tradition of the
      Catholic faith, including requiring all healthcare facilities to follow the Statement of Common
27    Values and/or ERDs.  McTernan Decl., Ex. I §§ 3.1–3.3.

28  • To lead consistent with Catholic teaching, executive leadership for Dignity at the system level
      and in both Catholic and non-Catholic facilities participates in three years of ministry

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

leadership education provided by the Ministry Leadership Center of Sacramento on foundational dimensions of Catholic healthcare.  Vespremi Decl., Ex. G at 12–15; *see also* http://www.ministryleadership.net.

- The terms of the Statement of Common Values are defined in a manner consistent with Catholic moral teachings.  McTernan Decl., Ex. I § 16.4.

- The Mission Integrity Committee, three of seven members of which are appointed by the Sponsorship Council, monitors Dignity's compliance with its Mission, the Catholic healing ministry, and the Statement of Common Values.  *Id.*, Ex. D.

- One of the three members of the Mission Integrity Committee who are appointed by the Sponsorship Council must be a member of the Retirement Plans Sub-Committee so that the Mission Integrity Committee can assure that the Sub-Committee administers the Plan "with the teachings and tenets of the Roman Catholic Church and understanding of the Sponsors in mind."  *Id.*, at 1–2.

- The Mission Integrity Committee members appointed by the Sponsorship Council must approve the appointment of Retirement Plans Sub-Committee members.  *Id.*

- The Sponsorship Council must approve any substantive changes to the Statement of Common Values and application of the ERDs.  *Id.*, E at 4.

- Two women religious from the Sponsoring Congregations must sit on Dignity's Board of Directors.  *Id.* § 7.2; Comp. ¶ 45.

- One woman religious from the Sponsoring Congregations must be a member of the Board's Executive Committee.  McTernan Decl., Ex. I § 10.2(a).

- The Official Catholic Directory lists the Sponsoring Congregations, and 23 of 24 of the Catholic-sponsored hospitals, which are dbas of Dignity.[28]  Vespremi Decl., Ex. N.

- The Sponsoring Congregations must approve the sale or encumbrance of Catholic-sponsored hospitals as stable patrimony.[29]  McTernan Decl., Ex. I (Governance Matrix).

- Should Dignity dissolve, all Catholic-sponsored hospital property must be returned to the Sponsoring Congregations.  *Id.*

- Each corporate officer and vice president has a duty to support Dignity's healing ministry.  *Id.*, Ex. I § 8.10.

- Seventy-five Catholic men and women religious continue to be approved by their Orders to provide services to Dignity to help it fulfill its healing mission.  McTernan Decl. ¶ 3.

- Work gatherings and meetings are expected to begin with a prayer/inspirational reflection to help Dignity employees connect with the deeper purpose of their work.  *Id.*, Ex. A at 3.

- Dignity's employees are educated about the social teachings of the Catholic Church, the ERDs, and/or the Statement of Common Values.  *Id.* at 4.

[28] The Official Catholic Directory is a directory of the Church published by P.J. Kenedy & Sons, the publisher of the Holy Apostolic See, the episcopal jurisdiction of the Church in Rome.

[29] Stable patrimony is "that which is destined for the long-term security of the members (in the case of a religious institute) and of the sponsored works. … [S]table patrimony consists of lands and buildings," and certain other types of property.  Frank Morrisey, *What Is Stable Patrimony*, HEALTH PROGRESS, Mar.–Apr. 2008, p. 14 (Appx. at A374–75).

- Dignity's hospitals have ethics committees whose role is to educate, develop policy, and support medical decision making within the framework of the ERDs and/or Statement of Common Values.  McTernan Decl. ¶ 2.

These key features of Dignity's governance and operations establish its common religious bonds and convictions with the Roman Catholic Church.

Moreover, contrary to plaintiff's allegations that Dignity's community hospitals detract from its association with the Catholic Church, Dignity partners with these hospitals to extend the Sponsoring Congregations' healing mission to even greater numbers of the poor and disenfranchised.  All community hospitals must abide by the Statement of Common Values, which are substantially similar to the ERDs.  Vespremi Decl., Ex. G at 24–25.  And, of the $1.6 billion in charitable community benefits and care for the poor provided by Dignity last fiscal year alone, it provided more than $600 million through the community hospitals.  *Id.*, Exs. G, K, L. Further, to the extent Dignity uses community hospitals to accomplish its religious mission, or that one of its Catholic hospitals is not in the Official Catholic Directory, the Court should not weigh in on the internal affairs of the Church.  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 701–09 (2012); *see also infra*, Section V.B. (discussing prohibition on government entanglement in religion).  In sum, because Dignity is associated with the Catholic Church based on its shared common values and bonds, Dignity's employees are deemed church employees under Section 1002(33)(C)(ii)(II).  The Plan qualifies as a church plan exempt from ERISA, and Counts I–VII fail as a matter of law.

**3.      The Plan Also Qualifies As A Church Plan Because It Is Maintained By A Non-Church Entity Associated With Or Controlled By A Church With The Principal Purpose Of Administering A Retirement Plan.**

A plan also meets the definition of a church plan if a non-church entity associated with or controlled by a church that has the principal purpose or function of administering a retirement plan maintains the plan.  29 U.S.C. § 1002(33)(C)(i).  The complaint acknowledges that plans administered by a church pension board are church plans; the statute does not require that the plan administrator be an incorporated entity, instead requiring that the administrator be "a civil law corporation *or otherwise*."  *Id.* (emphasis added).  In addition, despite plaintiff's claims to the contrary (Comp. ¶¶ 32–34), every court to consider the issue and the DOL have found that

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

1    Section 1002(33)(C)(i) applies to a plan established by a non-church organization.  *E.g.*, *Welsh v.*

2    *Ascension Health*, Case No. 3:08cv348/MCR/EMT, 2009 U.S. Dist. LEXIS 45947, at *19 (N.D.

3    Fla. 2009); *Rinehart*, 2009 U.S. Dist. LEXIS 32864, at *9; *Catholic Charities of Maine, Inc.*, 304

4    F. Supp. 2d at 86 n.4.[30]

5            Here, the Plan also qualifies as a church plan because the Sub-Committee administers the

6    Plan and its principal purpose or function is to do so.  Comp. ¶ 21; McTernan Decl., Ex. G

7    §§ 11.06–11.08.  The Sub-Committee is controlled by or associated with the Catholic Church

8    because the members of the Mission Integrity Committee appointed by the Sponsorship Council

9    must approve each member of the Sub-Committee and one member of the Sub-Committee must

10   be a member of the Mission Integrity Committee itself.  McTernan Decl., Ex. H.  The Plan

11   requires the Sub-Committee to be "mindful of [Dignity's] Judeo-Christian Philosophy and

12   Mission and the teachings and tenets of the Roman Catholic Church" in administering the Plan.

13   *Id.*, Ex. G § 11.07.  The Mission Integrity Committee receives reports on the Sub-Committee's

14   activities to ensure conformance to Dignity's values and mission.  *Id.*, Ex. I § 10.3(f)(4)(iii).

15   Based on these features, the Committee is at least associated with, if not controlled by, the

16   Church.

17           **B.        Count VIII Fails As A Matter Of Law Because ERISA's Church Plan**
                        **Exemption Does Not Violate The Establishment Clause.**

18

19           In the alternative, plaintiff asserts that even if Dignity comes within ERISA's church plan

20   exemption (which it does), applying the exemption to Dignity "violates the Establishment Clause

21   because it harms Dignity workers, puts Dignity competitors at an economic disadvantage, and

22   relieves Dignity of no genuine religious burden created by ERISA."  Comp. ¶ 163.  Plaintiff's

23   allegations are patently insufficient to state an Establishment Clause claim as a matter of law.

24

25   _____
     [30] In addition to the court decisions finding Section 1002(33)(C)(i) as an alternative means of
26   meeting the church plan definition, the DOL has issued at least 38 Advisory Opinions finding the
     same. *See, e.g.*, DOL Advisory Opinions 96-19A, 95-30A, 95-13A, 95-12A, 95-10A, 95-09A, 95-
27   08A, 95-07A, 95-02A, 94-36A, 94-34A, 94-18A, 94-16A, 94-15A, 94-13A, 94-12A, 94-11A, 94-
     10A, 94-09A, 94-08A, 94-06A, 94-05A, 94-04A, 93-08A, 93-07A, 93-03A, 93-01A, 92-09A, 91-
28   46A, 91-41A, 91-22A, 91-14A, 91-13A, 91-12A, 91-11A, 91-10A, 90-13A, 90-12A (Appx. at
     A39–327).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18                                              MEM. OF POINTS & AUTHS.
                                                  Case No. 13-C-1450 TEH

1    In the nearly 40 years since Congress passed ERISA's church plan exemption, no court

2    has even suggested—much less held—that the exemption, which was passed to avoid entangling

3    the federal government in religious matters, violates the Establishment Clause.  That is not

4    surprising, given that the Supreme Court has long held that avoiding excessive entanglement in

5    religion is not only permitted, but also required, under certain circumstances.  *See*, *e.g.*, *Corp. of*

6    *Presiding Bishop v. Amos*, 483 U.S. 327, 334 (1987).  Just last year, the Supreme Court

7    unanimously re-affirmed that avoiding entanglement with religious organizations is paramount

8    even where legislative and judicial efforts to avoid it may negatively impact nonadherents.

9    *Hosanna-Tabor Evangelical Lutheran Church & Sch.*, 132 S. Ct. at 701–09.[31]

10    Perhaps recognizing the futility of bringing a facial challenge to the exemption, plaintiff

11    styles her claim as an "as applied" challenge.  But that does not help plaintiff, because her

12    conclusory allegations cannot state an as-applied Establishment Clause claim under the governing

13    authorities.  Applying the exemption to Dignity satisfies each factor of the three-prong test first

14    applied by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), for analyzing

15    Establishment Clause challenges like this one.  Plaintiff thus cannot plead any facts to support a

16    plausible claim to the relief she seeks—a declaration that the exemption, as applied to Dignity,

17    violates the Establishment Clause.

18    **1.    The Exemption Satisfies The *Lemon* Test.**

19    The Supreme Court has long recognized that government may, and on occasion must,

20    accommodate religious practices without violating the Establishment Clause.  *Amos*, 483 U.S. at

21    _____

22    [31] The Supreme Court has repeatedly held that efforts to avoid government entanglement with
religion or interfering with the free exercise of religion protected by the First Amendment do not
violate the Establishment Clause.  *See*, *e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch.*

23    *v. EEOC*, 132 S. Ct. 694 (2012) (applying the judicially created "ministerial exception" to bar
plaintiff, a former schoolteacher in a religious school, from suing her former employer); *Cutter v.*

24    *Wilkinson*, 544 U.S. 709 (2005) (upholding Religious Land Use and Institutionalized Persons Act
that limited government's ability to interfere with prisoners' rights to practice their religion); *Corp.*

25    *of Presiding Bishop v. Amos,* 483 U.S. 327 (1987) (upholding statutory exemption to Title VII's
prohibition of religious discrimination); *St. Martin Evangelical Lutheran Church v. South Dakota*,

26    451 U.S. 772 (1981) (construing the Federal Unemployment Tax Act to exempt church-operated
schools from liability for payment of state unemployment taxes); *NLRB v. Catholic Bishop*, 440

27    U.S. 490, 507 (1979) (interpreting National Labor Relations Act to exclude coverage of teachers in
church-operated schools); *Walz v. Tax Commission*, 397 U.S. 664, 667 (1970) (upholding state

28    property tax exemption for nonprofit entities including churches).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19                                    MEM. OF POINTS & AUTHS.
                                     Case No. 13-C-1450 TEH

334.  In evaluating whether a particular accommodation violates the Establishment Clause, courts apply the three-factor test first announced in *Lemon*, 403 U.S. at 612.  *See Amos*, 483 U.S. at 335–37; *see also Access Fund v. U.S. Dep't of Agric.*, 499 F.3d 1036, 1042 (9th Cir. 2007) ("The *Lemon* test remains the benchmark to gauge whether a particular government activity violates the Establishment Clause").  To satisfy the *Lemon* test, (1) the statute must have a secular legislative purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) the statute must not foster excessive government entanglement with religion.  *Lemon*, 403 U.S. at 612.  Applying the *Lemon* test here confirms that Congress' efforts to avoid entanglement through the exemption fully comport with the Establishment Clause.

### a.        The Exemption Has A Secular Legislative Purpose.

The first *Lemon* factor—a secular legislative purpose—does not mean that the law's purpose must be unrelated to religion; rather this factor only prevents Congress from "acting with the intent of promoting a particular point of view in religious matters."  *Amos*, 483 U.S. at 335; *see also Mayweathers v. Newland*, 314 F.3d 1062, 1068 (9th Cir. 2002) ("Just because [a statute] addresses religion does not mean that its purpose is religious in nature").  That factor is easily satisfied here, because it cannot seriously be disputed that Congress had a legitimate secular purpose in enacting the exemption to prevent excessive government entanglement in religion.

That conclusion is required by the Supreme Court's decision in *Amos*.  There, the Supreme Court considered a statutory exemption under Section 702 of the Civil Rights Act of 1964 that exempted religious organizations from Title VII's prohibition against employment discrimination on the basis of religion.  *Amos*, 483 U.S. at 329.  The plaintiff was a building engineer terminated for religious reasons from his job at a public gymnasium owned and operated by the Mormon Church.  *Id.*  The plaintiff argued that Section 702 violated the Establishment Clause if interpreted to allow religious employers to discriminate on religious grounds in hiring for nonreligious positions.  *Id.* at 331.  In concluding that Section 702 satisfied the first prong of the *Lemon* test, the Supreme Court stated that "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions."  *Id.* at 335; *see also McKeon v. Mercy Healthcare Sacramento*,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

1    19 Cal. 4th 321, 325 (1998), *superseded by statute on other grounds as recognized by Silo v.*

2    *CHW Medical Foundation*, 27 Cal. 4th 1097, 1109 (2002) (finding a Dignity hospital exempt

3    from California's Fair Employment and Housing Act as a religious employer).

4           Here, Congress acted with an identical legislative purpose in exempting church plans from

5    federal regulation under ERISA.  Specifically, Congress recognized the serious potential for

6    impermissible interference with religious matters by subjecting church plans to ERISA:

7                   In 1974, when we enacted [ERISA], we exempted church plans from the
                    provisions of the act to avoid excessive Government entanglement with
8                   religion in violation of the first amendment to the Constitution.

9    124 Cong. Rec. H12106 (1978) (statement of Rep. Conable).  Congress enacted the exemption to

10   avoid entangling the government in the religious affairs of churches, religious organizations, and

11   their agencies.  For example, due to the exemption, Dignity may devote resources (in 2012, $1.6

12   billion) to its religious mission of providing medical care to the poor and underprivileged.

13   Presumably, plaintiff would prefer that Dignity not allocate a full $1.6 billion to serve the poor,

14   but would prefer additional contributions into the Plan funding her benefits.  However, balancing

15   these important concerns is a religious calculation that plaintiff and ERISA cannot impair.

16          Plaintiff pleads no facts or allegations to support a conclusion that Congress, in exempting

17   church plans from ERISA, was "acting with the intent of promoting a particular point of view in

18   religious matters." *Amos*, 483 U.S. at 335.  Congress sought only to prevent the significant

19   governmental interference with religious affairs that could occur if ERISA governed such plans.

20                         **b.      The Principal Or Primary Effect Of The Exemption Neither**
                                    **Advances Nor Inhibits Religion.**
21

22          *Lemon*'s "primary effect" factor test asks whether the government itself has advanced

23   religion through its own activities or influence.  *Amos*, 483 U.S. at 337.  "A law is not

24   unconstitutional simply because it allows churches to advance religion, which is their very

25   purpose." *Id.*  Even when the law singles out religious entities, that does not invalidate the law

26   where, as here, the point of doing so is to prevent entanglement with religion.  *See id.* at 338; *see*

27   *also Mayweathers*, 314 F.3d at 1069.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21                                        MEM. OF POINTS & AUTHS.
                                          Case No. 13-C-1450 TEH

1    Plaintiff pleads no facts or allegations that the primary effect of the exemption, as applied

2   to Dignity, impermissibly advances or inhibits religion.  Any such allegation would contradict

3   plaintiff's own allegation that the exemption "relieves Dignity of no genuine religious burden," to

4   the extent plaintiff is asserting that Dignity has no "genuine" religious mission, i.e., that it is not

5   religious "enough."  *See* Comp. ¶ 163(C).  The second *Lemon* prong is thus satisfied as a matter

6   of law because the primary effect of applying the exemption to Dignity is neither to advance nor

7   inhibit religion.  It simply relieves Dignity of regulation that could otherwise burden the exercise

8   of religion.  *See, e.g., Pieszak v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d 970, 997 (C.D.

9   Cal. 2000) (rejecting Establishment Clause challenge to religious organizations exemption in the

10   California Fair Employment and Housing Act and noting that "just because a religious

11   organization is involved in providing healthcare does not mean that it is engaged in non-religious

12   activity" (citation omitted)); Vespremi Decl., Ex. K at 4.

13    Analogous concerns led Congress to exclude from ERISA regulation the pension plans of

14   state and local governments as well—partly out of concern that federal regulation of such plans

15   might interfere with state and local sovereignty.  *See* 119 Cong. Rec. 7421 (March 13, 1973).

16   Similarly, Congress enacted the church plan exemption out of concern that federal regulation

17   would interfere with the autonomy of religious organizations (and thereby offend the Free

18   Exercise Clause).

19    Contrary to plaintiff's claim, where (as here) "government acts with the proper purpose of

20   lifting a regulation that burdens the exercise of religion, [there is] no reason to require that the

21   exemption come[ ] packaged with benefits to secular entities."  *Amos*, 483 U.S. at 338.  The

22   ERISA exemption for state and local governments simply confirms that the church plan

23   exemption does not have the primary effect of advancing or inhibiting religion.  *See Mueller v.*

24   *Allen*, 463 U.S. 388, 397 (1983).

25             **c.    The Exemption Avoids Excessive Government Entanglement**
                     **With Religion.**

26    In analyzing the third *Lemon* prong—"whether the government entanglement with

27   religion is excessive"—courts "examine the character and purposes of the institutions that are

28   benefitted, the nature of the aid that the State provides, and the resulting relationship between the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22                          MEM. OF POINTS & AUTHS.
                          Case No. 13-C-1450 TEH

1   government and the religious authority." *Lemon*, 403 U.S. 614–15.  In assessing entanglement,

2   "the questions are whether the involvement is excessive, and whether it is a continuing one

3   calling for official and continuing surveillance leading to an impermissible degree of

4   entanglement." *Walz*, 397 U.S. at 675.  The exemption here actually *minimizes* government

5   involvement in religious matters—and thus satisfies the third *Lemon* prong.

6          The complaint contains no allegation that the exemption, as applied to Dignity, creates

7   excessive entanglement with religion.  Nor could it.  Similar to the tax exemption upheld in *Walz*,

8   it has the opposite effect of *minimizing* government involvement.  As was the case in *Walz*, the

9   exemption here "restricts the fiscal relationship between church and state, and tends to

10  complement and reinforce the desired separation insulating each from the other."  *Id.* at 676.  The

11  third *Lemon* prong is thus satisfied, too—and plaintiff's Establishment Clause claim must fail.

12              **2.      Plaintiff's Allegations Are Irrelevant To Establishment Clause**
                **Concerns.**

13

14         The complaint alleges that the ERISA church plan exemption, as applied to Dignity,

15  violates the Establishment Clause of the First Amendment because it: (1) harms Dignity workers,

16  (2) puts Dignity competitors at an economic disadvantage, and (3) relieves Dignity of no

17  "genuine" religious burden created by ERISA.  Comp. ¶ 163.  None of those allegations gives rise

18  to an Establishment Clause claim as a matter of law.

19              **a.      Reasonable Efforts To Avoid Government Entanglement May**
                **Burden Nonadherents.**

20

21         Plaintiff alleges that Dignity's employees, many of whom may not be Catholic, are

22  harmed because their pension plans are not regulated by ERISA.  *See* Comp. ¶ 163(A).  More

23  specifically, plaintiff alleges that "[t]o be constitutional, an accommodation such as the Church

24  Plan exemption must not impose burdens on nonadherents without due consideration of their

25  interests."  *Id.*  Thus, according to plaintiff, the church plan exemption, as applied to Dignity, is a

26  violation of the Establishment Clause because employees, including plaintiff, are harmed by the

27  lack of ERISA protections (though the complaint contains no allegation that plaintiff has not

28  received all benefits to which she is entitled).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

1    Even assuming plaintiff and other employees, as nonadherents, are somehow harmed by

2  applying the exemption to Dignity, that harm is no basis for an Establishment Clause violation.

3  In *Amos*, as here, the plaintiff argued that the statutory exemption at issue violated the

4  Establishment Clause to the extent it allowed his employer to terminate him for religious reasons

5  from his nonreligious position as a building engineer.  *Amos*, 483 U.S. at 331.  The Supreme

6  Court rejected plaintiff's claim—despite the fact that the exemption clearly burdened him as a

7  nonadherent.  *Id.* at 334–40.  Plaintiff's conclusory allegations of harm do not support an

8  Establishment Clause claim.

9               **b.    Plaintiff's "Competitive Harm" Allegations Have Nothing To
                        Do With The Establishment Clause.**
10

11    Plaintiff argues that by exempting Dignity from ERISA regulation, its "competitors" are

12  harmed because they must use "their current assets to fully fund their pension plan obligations

13  and provide the other ERISA protections."  Comp. ¶ 163(B).  Plaintiff attempts to tie that

14  allegation to an Establishment Clause violation by alleging that "[t]he Church Plan exemption, as

15  applied by Dignity, provides no consideration of the disadvantage it creates for Dignity's

16  competitors."  *Id.*  Those allegations do not state a plausible Establishment Clause violation.

17    To the extent plaintiff seeks to invoke *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989),

18  that case has no application here.  There, in a plurality opinion authored by Justice Brennan and

19  joined by Justices Marshall and Stevens, the Supreme Court held that a sales tax exemption for

20  "[p]eriodicals that are published or distributed by a religious faith and that consist wholly of

21  writings promulgating the teaching of the faith and books that consist wholly of writings sacred to

22  a religious faith" violated the Establishment Clause because the exemption was "confined

23  exclusively to publications *advancing* the tenets of a religious faith."  *Texas Monthly*, 489 U.S. at

24  5 (emphasis added).  Unlike the exemption here, the *Texas Monthly* exemption concerned a

25  government subsidy designed to promote religious publications advancing religious beliefs.  The

26  ERISA church plan exemption is not a subsidy and regardless, employers are not required by

27  ERISA to provide benefits at all.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH

1

2

     **c.**    **Plaintiff's Allegations That ERISA Would Impose No "*Genuine Religious Burden*" On Dignity Only Confirms The Need For The Exemption To Avoid Government Entanglement.**

3     Plaintiff pleads that "[t]he Church Plan exemption, as claimed by Dignity, responds to no

4 *genuine* burden created by ERISA on any Dignity religious practice." Comp. ¶ 163(C) (emphasis

5 added). "To be constitutional," plaintiff alleges, "an accommodation such as the Church Plan

6 exemption, which exempts compliance with ERISA, must relieve a genuine burden upon the

7 recipient's *religious practice*." *Id.* (emphasis in original). Plaintiff's allegation is contrary to

8 Supreme Court precedent, disregards the legislative purpose of the church plan exemption, and

9 ignores Dignity's religious mission.

10     The Supreme Court rejected a virtually identical argument in *Amos*. 483 U.S. at 329–40.

11 The Court held that that "it is a significant burden on a religious organization to require it, on pain

12 of substantial liability, to predict which of its activities a secular court will consider religious….

13 [And] [f]ear of potential liability might affect the way an organization carried out what it

14 understood to be its religious mission." *Id.* at 336; *see also Spencer v. World Vision, Inc.*, 633

15 F.3d 723, 730–33 (9th Cir. 2011) (O'Scannlain, J. concurring) (quoting *Amos*, 483 U.S. at 332,

16 336, 343–44). Plaintiff's assertion that the ERISA church plan exemption relieves Dignity of no

17 "genuine" religious burden only emphasizes the danger highlighted by the Supreme Court in

18 *Amos*, as it would require this Court to determine when a religious burden is "genuine" enough.

19 Such entanglement is precisely what Congress sought to avoid in excluding church plans like

20 Dignity's from ERISA regulation in the first place.

21 **VI.**    **CONCLUSION**

22     For the above reasons, the Court should grant defendants' motion to dismiss.

23 Dated: June 17, 2013        MORGAN, LEWIS & BOCKIUS LLP

24

25             By  s/ Nicole A. Diller
             Nicole A. Diller

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

MEM. OF POINTS & AUTHS.
Case No. 13-C-1450 TEH