MANATT, PHELPS & PHILLIPS, LLP
Barry S. Landsberg (SBN 117284)
Harvey L. Rochman (SBN 162751)
Craig S. Rutenberg (SBN 205309)
Colin M. McGrath (SBN 286882)
11355 West Olympic Boulevard
Los Angeles, CA  90064-1614
Telephone:    (310) 312-4000
Facsimile:    (310) 312-4224
blandsberg@manatt.com
hrochman@manatt.com
crutenberg@manatt.com
cmcgrath@manatt.com

David L. Shapiro (*pro hac vice*)
1563 Mass. Ave.
Cambridge, MA 02138
Telephone:    (617) 495-4618
Facsimile:    (617) 495-1950
dshapiro@law.harvard.edu

Attorneys for Defendants

NIXON PEABODY, LLP
Charles M. Dyke (SBN 183900)
One Embarcadero Center, 18th Floor
San Francisco, CA 94111
Telephone:    (415) 984-8315
Facsimile:    (415) 421-2017
cdyke@nixonpeabody.com

TRUCKER HUSS
R. Bradford Huss (SBN 71303)
Sean T. Strauss (SBN 245811)
One Embarcadero Center, 12th Floor
San Francisco, CA 94111
Telephone:    (415) 788-3111
Facsimile:    (415) 421-2017
bhuss@truckerhuss.com
sstrauss@truckerhuss.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

STARLA ROLLINS and PATRICIA WILSON, on behalf of themselves, individually, and on behalf of all others similarly situated, and on behalf of the Dignity Plan

Plaintiff,

v.

DIGNITY HEALTH, a California non-profit corporation, HERBERT J. VALLIER, an individual, DARRYL ROBINSON, an individual, THE DIGNITY HEALTH RETIREMENT PLANS SUBCOMMITTEE, and JOHN AND JANE DOES, each an individual, 1-20,

Defendants.

No.  13-C-1450 JST

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES**

Date:        March 15, 2018
Time:        2:00 p.m.
Courtroom: 9
Judge:       Hon. Jon S. Tigar

Complaint Filed:    April 1, 2013
Trial Date:          None Set

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

MOTION TO DISMISS
CASE NO. 13-C-1450

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................ 1

II.     ISSUES PRESENTED ........................................................................................ 3

III.    FACTS ................................................................................................................ 4

        A.      Dignity Health .......................................................................................... 4

                1.      Dignity Health is Sponsored by the Sisters of Mercy and Other
                        Catholic Orders of Women Religious ........................................... 4

                2.      Dignity Health Holds Itself Out as a Religiously Affiliated Health
                        Care System .................................................................................... 5

                3.      Dignity Health's Bylaws Establish Its Strong Connection with the
                        Catholic Church ............................................................................. 5

        B.      The Plan .................................................................................................... 8

        C.      The Sub-Committee Maintains the Plans and is Associated With the
                Church ....................................................................................................... 8

IV.     STANDARD OF REVIEW ................................................................................. 9

V.      THE COURT SHOULD DISMISS THE COMPLAINT ................................. 10

        A.      The Plan Satisfies the Church Plan Maintenance Requirement ............. 10

                1.      The Plain Language of Section 1002(33)(C)(i) Clearly Permits the
                        Plan to be Maintained by the Sub-Committee ............................. 11

                2.      The Sub-Committee Has the Full Range of Powers Necessary to
                        "Maintain" the Plan ...................................................................... 13

        B.      Dignity Health and the Sub-Committee are Associated with the Catholic
                Church ..................................................................................................... 17

                1.      Church Control Is Not Necessary ................................................ 17

                2.      The Association Inquiry Must Be Limited ................................... 18

                3.      Dignity Health and the Sub-Committee Are Clearly Associated
                        with the Catholic Church ............................................................. 19

                4.      To the Extent *Lown* Has Any Relevance, Dignity Health and the
                        Retirement Sub-Committee Easily Satisfy Lown ....................... 20

                        a.      *Medina* Rejects *Lown's* Narrow Interpretation ............... 20

                        b.      The Facts in *Lown* are Inapposite .................................... 21

                        c.      The *Lown* Factors ............................................................ 21

                5.      Plaintiffs' Religious Orthodoxy Inquiry is Unconstitutional ...... 26

        C.      The Church Plan Exemption Does Not Violate the Establishment Clause ........... 28

                1.      The Supreme Court Has Already Rejected Plaintiffs' Argument ............. 28

                2.      The Establishment Argument Also Fails on the Merits ............... 29

        D.      Plaintiffs' State Law Claims Fail ........................................................... 30

                1.      The Court Should Not Exercise Supplemental Jurisdiction ........ 30

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

i

MOTION TO DISMISS
CASE NO. 13-C-1450

1
2

**TABLE OF CONTENTS**
**(continued)**

Page

3

2.   Plaintiffs Cannot Establish Jurisdiction Under CAFA ............................. 31

4

3.   Plaintiffs Lack Article III Standing To Pursue State Law Claims ............ 32

5

a.   Plaintiffs Do Not Allege Individualized Harm ............................. 33

6

b.   A Beneficiary Has No Standing to Sue on Behalf of the
Trust ...................................................................................... 34

7

c.   Plaintiffs' Theory is Speculative ................................................... 35

8

4.   Plaintiffs' Breach of Contract Claim Fails ................................................. 36

9

5.   Plaintiffs' Unjust Enrichment Claim Fails ................................................. 39

6.   Plaintiffs' Breach of Fiduciary Duty Claim Fails ..................................... 40

10

VI.   CONCLUSION ............................................................................................................. 40

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

ii

MOTION TO DISMISS
CASE NO. 13-C-1450

# TABLE OF AUTHORITIES

Page

## CASES

*Advocate Health Care Network v. Stapleton*,
  137 S. Ct. 1652 (2017) ................................................................................ passim

*Almendarez-Torres v. United States*,
  523 U.S. 224 (1998) ................................................................................................29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................9, 10

*Averhart v. US West Management Pension Plan*,
  46 F.3d 1480 (10th Cir. 1994) ................................................................................12

*Balistreri v. Pacifica Police Dep't*,
  901 F.2d 696 (9th Cir. 1990) ....................................................................................9

*Ball v. Steadfast-BLK*,
  196 Cal. App. 4th 694 (2011) .................................................................................24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................................9

*Bey v. SolarWorld Indus. Am.*,
  904 F. Supp. 2d 1096 (D. Or. 2012) .......................................................................31

*Boba v. City of Medford*,
  564 F.3d 1093 (9th Cir. 2009) .................................................................................36

*Butero v. Royal Maccabees Life Ins. Co.*,
  174 F.3d 1207 (11th Cir. 1999) ...............................................................................15

*California Medical Association v. Aetna U.S. Healthcare of California*,
  94 Cal. App. 4th 151 (2001) ...................................................................................39

*Canova v. Trustees of Imperial Irr. Dist. Employee Pension Plan*,
  150 Cal. App. 4th 1487 (2007) ...............................................................................39

*Catholic Charities of Maine v. City of Portland*,
  304 F. Supp. 2d 77 (D. Me. 2004) .......................................................................4, 22

*Catholic League for Religious & Civil Rights v. City & Cnty. of San Francisco*,
  624 F.3d 1043 (9th Cir. 2010) .................................................................................29

*Chronister v. Baptist Health*,
  442 F. 3d 648 (8th Cir. 2006) .......................................................................20, 21, 22

*Coleman-Edwards v. Simpson*,
  No. 03CV3779DLIVVP, 2008 WL 820021 (E.D.N.Y. Mar. 25, 2008), *aff'd*,
  330 F. App'x 218 (2d Cir. 2009) .............................................................................24

*Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day
  Saints v. Amos*,
  483 U.S. 327 (1987) ...................................................................................18, 26, 29

Manatt, Phelps &
Phillips, LLP
ATTORNEYS AT LAW
LOS ANGELES

MOTION TO DISMISS
CASE NO. 13-C-1450

**TABLE OF AUTHORITIES**
(continued)

Page

*David v. Alphin,*
   704 F.3d 327 (4th Cir. 2013)............................................................33, 36, 40

*Doe 1 v. Xytex Corp.,*
   No. C 16-02935 WHA, 2017 WL 1112996 (N.D. Cal. Mar. 24, 2017) ...................39

*Erickson v. Pardus,*
   551 U.S. 89 (2007).............................................................................10

*Fox v. McCormick,*
   20 F. Supp. 3d 133 (D.D.C. 2013) ...........................................................38

*Friend v. Sanwa Bank California,*
   35 F.3d 466 (9th Cir. 1994).................................................................34

*Gabriel v. Alaska Elec. Pension Fund,*
   773 F.3d 945 (9th Cir. 2014).................................................................38

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS, Inc.,*
   456 F.3d 1123 (9th Cir. 2006)...........................................................33, 34

*Great-W. Life & Annuity Ins. Co. v. Knudson,*
   534 U.S. 204 (2002)..........................................................................38

*Gualandi v. Adams,*
   385 F.3d 236 (2d Cir. 2004)..................................................................15

*Harley v. Minnesota Mining & Mfg.,*
   284 F.3d 901 (8th Cir. 2002).........................................................36, 38, 40

*Henderson v. Fisher,*
   236 Cal. App. 2d 468 (1965)..................................................................38

*Hollinger v. Home State Mut. Ins. Co.,*
   654 F.3d 564 (5th Cir. 2011).................................................................31

*Hughes Aircraft Co. v. Jacobson,*
   525 U.S. 432 (1999)....................................................................14, 33, 35

*Impress Commc'ns v. Unumprovident Corp.,*
   335 F. Supp. 2d 1053 (C.D. Cal. 2003) ......................................................34

*In re Ret. Cases,*
   110 Cal. App. 4th 426 (2003) .................................................................38

*Jones v. Wolf,*
   443 U.S. 595 (1979)..........................................................................26

*Kendall v. Employees Retirement Plan of Avon Products,*
   561 F.3d 112 (2d Cir. 2009)..................................................................40

*Klein v. Chevron U.S.A., Inc.,*
   202 Cal. App. 4th 1342 (2012) ...............................................................39

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

iv

MOTION TO DISMISS
CASE NO. 13-C-1450

**TABLE OF AUTHORITIES**
(continued)

Page

*Lee v. Verizon Communications, Inc.*,
    954 F. Supp. 2d 486 (N.D. Tex 2013), *aff'd* 837 F.3d 523 (5th Cir. 2016) ............33, 35, 36, 40

*Lee v. Verizon Communications, Inc.*,
    837 F.3d 523 (5th Cir. 2016)......................................................................33, 35, 36, 40

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971).............................................................................................29

*Lix v. Edwards*,
    82 Cal. App. 3d 573 (1978).....................................................................................37

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996)........................................................................................12, 14

*Loughrin v. United States*,
    134 S. Ct. 2384 (2014)................................................................................12, 14, 18

*Lown v. Contl. Cas. Co.*,
    238 F.3d 543 (4th Cir. 2001).......................................................................... passim

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..............................................................................................32

*McGuigan v. City of San Diego*,
    183 Cal. App. 4th 610 (2010) ................................................................................37

*McKeon v. Mercy Healthcare Sacramento*,
    19 Cal. 4th 321 (1998) ..........................................................................................24

*Medina v. Catholic Health Initiatives*,
    147 F.Supp.3d 1190 (D. Co. 2015) ................................................................. passim

*Medina v. Catholic Health Initiatives*,
    -- F.3d --, No. 16-1005, 2017 WL 6459961 (10th Cir. Dec. 19, 2017) ......................... passim

*Mertens v. Hewitt Assocs.*,
    508 U.S. 248 (1993)..............................................................................................38

*Meyer v. National Tenant Network*,
    10 F. Supp. 3d 1096 (N.D. Cal. 2014) ...............................................................9, 10

*Mitchell v. Helms*,
    530 U.S. 793 (2000) (plurality opinion) .................................................................18

*Mousa v. Harris*,
    No. 13-CV-00140-JST, 2013 WL 6185526 (N.D. Cal. Nov. 26, 2013)...................30

*N.L.R.B. v. Catholic Bishop of Chicago*,
    440 U.S. 490 (1979)..................................................................................... passim

*Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*,
    319 F. Supp. 2d 1040 (C.D. Cal. 2003) ..................................................................38

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

v

MOTION TO DISMISS
CASE NO. 13-C-1450

**TABLE OF  AUTHORITIES**
(continued)

Page

*New Orleans ILA Pensioners Ass'n v. Bd. of Trustees of New Orleans Employers*
  *Int'l Longshoremen's Ass'n AFL-CIO Pension Fund,*
  No. CIV. A. 07-6349, 2008 WL 215654 (E.D. La. Jan. 24, 2008).........................................34

*Oasis v. Realty, LLC v. Goldman,*
  51 Cal. 4th 811 (2011)..........................................................................................................36

*Okerman v. Life Ins. Co. of N. Am.,*
  No. CIV-S-00-0186 GEBPAN, 2001 WL 36203082 (E.D. Cal. Dec. 24, 2001)......................4

*Overall v. Ascension,*
  23 F. Supp. 3d 816 (E.D. Mich. 2014)............................................................................... passim

*Palmason v. Weyerhaeuser Co.,*
  No. C11-0695RSL, 2013 WL 4511361 (W.D. Wash. Aug. 23, 2013)........................35, 37, 38

*Papasan v. Allain,*
  478 U.S. 265 (1986)...............................................................................................................10

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.,*
  96 F.3d 1151 (9th Cir. 1996)..................................................................................................39

*Paulson v. CNF, Inc.,*
  559 F.3d 1061 (9th Cir. 2009).................................................................................................34

*Pegram v. Herdich,*
  530 U.S. 211 (2000)...............................................................................................................15

*Perelman v. Perelman,*
  793 F.3d 368 (3rd Cir. 2015) ................................................................................33, 35, 36, 38

*Real Estate Analytics, LLC v. Vallas,*
  160 Cal. App. 4th 463 (2008) ................................................................................................39

*Reiter v. Sonotone Corp.,*
  442 U.S. 330 (1979)...............................................................................................................11

*Retiree Support Grp. of Contra Costa Cty. v. Contra Costa Cty.,* 944 F. Supp. 2d
  799 (N.D. Cal. 2013)..............................................................................................................31

*Rinehart v. Life Ins. Co. of N. Am.,*
  No. C08-5486 RBL, 2009 WL 995715 (W.D. Wash. Apr. 14, 2009) .................................6, 22

*Robinson v. C.R. Bard, Inc.,*
  No. 16-CV-00942-JST, 2016 WL 3361825 (N.D. Cal. June 17, 2016)..................................39

*Robinson v. Metro. Life Ins. Co.,*
  No. 12-CV-01373-JAM-AC, 2013 WL 1281868 (E.D. Cal. Mar. 27, 2013).........................21

*Rollins v. Dignity Health,*
  19 F. Supp. 3d 909 (N.D. Cal 2013) ......................................................................................13

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

vi

MOTION TO DISMISS
CASE NO. 13-C-1450

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Rollins v. Dignity Health*,
830 F.3d 900 (9th Cir. 2016), *cert. granted*, 137 S. Ct. 547 (2016), *and rev'd sub nom. Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017) ...................4, 8

*Romero v. Allstate Ins. Co.*,
No. 01-3894, 2016 WL 6876307 (E.D. Pa. Nov. 22, 2016) .....................................12

*Rose v. Long Island R.R. Pension Plan*,
828 F.2d 910 (2d Cir. 1987).................................................................................19

*Rudgayzer v. Yahoo! Inc.*,
No. 5:12-CV-01399 EJD, 2012 WL 5471149 (N.D. Cal. Nov. 9, 2012) ................................32

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004)...............................................................................31

*Saks v. Damon Raike & Co.*,
7 Cal. App. 4th 419 (1992) ..............................................................................33, 34

*Saunders v. Davis*,
Case No. 15-CV-2026 (RC), 2016 WL 4921418 (D. D C. Sept. 15, 2016) ..........................15

*Serrano v. 180 Connect, Inc.*,
478 F.3d 1018 (9th Cir. 2007)..........................................................................31, 32

*Shaver v. Operating Engineers Local 428 Pension Tr. Fund*,
332 F.3d 1198 (9th Cir. 2003)...............................................................................34

*Silo v. CHW Medical Foundation*,
27 Cal.4th 1087 (2002) ..................................................................................24, 25

*Slack v. International U. of Operating Engineers*,
No. C-13-5001 EMC, 2014 WL 4090383 (N.D. Cal. Aug. 19, 2014)..........................33, 36, 40

*Smith v. OSF HealthCare Sys.*,
No. 16-CV-467-SMY-RJD, 2017 WL 6021625 (S.D. Ill. Dec. 5, 2017) ...............................30

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) .......................................................................................32

*Sullivan v. Stroop*,
496 U.S. 478 (1990)...........................................................................................11

*Thomas v. Review Bd.*,
450 U.S. 707 (1981)...........................................................................................26

*Thorkelson v. Publishing House of Evangelical Lutheran Church in Amer.*,
764 F. Supp. 2d 1119 (D. Minn. 2011) .....................................................................17

*Universidad Cent. De Bayamon v. N.L.R.B.*,
793 F.2d 383 (1st Cir. 1985)..................................................................19, 26, 27, 28

*University of Great Falls v. N.L.R.B.*,
278 F.3d 1335 (D.C. Cir. 2002) .......................................................................passim

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

vii

MOTION TO DISMISS
CASE NO. 13-C-1450

1

**TABLE OF AUTHORITIES**
**(continued)**

2

Page

3

*Wal–Noon Corp. v. Hill,*
    45 Cal. App. 3d 605 (1975).................................................................39

4

*Ward v. Unum Life Ins. Co. of Amer.,*
    No. 09-C-431, 2010 WL 4337821 (E.D. Wis. 2010)..............................25

5

6

*Wehen v. Lundgaard,*
    41 Cal. App. 2d 610 (1940).................................................................39

7

*Wells v. California Physicians' Serv.,*
    No. C05-01229 CRB, 2007 WL 926490 (N.D. Cal. Mar. 26, 2007).......34

8

9

*Wilkison v. Wiederkehr,*
    101 Cal. App. 4th 822 (2002)..............................................................38

10

*Winer v. Edison Bros. Stores Pension Plan,*
    593 F.2d 307 (8th Cir. 1979)...............................................................12

11

12

*Wright v. Oregon Metallurgical Corp.,*
    360 F.3d 1090 (9th Cir. 2004)..............................................................14

13

**STATUTES**

14

26 U.S.C. § 410(d) .................................................................................21

28 U.S.C. § 1332(d) (Class Action Fairness Act of 2005).....................30, 31

15

28 U.S.C. § 1332(d)(3)............................................................................32

16

28 U.S.C. § 1332(d)(4)(B) .......................................................................31

17

28 U.S.C. § 1367(c) .................................................................................30

18

29 U.S.C. § 1001 *et seq.* (Employee Retirement Income Security Act of 1974)................... passim

19

29 U.S.C. § 1002(16)(A)..........................................................................12

29 U.S.C. § 1002(33)(C)...........................................................................17

20

29 U.S.C. § 1002(33)(C)(i) .................................................................. passim

21

29 U.S.C. § 1002(33)(C)(ii)(II).................................................................17

22

29 U.S.C. § 1002(33)(C)(iii).....................................................................17

23

29 U.S.C. § 1002(33)(C)(iv)..........................................................17, 18, 21, 27

24

29 U.S.C. § 1002(33)(D)(i) .......................................................................8

29 U.S.C. § 1109 .....................................................................................34

25

**RULES AND REGULATIONS**

26

40 Fed. Reg. 48,106 (1975)......................................................................12

27

Fed. R. Civ. P. 12(b)(1)......................................................................31, 32

28

Fed. R. Civ. P.12(b)(6).............................................................................9

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

viii

MOTION TO DISMISS
CASE NO. 13-C-1450

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF  AUTHORITIES**
**(continued)**

Page

### CONSTITUTIONS

U.S. Const. amend. I ............................................................................................... passim

U.S. Const. art. III ................................................................................................... passim

### LEGISLATIVE MATERIALS

H.R. Rep. No. 533, 1974 U.S. Code Cong. & Ad. News at 4647....................................19

S. Rep. No. 383, 93d Cong., Ist Sess. 81 (1973)............................................................18

### BRIEFS

*Advocate Health Care Network v. Stapleton,*
   2017 WL 656675 (U.S.), 43 (Brief for Respondent, U.S., 2017) ...........................17

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

ix

MOTION TO DISMISS
CASE NO. 13-C-1450

1

### NOTICE OF MOTION AND MOTION TO DISMISS

2      PLEASE TAKE NOTICE that on Thursday March 15, 2018 at 2:00 p.m., or as soon

3  thereafter as counsel may be heard in the courtroom of the Honorable Jon S. Tigar, United States

4  District Judge for the Northern District of California, located at the United States Courthouse, 450

5  Golden Gate Avenue, San Francisco, California 94102, Defendants Dignity Health, Herbert J.

6  Vallier, Darryl Robinson, and the Dignity Health Retirement Plans Sub-Committee (collectively

7  "Defendants") will and hereby do move the Court for an order dismissing the Amended Class

8  Action Complaint pursuant to Federal Rules of Civil Procedure Rules 12(b)(1) and 12(b)(6).

9      This motion is based upon this Notice of Motion, the accompanying Memorandum of

10 Points and Authorities, the Request for Judicial Notice, the Declaration of Elizabeth

11 Meckenstock, and such other evidence and further arguments as may be presented at the hearing

12 on the matter.

13 **I.**    **INTRODUCTION**

14      After four years of costly litigation against non-profit religiously affiliated hospitals that

15 serve the needy, a unanimous Supreme Court flatly rejected Plaintiffs' principal theory of this

16 case. *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017).  The Supreme Court

17 concluded that the hospitals' interpretation of the church plan exemption statute was the "most

18 natural" reading, and that the Plaintiffs' interpretation contradicted their own arguments regarding

19 Congress' main purpose in enacting the legislation.  *Id*. at 1659, 1662.  In response, Plaintiffs

20 amended their complaint and seek to further litigate whether the Dignity Health Retirement Plan

21 (the "Plan") is covered by ERISA based upon additional strained and unsupported interpretations

22 of the other words in the same sentence that has been litigated for the last four years.  However,

23 these very claims have now been squarely rejected by the Tenth Circuit in the first church plan

24 decision following remand from the Supreme Court.  *Medina v. Catholic Health Initiatives*, --

25 F.3d --, No. 16-1005, 2017 WL 6459961 (10th Cir. Dec. 19, 2017).  The Tenth Circuit also found

26 that the church plan exemption is constitutional.  Therefore, the Court should dismiss Plaintiffs'

27 ERISA claims, and dismiss Plaintiffs' state law claims on the merits or decline jurisdiction over

28 them.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1

MOTION TO DISMISS
CASE NO. 13-C-1450

1    The core issue in this case and the church plan litigation commenced by Plaintiffs'

2    counsel across the country is whether a pension plan that is established by a religiously affiliated

3    non-profit hospital is exempt from the requirements of the Employee Retirement Income Security

4    Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").  In *Advocate*, the Supreme Court rejected the

5    plaintiffs' claim that only an actual church could establish a church plan.  Instead, the Supreme

6    Court held that religious hospitals could establish church plans, and that the plans established by

7    religious hospitals are exempt so long as they are "maintained by a principal-purpose

8    organization." *Advocate*, 137 S. Ct. at 1663.  On remand, Plaintiffs now attempt to allege that

9    the Plan is not maintained by a principal-purpose organization.  But they reach that legal

10   conclusion only by asserting that the church plan exemption contains multiple requirements that

11   simply are not contained in the statutory language.

12       The Tenth Circuit had no trouble parsing the requirements of a principal-purpose

13   organization and finding that the retirement plan established by Catholic Health Initiatives

14   ("CHI") easily qualified as a church plan.  *Medina*, 2017 WL 6459961.  These same

15   determinations establish that Plaintiffs' Amended Class Action Complaint ("FAC") should be

16   dismissed.  The Tenth Circuit not only rejected the arguments made by Plaintiffs that form the

17   core of this case, it concluded they were "contrary to common sense." *Id.* at *7.  To satisfy the

18   statutory church exemption test, the Tenth Circuit found that the hospital or other entity

19   establishing the plan must be associated with a church, the plan must be maintained by a

20   principal-purpose organization, and the principal-purpose organization itself must be associated

21   with the church. *Id.* at *3.  Moreover, the Tenth Circuit rejected the same attempts by Plaintiffs

22   here to inject requirements into the statutory language that simply do not exist. *Id.* at *5 n.3.

23       Based upon the statutory text, the Tenth Circuit concluded that CHI's internal retirement

24   committee satisfied the principal-purpose requirement, rejecting Plaintiffs' claims that the

25   principal-purpose "organization" must be "distinct" from the hospital and have powers and

26   responsibilities nowhere even mentioned in the statute as "contrary to the  . . . ordinary usage" of

27   the terms in the statute. *Id.* at *6.  Likewise, the Tenth Circuit also flatly rejected Plaintiffs'

28   intentionally cramped interpretation of the church "association" requirement as requiring that the

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

2

MOTION TO DISMISS
CASE NO. 13-C-1450

hospital receive funding from a church or impose a constitutionally improper denominational requirement on employees and patients. *Id*. at *5. Finally, the Tenth Circuit found that the retirement committee was also associated with the church simply because it is closely related to CHI, which itself shares common religious bonds and convictions with the church. *Id*. at 8.

The claims that the Tenth Circuit rejected are precisely the claims Plaintiffs make here. Just as in *Medina*, Plaintiffs' text-defying interpretation of the key statutory language has no support from the statute itself or existing authority, is contrary to common sense, and would render the *Advocate* decision virtually meaningless. Plaintiffs' statutory interpretation must be rejected along with their ERISA claims which are based upon that interpretation.

The FAC's inclusion of state law claims is a telltale sign that they know this. However, those claims are also barred. Plaintiffs' state law claims are all based upon the false premise, unsupported by law, that Dignity Health's obligation "to contribute to the Plan an amount which is sufficient on an actuarial basis to provide for" the benefits under the Plan means that the Plan must be fully funded at all times. However, the FAC does not even include any allegations that the Plan is insufficiently funded *on an actuarial basis*. Nor do Plaintiffs allege that Dignity Health has ever failed to pay a participant his or her vested benefits when due. Ultimately, not only do Plaintiffs' state law claims lack merit, but Plaintiffs do not even have Article III standing to bring them and the Court should decline jurisdiction over them.

## II.     ISSUES PRESENTED

1.     Whether the Plan is maintained pursuant to 29 U.S.C. § 1002(33)(C)(i).

2.     Whether Dignity Health and the Dignity Health Retirement Plans Sub-Committee the "Sub-Committee") are associated with a church.

3.     Whether the church plan exemption violates the Establishment Clause.

4.     Whether the Court has jurisdiction over Plaintiffs' state law claims.

5.     Whether the Plaintiffs have Article III standing to bring their state law claims.

6.     Whether Plaintiffs' state law causes of action state a claim upon which relief can be granted.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

3

MOTION TO DISMISS
CASE NO. 13-C-1450

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

III.    **FACTS.**

    A.    **Dignity Health.**

        1.    **Dignity Health is Sponsored by the Sisters of Mercy and Other Catholic Orders of Women Religious.**

Dignity Health has 39 hospitals in California, Nevada, and Arizona.  The health system was originally formed in 1986 when two congregations of the Sisters of Mercy, an order of religious women founded in Dublin, Ireland in 1831, merged their hospitals to form Catholic Healthcare West ("CHW").  The Sisters of Mercy originally founded St. Mary's Hospital in San Francisco in 1854 to care for residents of the city suffering from cholera, typhoid, and influenza. By 1986, the Sisters of Mercy congregations had 10 Catholic hospitals which merged to become CHW.  As the Ninth Circuit put it, "in the early 1980s, the Sisters of Mercy Congregations in Auburn, California and Burlingame, California (the "Sponsoring Congregations") each established nonprofit hospital systems.  In 1986, the Sponsoring Congregations merged the two systems to form Catholic Healthcare West ("CHW")."  *See Rollins v. Dignity Health*, 830 F.3d 900, 903–04 (9th Cir. 2016), *cert. granted*, 137 S. Ct. 547(2016), *and rev'd sub nom. Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017).

The Bylaws reflect that the "Sponsors" include: the Sisters of Mercy of the Americas: West Midwest Community; the Sisters of St. Dominic, Congregation of the Most Holy Rosary, Adrian, Michigan; the Sisters of the Third Order of St. Dominic, Congregation of the Most Holy Name, San Rafael, California; Congregation of the Sisters of Charity of the Incarnate Word, Houston, Texas; the Congregation of the Dominican Sisters of St. Catherine of Siena, Taos, New Mexico; and the Sisters of St. Francis of Penance and Christian Charity, St. Francis Province, Redwood City, California.  Request for Judicial Notice ("RJN"), Exh. 1.  "These religious orders are an integral part of the Church by virtue of the religious and healthcare ministries they perform."  *Okerman v. Life Ins. Co. of N. Am.*, No. CIV-S-00-0186 GEBPAN, 2001 WL 36203082, at *4 (E.D. Cal. Dec. 24, 2001).[1]

---

[1] These orders of women religious are listed in the Official Catholic Directory ("OCD").  *Overall v. Ascension*, 23 F. Supp. 3d 816, 831 (E.D. Mich. 2014)(listing in the OCD means that the entity is "operated, supervised, or controlled by or in connection with the Roman Catholic Church"); *Catholic Charities of Maine v. City of Portland*, 304 F. Supp. 2d 77, 84 (D. Me. 2004) (finding

The leaders of the Sponsoring Congregations make up a "Sponsorship Council," which oversees the healing ministry.  RJN, Exh. 1, Art. XII.

### 2. Dignity Health Holds Itself Out as a Religiously Affiliated Health Care System

Dignity Health holds itself out as a religiously affiliated health system.  Dignity Health's website describes its "Mission" as a commitment to "furthering the healing ministry of Jesus." *See* https://www.dignityhealth.org/about-us/our-organization/mission-vision-and-values.  RJN, Exh. 3 (Dignity Health Mission and Values).  The website also describes Dignity Health's history from its beginning – as a single hospital founded by the Sisters of Mercy in San Francisco to the joining together of the ten hospitals operated by two different congregations of the Sisters of Mercy in 1986 to form Catholic Healthcare West – up to its 2012 name change to Dignity Health. The website has links to Dignity Health's Statement of Common Values ("SCVs") and the Ethical and Religious Directives for Catholic Healthcare Services ("ERDs").  These documents embody Catholic religious teaching, including limits on the health care services that may be provided at any Dignity Health facility.  https://www.dignityhealth.org/about-us/our-organization/ethics.  In addition, the website describes Dignity Health's mission integration process which integrates the organization's religious mission throughout its operations. https://www.dignityhealth.org/-/media/cm/media/documents/PDFs/standards-for-mission-integration-2.ashx?la=en.  RJN, Exh. 4-6.

### 3. Dignity Health's Bylaws Establish Its Strong Connection with the Catholic Church.

The FAC quotes from the Amended and Restated Bylaws of Dignity Health (the "Bylaws") but conspicuously neglects to cite the portions relevant to the association inquiry.  The following provisions of the Bylaws in and of themselves establish that Dignity Health and the Sub-committee share common religious bonds and convictions with the Catholic Church:

association based upon Catholic Charities mission statement, financial support from the local diocese, and listing in the OCD); General Counsel Memorandum, 39007 (I.R.S. July 1, 1983) ("Any organization listed in this directory is considered associated with the Roman Catholic Church in the United States.").  RJN, Exh. 10

- Section 3.1 provides that "[t]his corporation, pursuant to the legacy of the Sponsors, as identified in these bylaws, *is committed to continuing a healing ministry based upon the life and works of Jesus* in the provision of healthcare services in the communities it serves (the "healing ministry")" (emphasis added).

- Section 3.2 provides that "the Corporation *shall* follow the mission and values of the healing ministry, which are intended to apply to *all* of its activities and operations" (emphasis added).

- Section 3.3 provides that "[i]n striving to fulfill its healing ministry, the Corporation's Health Facilities [which include all of Dignity Health's hospitals and licensed health care providers] will follow the Statement of Common Values."  Consistent with Dignity Health's Catholic healing ministry and its shared bonds and convictions with the Catholic Church, this statement focuses on the dignity and value of all people and prohibits direct abortion as well certain reproductive technologies and physician assisted suicide.[2]

- Section 3.3 further provides that the hospitals and health care providers that were contributed to Dignity Health by the Sponsoring Congregations of religious women, and that remain under the Canonical stewardship of the Sponsoring Congregations must abide by the Ethical and Religious Directives for Catholic Health Care (the "ERDs") which are promulgated by the United States Conference of Catholic Bishops (USCCB).[3]  Over half of Dignity Health's acute care hospitals are listed in the OCD meaning that they are considered part of the Catholic Church.  RJN, Exh. 10.

- Section 7.2 provides that "[a]t all times, not less than 2 Director positions shall be reserved for women religious of the Sponsors, who shall serve in their individual capacity and not as a representative of a Sponsor or Sponsors."

- Section 8.6(d) provides that the "President/CEO [of Dignity Health] shall be the chief executive officer of this Corporation" and shall exercise control over Dignity Health's

---

[2] *See* RJN, Exh. 6.

[3] *See, e.g., Rinehart v. Life Ins. Co. of N. Am.*, No. C08-5486 RBL, 2009 WL 995715, at *4 (W.D. Wash. Apr. 14, 2009) (adherence to ERDs demonstrates shared common religious bonds and convictions).

MOTION TO DISMISS
CASE NO. 13-C-1450

operations "but at no time shall this supervision and control directly facilitate procedures that are contrary to Catholic teaching."

- Section 8.10 provides that "[e]ach Corporate Officer and Vice President shall support the healing ministry as established in accordance with these bylaws.  Failure of any Corporate Office or Vice President to adhere to such standards may be grounds for his or her removal or termination in accordance with these bylaws."

- Section 10.3(f) provides for the establishment of a Mission Integrity Committee which is responsible for approving policies relating to the healing ministry and "establishing and maintaining systems for monitoring compliance with the mission and values of the hearing ministry."  This includes reviewing and monitoring Dignity Health's labor practices and "[p]ension administration."

- Article XII establishes a "Sponsorship Council" whose members are comprised of leaders of the Sponsoring Congregations of women religious or their designees who must be members of the Sponsoring Congregations.  The Sponsorship Council oversees and acts upon issues of Catholic identity including oversight of mission integration, ministry leadership, education and formation, and chapels and religious symbols and also informing the healing ministry of the Corporation on matters of mission integration, ministry leadership formation and dedicated sacred space.

- Section 12.6 also importantly provides that the Sponsorship Council has the powers and responsibilities set forth in the Governance Matrix attached to the Bylaws as Exhibit A.  The Governance Matrix provides that the Sponsorship Council has veto or approval rights over changes to the SCVs and the application of the ERDs and also has continuing approval rights regarding the sale, lease or encumbrance of the property subject to Catholic church law that the Sponsoring Congregations contributed to Dignity Health.  The Bylaws reflect that this includes 23 hospitals.

RJN, Exh. 1.  The Bylaws thus overwhelmingly establish the religious character of Dignity Health and the Sub-Committee and demonstrate that both are deeply connected to the Catholic Church.  RJN, Exh. 7 ("The system moved from being a formal ministry of the Catholic Church

1   to one that, in association with the Catholic Church, remains based on Gospel values as expressed

2   through our Catholic heritage.").

3       **B.**    <u>**The Plan.**</u>

4       Originally, "[e]mployees in the CHW system received pension benefits through seven

5   plans, separately maintained either by a Sponsoring Congregation, by an individual hospital, or

6   by CHW.  On January 1, 1989, the Sponsoring Congregations, the hospitals, and CHW merged

7   these plans into a single pension plan (the "Plan").  On July 20, 1992, CHW's board of directors

8   adopted a retroactive  resolution to treat the Plan as a church plan."  *Rollins*, 830 F.3d at 903–04.

9   The IRS issued four separate PLRs ruling that the Plan and the plans of hospitals affiliated with

10  CHW were, and had been from inception, church plans.  *See Advocate,* 137 S.Ct. at 1657.[4]

11      **C.**    <u>**The Sub-Committee Maintains the Plans and is Associated With the Church.**</u>

12      The Plan identifies the Sub-Committee as the "Plan Administrator" (FAC, ¶ 95; RJN,

13  Exh. 8) and provides that the Sub-Committee is a named fiduciary "with the full power to

14  administer the Plan and to interpret, construe and apply all of its provisions on behalf of the

15  Employer," Dignity Health.  For example, its powers include:

16     &bull;   "Interpreting the plan, carrying out provisions of the Plan and deciding questions relating

17        to eligibility, the crediting of services vesting and benefit accrual and benefit amounts."

18     &bull;   Deciding disputes which may arise with regard to benefits.  Decisions of the Sub-

19        Committee are final.

20     &bull;   Compiling and maintaining all records necessary for the Plan.

21

[4] The fact that the plan was properly established as a church plan means that Plaintiffs' claims

22  under ERISA are not ripe.  ERISA provides for retroactive relief for correction of any failure to
meet the requirements of the church plan statute:

23

    If a plan established and maintained for its employees (or their beneficiaries) by a

24    church or by a convention or association of churches which is exempt from tax
    under section 501 of title 26 fails to meet one or more of the requirements of this

25    paragraph and corrects its failure to meet such requirements within the correction
    period, the plan shall be deemed to meet the requirements of this paragraph for the

26    year in which the correction was made and for all prior years.  29 U.S.C. §
    1002(33)(D)(i).

27

After the *Advocate* decision, Plaintiffs no longer dispute that the Plan was properly established.

28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

MOTION TO DISMISS
CASE NO. 13-C-1450

- Authorizing the Trustee to make payment of all benefits.

- Engaging consultants including lawyers, accountants and actuaries.

- Adopting rules and regulations for the administration of the Plan.

- Delivering statements to participants and providing copies of plan documents.

- Providing for the valuation of trust assets at market value.

- "Doing and performing such other actions as may be provided for in other parts of this Plan."

RJN, Exh. 8, § 11.08.  "In performing its duties, the Sub-Committee shall be mindful of the teachings and tenets of the Roman Catholic Church and of the Sponsors (the Orders of Women Religious who founded many of Dignity Health's facilities and who are listed as 'Sponsors' in Dignity Health's Bylaws) . . . ."  RJN, Exh. 9, § I.

The Sub-Committee is comprised of at least five members appointed by the Human Resources and Compensation Committee of Dignity Health.  *Id.*  The Sponsorship Council, through its appointed members of the Mission Integrity Committee, must approve each member of the Sub-Committee.  *Id.*; RJN, Exh. 8 (Plan Amendment 25).  The Sub-Committee Charter provides for oversight of Dignity Health retirement plans and that it is responsible for assessing proposed plan changes and determining which plan changes are presented for approval.  *Id.*

## IV.  STANDARD OF REVIEW.

Dismissal under Rule 12(b)(6) may be "based on the lack of cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A complaint cannot survive a Rule 12(b)(6) motion unless it "contain[s] sufficient factual matter . . .  to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The "facial plausibility" standard mandates "more than a sheer possibility that a defendant has acted unlawfully."  *Meyer v. National Tenant Network*, 10 F. Supp. 3d 1096, 1099 (N.D. Cal. 2014) (quoting *Iqbal*, 556 U.S. at 678).

A pleading that offers merely "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Meyer*, 10 F. Supp. 3d at 1099 (quoting *Iqbal*, 556

1   U.S. at 678). "'Determining whether a complaint will survive a motion to dismiss for failure to

2   state a claim is a 'context-specific task that requires the reviewing court to draw on its judicial

3   experience and common sense.'" *Meyer,* 10 F. Supp. 3d at 1099 (again quoting *Iqbal*). In

4   making this context-specific evaluation, the Court construes the complaint in the light most

5   favorable to the plaintiff and accepts as true the factual allegations of the complaint, but this rule

6   does not apply to legal conclusions couched as factual allegations. *See Erickson v. Pardus*, 551

7   U.S. 89, 93-94 (2007); *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

8   **V.      THE COURT SHOULD DISMISS THE COMPLAINT.**

9          Plaintiffs allege two counts – Count I for equitable relief and Count X for declaratory

10   relief – that require a threshold determination that the Plan is subject to ERISA.  If both claims

11   fail, then the Court must also dismiss Counts II-IX, which presuppose the existence of an ERISA

12   plan.  Because the FAC fails to allege facts establishing that the Plan is not an exempt church

13   plan, the Court should dismiss Counts I-X.  Additionally, as discussed below, Plaintiffs'

14   alternative state law claims fail and must be dismissed as well.

15          During this litigation, Plaintiffs have alleged four different reasons why the Plan is not a

16   church plan: (1) the Plan was not established by a church; (2) the Plan was not maintained as

17   required; (3) Dignity Health is not associated with a church; and (4) the ERISA church plan

18   exemption violates the Establishment Clause.  After nearly four years of litigating Plaintiffs' first

19   reason, the Supreme Court unanimously rejected Plaintiffs' "text-defying[] statutory

20   construction" of 29 U.S.C. § 1002(33)(C)(i), and implicitly rejected Plaintiffs' Establishment

21   Clause claim.  *Advocate,* 137 S. Ct. at 1662.  Plaintiffs' further arguments that the Plan is not

22   properly maintained and that Dignity Health is not associated with a church also defy the text of

23   the statute and fare no better.

24          **A.      The Plan Satisfies the Church Plan Maintenance Requirement.**

25          Plaintiffs have failed to allege that the Plan is not properly maintained as a church plan

26   under 29 U.S.C. § 1002(33)(C)(i), and therefore that it is subject to ERISA.  According to

27   Plaintiffs, the Plan is not properly maintained because the Sub-Committee does not satisfy the

28   statutory requirements for a "principal-purpose" organization that maintains a church plan.

(FAC, ¶¶ 122-128.)  Plaintiffs' allegations fail because the Sub-Committee meets all of the statutory requirements.

> **1.     The Plain Language of Section 1002(33)(C)(i) Clearly Permits the Plan to be Maintained by the Sub-Committee.**

"As is true in every case involving the construction of a statute, our starting point must be the language employed by Congress."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337 (1979).  Section 1002(33)(C)(i) provides:

> A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches includes a plan *maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits*, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.  (Emphasis added.)

If the language of the statute is clear, there is no need to go further than the statute itself.  *See Sullivan v. Stroop*, 496 U.S. 478, 482 (1990).  Here, the language is clear – the Plan must be "maintained" by an "organization" that has the principal purpose of "administration *or* funding" of the plan (emphasis added).[5]  *Medina*, 2017 WL 6459961 *6 (applying dictionary definitions).  The Plan is maintained by the Sub-Committee, which is an organization the principal purpose of which is the administration of the Plan.  Therefore, the Plan is properly maintained.  Plaintiffs' legal arguments are contrary to the text of the statute, over three decades of private letter rulings from the IRS, and common sense.

Plaintiffs do not dispute that the Sub-Committee's principal purpose is the administration of the plan.  And they have no legal support for their argument that an "internal committee" cannot satisfy the "organization" requirement.  (FAC ¶ 5.)  The term "organization" is not defined in ERISA.  Instead, Section 1002(33)(C)(i) broadly provides that that the organization may be a "civil law corporation *or otherwise*."  (Emphasis added.)  Plaintiffs' theory essentially boils down to an argument that the maintaining organization must be separately incorporated, but that ignores

---

[5] The statute also requires that the organization be "controlled by or associated with a church." *See* Section V(B).

the statute's express "or otherwise" language.  *See Loughrin v. United States,* 134 S. Ct. 2384, 2389–90 (2014) ("To read the next clause, following the word "or," as somehow repeating that requirement, even while using different words, is to disregard what "or" customarily means. As we have recognized, that term's "ordinary use is almost always disjunctive, that is, the words it connects are to be given separate meanings.").[6]  The Sub-Committee is clearly an "otherwise" organization.  *Medina*, 2017 WL 6459961 *7 ("Medina fails to persuade us that the Subcommittee cannot be an 'organization' within the meaning of the statute"; applying Black's Law Dictionary to define an "organization" as "[a] body of persons (such as a union or a corporation) formed for a common purpose").  Therefore, the Sub-Committee satisfies this statutory requirement.  Nothing in the law provides that the organization must be "distinct" from the plan sponsor in the way Plaintiffs suggest (FAC ¶ 128) or that the organization cannot be an internal benefits committee.[7]  Plaintiffs simply made these requirements up.  Indeed, contrary to Plaintiffs' suggestion, an internal benefits committee is precisely the type of "organization" that Congress would have understood as having "administration" of a plan as its "principal purpose or function."  Internal benefits committees frequently administer pension plans[8] and where, as here, the Plan document designates the committee as the plan administrator, that designation is conclusive.  *See Averhart v. US West Management Pension Plan,* 46 F.3d 1480, 1489 (10th Cir. 1994) (designation of committee as administrator in the plan document is conclusive) (citing 29 U.S.C. § 1002(16)(A)(definition of "Administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated").[9]

---

[6] Plaintiffs' refusal to apply the common-sense meaning of the word "or" is a recurring theme. *See* Sections V(A)(2) and V(B)(1), *infra.*

[7] By naming the Sub-Committee as a party in this action, Plaintiffs have acknowledged that it is a distinct entity.  (FAC, ¶ 24).

[8] Employers commonly maintain pension plans through a single-purpose retirement committee, not directly. *See, e.g., Lockheed Corp. v. Spink*, 517 U.S. 882, 892 (1996); *Romero v. Allstate Ins. Co.*, No. 01-3894, 2016 WL 6876307, at *2 (E.D. Pa. Nov. 22, 2016) (committee set-ups are "[t]ypical"); The same was true in 1980. *See, e.g., Winer v. Edison Bros. Stores Pension Plan*, 593 F.2d 307, 309-11 (8th Cir. 1979); 40 Fed. Reg. 48,106 (1975) ("plan administrator" may be "a board or committee of trustees appointed by a corporation"). Subparagraph (C)(i) could not have been intended to forbid this common practice. Rather, subparagraph (C)(i) ensures that the organizations directly maintaining the plan, whether internal or external, are church-affiliated.

[9] In an early ruling in this case, Judge Henderson also mistakenly interpreted Section 1002(3)(33)(c)(i) to require Dignity Health to have plan administration as its principal purpose.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

12

MOTION TO DISMISS
CASE NO. 13-C-1450

Finally, Plaintiffs' legal conclusions are contrary to over three decades of private letter rulings and administrative guidance from the IRS, the administrative agency charged with applying the church plan exemption.  For decades, the IRS has found that the "organization" requirement is satisfied by an "internal benefits committee of a church-affiliated non-profit."[10] *Cf. Advocate*, 137 S. Ct. at 1657 (noting that this "interpretation has appeared in hundreds of private letter rulings and opinion letters issued since 1982, including several provided to the hospitals here").  Dignity Health itself has received four private letter rulings ("PLRs") from the IRS, each of which determined that the Sub-committee was a principal-purpose organization that properly maintained the Plan.

### 2.   The Sub-Committee Has the Full Range of Powers Necessary to "Maintain" the Plan.

Plaintiffs also argue that the Plan is not properly maintained because the Sub-Committee purportedly "does not have the full range of powers and responsibilities required to 'maintain' a plan." (FAC ¶ 128.)  According to Plaintiffs, this "includes the power to fund, continue, amend and/or terminate the Plan." (*Id*.)  Like Plaintiff's prior interpretation of the "establishment" requirement, which was unanimously rejected by the Supreme Court in *Advocate*, Plaintiffs' new interpretation of the maintenance provisions in Section 1002(3)(33)(C)(i) is contrary to the plain language of the statute, is not supported by legal authority and makes no sense in light of the statutory scheme and the Supreme Court's ruling in *Advocate*.[11]  *Medina*, 2017 WL 6459961 *6 ("Medina's view that 'maintain' must include the power to terminate or modify is contrary to the term's ordinary usage.").

---

*Rollins v. Dignity Health*, 19 F.Supp.3d 909, 914 (N.D. Cal. 2013).  Judge Henderson cited no authority for his comment and did not make this point in his subsequent summary judgment ruling.  As discussed in this motion, Judge Henderson's comment is not consistent with the language of the statute and would substantially undermine the decision in *Advocate*.  The parties and the Supreme Court agree that the scope of maintenance portion of Section 1002(3)(33)(c)(i) remains to be litigated. *See Advocate*, 137 S.Ct., n. 2, 3.

[10] Following the 1980 amendments, the IRS issued a new General Counsel Memorandum, which reversed its prior ruling against an order of Catholic sisters who operated healthcare facilities. Church Plans I - * * * Church Plans II - * * *, GCM 39007 (I.R.S. July 1, 1983).

[11] The Sub-Committee is empowered to "continue" the Plan, which is consistent with its principal purpose of administering the Plan.  Indeed, the Plan document contains an extensive list of Sub-Committee responsibilities that constitute continuing the Plan.  *See* Section III(C) above.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

13

MOTION TO DISMISS
CASE NO. 13-C-1450

First, nothing in Section 1002 (33)(C)(i) indicates the existence of any such requirement. Section 1002 (33)(C)(i) provides only that the Plan must be maintained by an organization "*the principal purpose or function of which is the administration **or** funding of a plan.*" (Emphasis added.)  There is no indication in Section 1002(33)(c)(i) that the organization maintaining a plan must have any powers other than administration or funding.  Just the opposite.  The principal purpose of that organization must be limited to administration "**or**" funding.  Had Congress intended to require the organization to have these other powers and responsibilities, it would not have listed only two responsibilities and would not have listed them in the disjunctive.  *See Loughrin,* 134 S. Ct. at 2389–90 (2014) ( "ordinary use [of the word "or"] is almost always disjunctive, that is, the words it connects are to be given separate meanings.").

Second, Plaintiffs' purported standard for an organization qualified to maintain a church plan makes no sense because it does not even include plan "administration," which is one of only two responsibilities that Congress actually included in the statute as the principal purpose or function of the organization maintaining the plan.  Plaintiffs have simply made up new requirements that do not exist and must be rejected because they are not contained in the statute.

Third, it makes no sense to assert that the principal purpose of the organization can be plan administration while also demanding that the organization have the power to fund, amend and/or terminate the plan, which are fundamentally different "settlor" functions that ordinarily belong to the employer/plan sponsor and as to which there are generally no fiduciary duties.  Under ERISA and the pre-ERISA state trust law originally codified in ERISA and applicable to church plans, the powers to fund, amend and/or terminate a benefit plan are functions ordinarily reserved to the settlor of the trust who is the employer/plan sponsor.  "[E]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."  *Spink*, 517 U.S. at 890 (1996) (citations omitted); *see also Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 444-45 (1999) ("an employer's decision to amend a pension plan concerns the composition or design of the plan and does not implicate the employer's fiduciary duties"); *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1101-02 (9th Cir. 2004) (agreement not to amend a plan "did not constitute a fiduciary function, but was

1   rather a plan design or settlor function").  Likewise, funding is the natural obligation of the

2   employer or plan sponsor that establishes the plan for the simple reason that the employer or plan

3   sponsor has the money to fund the benefits as a result of its business operations.  *See, e.g., Butero*

4   *v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1214 (11th Cir. 1999); *Gualandi v. Adams*, 385

5   F.3d 236, 243-44 (2d Cir. 2004) ("exclusive governmental funding is enough to constitute

6   governmental establishment of a plan"); *Saunders v. Davis*, Case No. 15-CV-2026 (RC), 2016

7   WL 4921418, at *10 (D. D C. Sept. 15, 2016)(funding by government employer established

8   government plan).

9           While the employer/plan sponsor could also be the plan administrator, it could do so only

10  acting in effect as separate entities, *i.e.*, "wearing two hats."  *Pegram v. Herdich*, 530 U.S. 211,

11  224 (2000) (an employer acting as a plan administrator wears "two hats," one hat as the

12  employer/plan sponsor/settlor who can change or terminate the plan and another "fiduciary" hat

13  when the employer acts as the plan administrator; however, "the fiduciary with two hats [can]

14  wear only one at a time").  Interpreting Section 1002(33)(C)(i) to require the plan *administrator*

15  to also have some of the settlor's powers and responsibilities makes no sense and contradicts the

16  basic division of plan functions between settlor functions belonging to the employer and plan

17  administration functions belonging to the administrator.  It would require the Sub-Committee to

18  wear "two hats" at the same time, which does not work.  For example, a plan administrator acting

19  as a fiduciary could not properly terminate the plan and there is no way that the plan administrator

20  could fund the plan because it does not have access to a source of funds.

21          Plaintiffs' interpretation would thus effectively eliminate the possibility of the very church

22  plans just validated by the Supreme Court in *Advocate* – those established by church associated

23  non-profits – because the plan administrator could not (in Plaintiffs' view) be an organization

24  whose principal purpose is plan administration.  In *Advocate*, the Court unanimously found that

25  Congress' purpose in enacting Section 1002(33)(c)(i) was to permit non-profits, including

26  hospitals, associated with a church to establish a church plan.  Having established a church plan,

27  the non-profit hospital would be the plan sponsor and would have the settlor functions including

28  the authority to amend or terminate the plan as well as the obligation to fund the plan.  However,

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

15

MOTION TO DISMISS
CASE NO. 13-C-1450

1   according to the Plaintiffs, that structure would be turned on its head.  *Advocate* would be an

2   empty letter because the entity that established the plan and holds the settlor functions like

3   terminating the plan (the hospital) would also be required to maintain the plan, which it cannot do

4   so because that is funding or administering the plan is not its principal purpose.  The possibility of

5   setting up a separate organization besides the hospital would not solve the problem; if it holds the

6   powers like termination or other settlor functions that Plaintiffs say are crucial to "maintaining"

7   the plan, that separate organization would also fail the principal purpose requirement.  It's an

8   Alice in Wonderland interpretation under which you cannot get from here to there and, if you get

9   there, by definition you have not arrived.  Neither Congress nor the Supreme Court in *Advocate*

10  intended any such absurd result.  *Medina*, 2017 WL 6459961 * 7 ("Medina's arguments are,

11  moreover, contrary to common sense. . . . If we accept Medina's view of the statute, virtually no

12  plan administered by a benefits committee or similar organization could qualify for the church-

13  plan exemption.")[12]

14         Third, interpreting the maintenance requirement as requiring the principal purpose

15  organization to do more than administer the plan is inconsistent with the *Advocate* decision itself.

16  In *Advocate*, the Supreme Court said that the "main job of such an entity [the principal purpose

17  organization] is to fund *or manage* a benefit plan . . .."  *Advocate*, 137 S.Ct. at 1657 (emphasis

18  added).  The legislative history contains no support for Plaintiffs' argument that the principal

19  purpose organization must have additional settlor functions.  As the Tenth Circuit concluded,

20  "[w]e see no reason to . . .  require principal-purpose organizations to be organizations

21  independent of the parent entity, endowed with the power to terminate benefit plans.  No

22  authority compels us to bar organizations from constituting subsidiary committees to administer

23  their church plans" *Medina*, 2017 WL 6459961 * 7.

24         As the Plaintiffs have repeatedly acknowledged in this litigation, Congress clearly sought

25  to exempt church plans maintained by pension boards from ERISA; the core power and

26  responsibility that Congress envisioned for pension boards was plan administration, not the ability

27  ───────────────

[12] "There may be some organization out there that is structured like that, but it certainly is not the
28  most intuitive way to do it.  And, it is not clear what the advantage of such a structure would be or
    why Congress would have required it."  *Medina*, 2017 WL 6459961 *7.

16

1  to fund, terminate and/or amend a plan.[13]  *Cf. Thorkelson v. Publishing House of Evangelical*

2  *Lutheran Church in Amer.*, 764 F. Supp. 2d 1119, 1129 (D. Minn. 2011)("there is no basis to

3  differentiate a Pension Committee from a Pension Board").[14]

4  **B.**   **Dignity Health and the Sub-Committee are Associated with the Catholic Church**

5

6  Plaintiffs contend that even if the Plan is maintained by a principal purpose organization,

7  the Plan is not a church plan for two additional reasons: (1) the Plan is not maintained for the

8  employees of a church because Dignity Health purportedly is not associated with the church

9  (FAC, ¶ 129); and (2) the Sub-Committee is purportedly not associated with the Catholic Church

10 (FAC, ¶ 144).  However, the FAC fails to allege facts that establish either of these legal

11 conclusions, and documents cited within the FAC establish that both Dignity Health and the Sub-

12 Committee *are* associated with the Catholic Church.  Instead, Plaintiffs' allegations are once

13 again based upon strained statutory interpretation that seeks to narrow to the point of invisibility

14 the obviously broad standard for association with a church – that the organization simply "shares

15 common religions bonds and convictions with a church."  *Medina*, 2017 WL 6459961 * 5 (noting

16 the "broad language of the definition [of associated with a church] in § 1002(33)(C)(iv)").

17 **1.**   **Church Control Is Not Necessary.**

18 Dignity Health is not controlled by the Catholic Church nor is church control required to

19 qualify as a church plan.  Section 1002(33)(C) makes it clear that while church control of an

20 organization is sufficient to qualify, control is not necessary.  Association alone is sufficient.  29

21 U.S.C. § 1002(33)(C)(i) (principal-purpose organization must be "controlled by *or* associated

22 with a church" (emphasis added); § 1002(33)(C) (ii)(II) (the term "employee of a church"

23

---

[13] Although Plaintiffs now contend that "'administer' and 'maintain' are distinct concepts," (D. I. 237, 6:27-7:3), in the Supreme Court Rollins admitted that "administered" is "closely related to 'maintained.'"  *Advocate Health Care Network v. Stapleton*, 2017 WL 656675 (U.S.), 43 (Brief for Respondent, U.S., 2017).

[14] Even if the Plan was maintained by Dignity Health, the Plan would still be an exempt church plan because Dignity Health's employees are deemed to be employees of a church and Dignity Health as their employer is deemed to be a church.  *See* 29 U.S.C. § 1002(33)(C)(ii)(II)(employees of church associated non-profit deemed to be employees of a church); 29 U.S.C. § 1002(33)(C)(iii)(church deemed to be employer of employees of church associated non-profit).

1   includes "an employee of an organization . . . which is controlled by *or* associated with a church"

2   (emphasis added)).  *See Loughrin,* 134 S. Ct. at 2389–90 (2014).

3                 **2.**       **The Association Inquiry Must Be Limited.**

4        To be associated with a church, the organization must merely "share[] common religious

5   bonds and convictions with that church." 29 U.S.C. § 1002(33)(C)(iv).  ERISA does not define

6   what that means.  However, to pass constitutional muster, the Supreme Court has repeatedly held

7   in similar contexts that the inquiry cannot delve into the religious beliefs or practices of an

8   organization.  *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979) (declaring

9   unconstitutional agency practice of examining whether a school is "completely religious" or

10   merely "religiously associated" to determine jurisdiction); *Mitchell v. Helms*, 530 U.S. 793, 828

11   (2000) (plurality opinion) ("it is well established, in numerous other contexts, that courts should

12   refrain from trolling through a person's religious beliefs"); *see University of Great Falls v.*

13   *N.L.R.B.*, 278 F.3d 1335, 1344 (D.C. Cir. 2002) (inquiry related to agency jurisdiction limited to

14   existence of "*bona fide*" association).

15        The church plan exemption to ERISA was originally established to prevent government

16   entanglement with religion.[15]  Thus, any "association" test to implement the church plan

17   exemption must avoid "delving into matters of religious doctrine or motive" or invoking a

18   standard that would coerce an "institution into altering its religious mission to meet regulatory

19   demands." *Great Falls*, 278 F.3d at 1345; *cf. Corporation of the Presiding Bishop of the Church*

20   *of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 345 (1987) (noting inherent tension

21   between laws requiring inquiry into religious nature of organization and constitutional protection

22   of religious freedom) (Brennan, J. concurring).  Likewise, in *Medina*, the Tenth Circuit found that

23   in the absence of a broad "associated with a church" requirement, ERISA would violate

24   "precisely what Supreme Court precedent forbids" because ERISA "would require religious

25   organizations, in order to receive the exemption's benefits, to adopt a particular structure . . . ."

26  
_____

[15] As the government noted in briefing filed in the Supreme Court, "Congress exempted 'church

27   plans' in part because 'the examinations of books and records' required under ERISA 'might be
regarded as an unjustified invasion of the confidential relationship that is believed to be

28   appropriate with regard to churches and their religious activities." *See* S. Rep. No. 383, 93d
Cong., Ist Sess. 81 (1973).

*Medina*, 2017 WL 6459961 *13; *see, e.g., Overall*, 23 F. Supp. 3d at 832 (plaintiff's "argument regarding religious orthodoxy is prohibited by the Constitution"); *see also Medina v. Catholic Health Initiatives*, 147 F. Supp. 3d 1190, 1202 (D. Co. 2015) ("plaintiff's arguments here would require the court to probe at the core of Catholic doctrine, and thus are inappropriate for judicial determination").

Indeed, the very inquiry into the degree of the religious association is prohibited. *Catholic Bishop*, 440 U.S. at 502 ("The resolution of [religious claims] will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission. *It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions"*) (emphasis added); *see Universidad Cent. De Bayamon v. N.L.R.B.*, 793 F.2d 383, 398-99 (1st Cir. 1985) (*en banc* opinion of Judge Breyer) (applying the *Catholic Bishop* exemption to a "Catholic- oriented" university that had both religious and secular purposes); *Great Falls*, 278 F.3d at 1340 ("the very inquiry by the NLRB into the University's religious character" is unconstitutional).[16]

### 3. Dignity Health and the Sub-Committee Are Clearly Associated with the Catholic Church.

Dignity Health was founded by Sponsoring Congregations of women religious whose religious orders date back to 19th century Ireland and are dedicated to serving the healing ministry of Jesus. Dignity Health holds itself out as religious. Dignity Health's website describes its "Mission" as a commitment to "furthering the healing ministry of Jesus," and its Mission Integration process ensures that the healing ministry of Jesus is folded into all aspects of the organization. *See* Section III(A)(2), *supra*.

Dignity Health's Bylaws include extensive provisions describing the mission of the organization as continuing the healing ministry of Jesus, requiring the corporation to follow the

---

[16] *Cf. Rose v. Long Island R.R. Pension Plan,* 828 F.2d 910, 916 (2d Cir. 1987) ("The NLRB guidelines are a useful aid in interpreting ERISA's governmental exemption, because ERISA, like the National Labor Relations Act, 'represents an effort to strike an appropriate balance between the interests of employers and labor organizations'")(quoting H.R. Rep. No. 533, 1974 U.S. Code Cong. & Ad. News at 4647 (relating to enactment of ERISA)).

1  mission and values of the healing ministry and requiring its facilities, employees and corporate

2  officers to follow the SCVs or ERDs which specifically embody Catholic religious doctrine.  *See*

3  Section III(A)(3), *supra*; RJN., Exh. 2.

4  　　The Bylaws also provide that Dignity Health's Board of Directors will include women

5  religious, that Dignity Health will establish a Mission Integrity Committee to monitor compliance

6  with the healing ministry as well as a Sponsorship Council whose members are the leaders of the

7  Sponsoring Congregations to oversee issues including Catholic identity, mission integration,

8  ministry leadership, chapels and religious symbols.  The Sponsorship Council must approve the

9  members of the Mission Integrity Committee, retains veto or approval rights over changes to the

10  SCVs and the implementation of the ERDs and it also has continuing approval rights regarding

11  the sale, lease or encumbrance of the massive amount of real property encompassing at least 23

12  hospitals contributed to Dignity Health by the Sponsoring Congregations.  *See* Section

13  V(B)(4)(c)(2), *infra*.

14  　　Likewise, the Sub-Committee's Charter expressly provides that it "shall be mindful of the

15  teachings and tenets the Roman Catholic Church and the Sponsors" and its members must be

16  approved by the Mission Integrity Committee whose members must themselves be approved by

17  the leaders of the Sponsoring Congregations.  In addition, the Mission Integrity Committee itself

18  reviews and monitors Dignity Health's pension administration.  *See id.*

19  　　These facts more than establish that Dignity Health and the Sub-Committee share

20  common religious bonds and convictions with the Catholic Church.

21  　　　　**4.**　　**To the Extent *Lown* Has Any Relevance, Dignity Health and the**
     **Retirement Sub-Committee Easily Satisfy *Lown*.**

22  　　　　　　**a.**　　***Medina* Rejects *Lown's* Narrow Interpretation.**

23  　　Plaintiffs have indicated that they intend to rely on *Lown v. Contl. Cas. Co.*, 238 F.3d 543,

24  548 (4th Cir. 2001) and *Chronister v. Baptist Health*, 442 F. 3d 648 (8th Cir. 2006) (following

25  *Lown*) to support their argument that Dignity Health and the Sub-Committee are not associated

26  with the Catholic Church.  Plaintiffs' allegations in the FAC regarding whether Dignity Health

27  receives funding from the church or imposes a denominational requirement on employees or

28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

20

MOTION TO DISMISS
CASE NO. 13-C-1450

1   patients are stated in an obvious attempt to run conform to these cases.  Although Dignity Health

2   and the Sub-Committee also satisfy any constitutional standard identified in *Lown*, the Tenth

3   Circuit correctly concluded that these cases are essentially irrelevant because "an organization

4   could share 'common religious bonds and convictions' with a church while satisfying none of the

5   *Lown* factors."  *Medina,* 2017 WL 6459961, at *5.  *Medina* noted the "uncertain derivation" of

6   the test identified in *Lown*, and also found that the factors identified are "much narrower than the

7   broad language of the definition in § 1002(33)(C)(iv)[sharing common religious bonds and

8   convictions]."  Thus, while it may suffice to satisfy these factors, an organization "does not need"

9   to satisfy them "in order to be associated with a church."  *Medina*, 2017 WL 6459961, at *5.

### b.      The Facts in *Lown* are Inapposite.

11      Plaintiffs' reliance on *Lown* is also misplaced.  *Lown* and *Chronister* arose under very

12   different circumstances guaranteeing that the key constitutional limitations on the association test

13   would not be relevant or litigated.  In both cases, the employer hospitals *denied* that they had any

14   association with a church and asserted that they were operating ERISA plans.  The courts were

15   considering whether to treat the plans as church plans so that the participants could avoid ERISA

16   preemption of their state law claims, even though the employers themselves contended that the

17   plans were covered by ERISA and had sought to administer the plans according to ERISA.  The

18   cases were not attempting to set forth a test for when a court can look behind a hospital or other

19   organization's bona fide assertion of religious character, nor did any employer raise any

20   constitutional objections to the tests the courts created.  Consequently, these cases are not relevant

21   to the issues raised in this motion.[17]

### c.      The *Lown* Factors.

23      In the much different circumstances of *Lown*, the Fourth Circuit identified a three-factor

---

[17] Moreover, given that the employer's decision to operate pursuant to ERISA is ordinarily decisive as a church plan can simply opt to have ERISA apply, there is a serious question as to whether there was any need for the court to identify a test for association at all.  *See, e.g., Robinson v. Metro. Life Ins. Co.*, No. 12-CV-01373-JAM-AC, 2013 WL 1281868, at *2 (E.D. Cal. Mar. 27, 2013) ("under certain circumstances, an election made pursuant to 26 U.S.C. § 410(d) permits a church plan to opt in to the ERISA regulatory scheme.  It is undisputed that such an election would operate along with ERISA's broad preemption provision to bar state law claims such as Plaintiff's if they relate to the [plan]").

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

MOTION TO DISMISS
CASE NO. 13-C-1450

1    test to determine whether an organization that claims it is *not* associated with a church may

2    nonetheless be deemed to be associated with a church: (1) whether the religious institution plays

3    an official role in the governance of the organization, (2) whether the organization receives

4    assistance from the religious institution, and (3) whether a denominational requirement exists for

5    any employee or patient/customer of the organization.  *Lown,* 238 F.3d at 548.  As noted, *Lown*

6    cites no authority for the three factors that it noted and *Chronister* simply cites *Lown*.  As a result,

7    these cases have been criticized.  *See Medina,* 2017 WL 6459961 *5 ("We do not rely on the

8    *Lown* factors"); *Medina*, 147 F. Supp. 3d at 1201 (*Lown* test "appears to have been crafted out of

9    whole cloth" and "seems to take a rather cramped view of what it means for two entities to share

10   common religious bonds.").[18]  In *Overall*, the only church plan case favorably cited by the

11   Supreme Court in *Advocate*, 137 S. Ct. at 1658-59, the court did not even apply the *Lown* test.

12   The court decided the "association" question on defendant's motion to dismiss and summarily

13   rejected, as a constitutionally prohibited argument regarding religious orthodoxy, the same

14   arguments Plaintiffs assert to show that Dignity Health does not share common religious bonds

15   and convictions with the Catholic Church.  *Overall*, 23 F. Supp. 3d at 832; *Rinehart*, 2009 WL

16   995715, at *4 (applying the "associated with" test provided under § (33)(C)(iv)); *Catholic*

17   *Charities*, 304 F. Supp. 2d at 85  (finding association but not applying *Lown* test).  Nonetheless,

18   to the extent it is relevant or constitutional, Dignity Health satisfies *Lown*.

19                    **(1)      The Sponsoring Congregations Play an Official Role.**

20           The Court need look no further than Dignity Health's Bylaws to determine that the

21   Sponsoring Congregations play an "official role" in Dignity Health directly and through the

22   Sponsorship Council.  Under Dignity Health's Bylaws, the Sponsors have specific reserved rights

23   regarding Dignity Health and its subsidiaries, which may require the written consent of the

24   Sponsors or the Sponsorship Council.  RJN, Exh. 1, § 6.1.  These rights are stated in the

25   _____

26   [18] *See* Suzanne K. Skinner, The ERISA Church Plan Exception: Why the *Lown* Test Is
     Improperly Narrow, 10 U. Pa. J. Bus. & Emp. L. 741, 753-55 (2008) ("When considering the
27   association aspects of the statute, the Fourth Circuit should have examined whether factors
     outside of control demonstrated that the hospital was 'associated with' a church.  Instead, it
28   repeated its prior analysis using only slightly different language, and thus put forth the idea that
     being associated with a church is equivalent to being controlled by a church.").

1    Governance Matrix (attached to the Bylaws), which provides that the Sponsorship Council or the

2    Sponsors have approval rights or veto power over: (1) changes to the SCVs (governing all

3    Dignity Health facilities), (2) changes in the substantive application of the ERDs governing

4    facilities whose property is subject to church law, (3) the sale, lease, disposition or encumbrance

5    of such property, and (4) amendment of provisions in the Articles of Incorporation regarding

6    Sponsor rights and dissolution of the corporation.  *Id*. at § 6.1, 16.2, Exh. A to the Bylaws; RJN,

7    Exh. 2, Art. V (non-member rights), Art. VII (dissolution).

8         In addition, the Sponsoring Congregations have an official role in the organization

9    through the Sponsorship Council, whose membership is composed of the leaders of the

10   Sponsoring Congregations.  RJN, Exh. 1, Art. XII.[19]  The purpose of the Sponsorship Council is

11   to "oversee and, as applicable, act upon issues of Catholic identity with respect to the Catholic

12   Sponsored Health Facilities" and "inform Dignity Health on matters of mission integration,

13   ministry leadership formation and dedicated sacred space as to all facilities . . . ."  *Id.*, § 12.1.

14   Moreover, through its representation on the Mission Integrity Committee, the Sponsorship

15   Council has an official role in, among other things, reviewing and monitoring "pension

16   administration" and appointment of the members of the Sub-Committee.  *Id*. at §

17   10.3(f)(4)(iii)(b).  This ongoing participation of the Sponsoring Congregations thus fully satisfies

18   the "official role" requirement of the *Lown* test.

19                    **(2)    The Sponsoring Congregations Provide Substantial
                                Financial Support.**

20

21         Likewise, Dignity Health and the Sub-Committee receive assistance from the Sponsoring

22   Congregations.[20]  In particular, the Sponsoring Congregations have provided Dignity Health with

23

24   _____

25   [19] The Sponsorship Council appoints three members to the Mission Integrity Committee; two
     Sisters from the Sponsoring Congregations sit on Dignity Health's Board of Directors; and one
     woman religious from the Sponsoring Congregations must be a member of the Board's Executive
     Committee.  RJN, Exh. 1, §§ 7.2 and 10.2(a).

26   [20] Although Dignity Health satisfies this factor, it is probably unconstitutional as a violation of the
     Establishment Clause because it prefers hierarchical religions over congregational religions.  In

27   many cases involving congregational religions there simply is no "religious institution" to provide
     financial support to the "organization."  It also improperly penalizes established church agencies,

28   which may neither rely upon nor require such support.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

23                                                          MOTION TO DISMISS
                                                            CASE NO. 13-C-1450

an enormous financial endowment as to which they have continuing rights through the contribution of at least 23 hospitals and related property known as the "Catholic Sponsored Health Facilities."[21]   These facilities are "Property Subject to the Norms of Church Law,"[22] were "contributed to the System by a Sponsor (or Sponsor predecessor)" and some of which constitute "Stable Patrimony" subject to church law on alienation of temporal goods.  (RJN, Exh. 1, Governance Matrix, p. 7, 9, notes 8, 24.)  The Sponsoring Congregations retain approval rights over the sale, lease, disposition or encumbrance of such property.  In addition, the use of such property is subject to the ERDs, the application of which cannot be changed without the approval of the Sponsoring Congregations.  And, if Dignity Health were to dissolve, these facilities must be returned to the Sponsoring Congregations.  RJN, Exh. 1(Bylaws, Article XIII, ¶ 13.2(a).)  In other words, the Sponsoring Congregations, which are part of the Catholic Church, have provided and continue to provide a massive financial contribution in the form of the land and buildings through which the system operates more than half of its hospitals.[23]  *See, e.g., McKeon v. Mercy Healthcare Sacramento,* 19 Cal. 4th 321, 324 (1998) (describing one Dignity Health hospital: "Most of the financing for the original Mercy Hospital buildings, as well as for subsequent additions and new buildings, was contributed by members of the Roman Catholic faith.  The church has been involved in all dedications of new Mercy buildings and facilities for over 75 years.  The facilities are dedicated for the exclusive purpose of healing, and holy water is sprinkled on the property as a symbolic act setting it aside as a sacred space for healing."), *superseded by statute recognized in Silo v. CHW Medical Foundation,* 27 Cal.4th 1087 (2002).  In addition, the Sub-Committee receives assistance from the Sponsoring Congregations through

---

[21] Dignity Health is not a holding or parent company; these Catholic hospitals are operated as dbas of Dignity Health, which means that they are not a legal entity separate and apart from Dignity Health.  *See Ball v. Steadfast-BLK,* 196 Cal. App. 4th 694, 701 (2011); *see also Coleman-Edwards v. Simpson,* No. 03CV3779DLIVVP, 2008 WL 820021, at *12 (E.D.N.Y. Mar. 25, 2008), aff'd, 330 F. App'x 218 (2d Cir. 2009) (plaintiff teacher was an employee of a church, and church plan participant because "although she worked at the School, [she] was employed directly by Concord, as the School was not a distinct legal entity").

[22] "'Property Subject to the Norms of Church Law'" means land, buildings and designated funds which are under the Canonical stewardship of a sponsoring religious institute, province or regional community.  RJN, Exh. 1, Governance Matrix, p. 9, ¶ 24.)

[23] The one-time contribution of buildings and land is at least as, if not more, significant than annual financial support.  The contribution of the physical hospitals makes possible the continuing existence of Dignity Health and the Plan.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

24

MOTION TO DISMISS
CASE NO. 13-C-1450

1    the Mission Integrity Committee which oversees pension administration and approves the

2    appointment of members of the Sub-Committee.

3                          **(3)      The Denominational Requirement is Unconstitutional.**

4         Finally, *Lown*'s third factor, a denominational requirement for employees or patients, is

5    contrary to the statute, unconstitutional, and has been almost uniformly criticized.  Nothing about

6    the statute's "common bonds and convictions" requirement remotely requires hospitals to refuse

7    service to patients of a different faith.  As one Court noted dismissively, "it is difficult to imagine

8    a health provider that would discriminate against non-Catholic patients and hire only Catholic

9    doctors, nurses and other staff.  In fact, the statutory test does not ask about the employees and

10   patients or customers *but about the organization itself.*"  *Ward v. Unum Life Ins. Co. of Amer.*,

11   No. 09-C-431, 2010 WL 4337821, at *2 (E.D. Wis. 2010) (emphasis added).  Jesus healed

12   persons of other faiths.  (Mark 7:25-30; Luke 17:15-19.)  The very suggestion that Dignity Health

13   must discriminate against non-Catholics to prove it shares "common bonds and convictions" with

14   the Catholic Church is contrary to the healing ministry of Jesus.  *Cf. Silo*, 27 Cal. 4th at 1109

15   (discussing a CHW affiliate "maintaining a secular appearance in its medical facility that is

16   welcoming to all faiths, thereby deemphasizing its distinctively Catholic affiliation, appears to be

17   part of CHWMF's religiously inspired mission of offering health care to the community").

18        In addition, a denominational requirement violates the Establishment Clause.  Such a

19   requirement "minimize[s] the legitimacy of the beliefs expressed by a religious entity."  *Great*

20   *Falls*, 278 F.3d at 1345-46 ("If the University is ecumenical and open-minded, that does not make

21   it any less religious, [and to limit the] exemption to religious institutions with hard-nosed

22   proselytizing, that limit their enrollment to members of their religion, and have no academic

23   freedom . . . is an unnecessarily stunted view of the law, and perhaps even itself a violation of the

24   most basic command of the Establishment Clause . . .").  The denominational requirement is

25   improper and seeks to penalize religious organizations "trying to find their place in a twenty-first

26   century world without giving up what makes them religious."  *Id.* at 1347.

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

25

MOTION TO DISMISS
CASE NO. 13-C-1450

1

### 5.    Plaintiffs' Religious Orthodoxy Inquiry is Unconstitutional.

2     Plaintiffs' suggestion that the Court can determine association by engaging in any

3  substantive review of Dignity Health's religious practices is plainly barred by the Supreme

4  Court's decisions in *Catholic Bishop* and *Great Falls*.  *See Overall*, 23  F. Supp. 3d at 832 (citing

5  *Amos*, *Catholic Bishop*, and *Great Falls* and rejecting plaintiff's attempt to impose a religious

6  orthodoxy requirement on association).  The constitutional problem exists whenever a court is

7  asked, as Plaintiffs do here, to inquire whether an entity (or individual) is "*sufficiently* religious."

8  *Great Falls,* 278 F.3d at 1343 (emphasis in original).  "[A]d hoc efforts, the application of which

9  will themselves involve significant entanglement, are precisely what the Supreme Court in

10 *Catholic Bishop* sought to avoid."  *Id.* at 1342, *citing Universidad*, 793 F.2d at 402-03 (holding

11 NLRB has no jurisdiction over Catholic-oriented college that primarily provides secular

12 education).

13    As the D.C. Circuit observed, a court cannot constitutionally measure degrees of

14 association by questioning a religious organization's motives, beliefs, or mission, because

15 "[r]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others to

16 merit First Amendment protection."  *Great Falls*, 278 F.3d at 1344, *citing Thomas v. Review Bd.*,

17 450 U.S. 707, 714 (1981); *see also Amos*, 483 U.S. at 343 ("What makes the application of a

18 religious-secular distinction difficult is that the character of an activity is not self-evident.  As a

19 result, determining whether an activity is religious or secular requires a searching case-by-case

20 analysis.  This results in considerable ongoing government entanglement with religious affairs.")

21 (Brennan, J., concurring).  Plaintiffs' attempt to allege lack of association by imposing a religious

22 orthodoxy requirement fails because the inquiry itself is unconstitutional.

23    Plaintiffs allege that not all Dignity Health facilities fully "adhere to the moral and

24 doctrinal teaching" of the Catholic Church (FAC, ¶¶ 40-42) and decry the absence of

25 denominational requirements (*Id.*, ¶¶ 139-142).  But the First Amendment prohibits Plaintiffs

26 from questioning, and this Court from evaluating, whether Dignity Health and the Subcommittee

27 are "Catholic enough."  *Jones v. Wolf*, 443 U.S. 595, 602 (1979).  Such allegations cannot bear on

28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

26

MOTION TO DISMISS
CASE NO. 13-C-1450

1   Dignity Health's association with the Catholic Church; they do not differ from the NLRB's

2   unconstitutional policy of declining jurisdiction over "completely religious" schools but

3   exercising jurisdiction over "religiously associated" schools. *See Catholic Bishop*, 440 U.S. at

4   502 ("process of inquiry" into issues of religious faith may impinge on constitutional rights); *see*

5   *also Universidad,* 793 F.2d at 402-03 (*Catholic Bishop* "sought to minimize the extent to which

6   Labor Board inquiry (necessary to make the 'completely/merely-associated' distinction) would

7   itself entangle the Board in religious affairs"); *Great Falls*, 278 F.3d at 1340 ("the very inquiry by

8   the NLRB into the University's religious character" is unconstitutional); *Overall*, 23 F. Supp. 3d

9   at 832 (plaintiff's "argument regarding religious orthodoxy is prohibited by the Constitution");

10  *Medina*, 147 F.Supp.3d at 1202 ("plaintiff's arguments here would require the court to probe at

11  the core of Catholic doctrine, and thus are inappropriate for judicial determination").

12       For the same reasons, Plaintiffs' misleading allegation that the Archbishop of San

13  Francisco stated that Dignity Health's name will not suggest a direct association with the Catholic

14  Church (FAC, ¶ 9. D) is irrelevant and simply invites the Court down a rabbit hole of

15  unconstitutional entanglement in issues of religious belief and doctrine. [24]   In context, those

16  statements merely observe that after a restructuring, Dignity Health is no longer part of (*i.e.*,

17  controlled by) the Catholic Church, and that Dignity Health's name does not suggest otherwise.

18  But as the Archbishop of San Francisco explained, the restructuring's purpose was to ensure that

19  Dignity Health would continue to "comply[] with Catholic moral teaching."  RJN, Exh. 11   The

20  Archbishop further agreed with expert theologians that the restructuring "appropriately respects

21  the moral teaching of the Roman Catholic Church."  *Id.*  The very involvement of these religious

22  authorities, including the Archbishop's issuance of a formal theological declaration, underscores

23  that Dignity Health "shares common religious bonds and convictions" with the Catholic Church,

24  which is all the statute requires. 29 U.S.C. § 1002(33)(C)(iv). Moreover, in *Universidad*, Judge

25  Breyer had no trouble finding a religious affiliation sufficient to exempt the university from

26  NLRB jurisdiction even though the Archbishop of San Juan had stated that the "University was

27  ───────────────
    [24] Notably, the *nihil obstat*, the document that Plaintiffs' quote but do not name in paragraph 9.D
    of the FAC, is a document that is required to be obtained under ERD 68 only for partnerships
28  sponsored by religious institutes of pontifical right such as the Sponsoring Congregations.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

MOTION TO DISMISS
CASE NO. 13-C-1450

1   'not a Catholic university.'"  *Universidad*, 793 F.2d at 387, 399-400;[25] *Great Falls*, 276 F.3d at

2   1343 (citing *Universidad*).

3       In *Catholic Bishop*, the Supreme Court concluded, "in the absence of a clear expression of

4   Congress' intent to bring teachers in church-operated schools within the jurisdiction of the Board,

5   we decline to construe the Act in a manner that could in turn call upon the Court to resolve

6   difficult and sensitive questions arising out of the guarantees of the First Amendment Religion

7   Clauses." *Catholic Bishop*, 440 U.S. at 507.  Here, the clear legislative intent was to expand the

8   church plan exemption and avoid what Plaintiffs seek here – judicial examination of "difficult

9   and sensitive" issues of religious faith.

10      **C.    The Church Plan Exemption Does Not Violate the Establishment Clause.**

11          **1.    The Supreme Court Has Already Rejected Plaintiffs' Argument.**

12      Both common sense and the constitutional doubt doctrine establish that the Supreme

13  Court's decision in *Advocate* has resolved any establishment of religion argument in this case.

14  Rollins (and several of her amici) pointedly argued in *Advocate* that the church plan exemption

15  itself, as interpreted by Dignity Health, necessarily violated the Establishment Clause.  Plaintiffs

16  told the Supreme Court that Defendants' interpretation of the church plan definition would

17  "create grave constitutional doubts" and "run afoul of the Establishment Clause."  (Respondent's

18  Brief at 56).  But the Supreme Court, while unanimously ruling against Rollins, declined even to

19  mention her constitutional argument.  However, if the Supreme Court found that the exemption

20  violated the Establishment Clause, it would not (indeed, could not, in light of the arguments

21  presented to it) have ruled that church plans include plans maintained by a Section 1002(33)(C)(i)

22  organization, while expressly noting the maintained and association issues as open for further

23  litigation.  *Advocate,* 137 S.Ct. at 1657 n.2 and 1658 n.3.  Accordingly, *Advocate* implicitly and

24  definitively rejected Plaintiffs' Establishment Clause argument.

25  [25] In *Univerisdad*, Judge Breyer noted in *dicta* that the concerns in *Catholic Bishop* could apply
    whenever a church runs a "non-religious enterprise such as a hospital" and noted that church
26  related moral issues were more likely to permeate the educational process than the administration
    of farms or even hospitals.  However, Judge Breyer did not consider application of *Catholic
27  Bishop* to church associated hospitals or more specifically the constitutional limits of the church
    association inquiry necessitated by the Supreme Court's ruling in *Advocate* that a church
28  associated non-profit can establish a church plan provided that the plan is properly maintained.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

28

MOTION TO DISMISS
CASE NO. 13-C-1450

The Supreme Court is obliged to interpret a statute in a way that preserves its constitutionality.  *See Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998).  In *Almendarez-Torres*, the Supreme Court stated that "the 'constitutional doubt' doctrine does not apply mechanically whenever there arises a significant constitutional question the answer to which is not obvious.  *And precedent makes clear that the Court need not apply (for it has not always applied) the doctrine* in circumstances similar to those here—where a constitutional question, while lacking an obvious answer, does not lead a majority gravely to doubt that the statute is constitutional."  *Almendarez-Torres*, 523 U.S. at 239 (emphasis added); *Catholic Bishop*, 440 U.S. at 509.

### 2.     The Establishment Argument Also Fails on the Merits.

Notwithstanding the Supreme Court's implied rejection of Plaintiffs' argument, if the Court were to consider the issue, it would evaluate Plaintiffs' Establishment Clause claims under the three-part test in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), under which "government action must have a secular purpose, its principal or primary effect must be one that neither advances nor inhibits religion, and it must not foster excessive entanglement with religion."  *Catholic League for Religious & Civil Rights v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1055 (9th Cir. 2010) (internal quotation omitted).  *Medina* fully addressed and rejected all of Plaintiffs' arguments that the church plan exemption is unconstitutional.  *Medina*, 2017 WL 6459961, at *10.

Under the *Lemon* test, there is no establishment of religion caused by Congress's decision to exempt church plans from ERISA.  Dignity Health's interpretation of the church plan exemption serves the "permissible legislative purpose to alleviate significant government interference with the ability of religious organizations to define and carry out their religious mission."  *Amos*, 483 U.S. at 335; *see also Medina*, 2017 WL 6459961, at *11 ("[W]e find this purpose – avoiding entanglement with religion – is a secular one.  A contrary conclusion would be illogical . . .").  Because it merely relieves religious organizations from burdensome regulations to allow them to pursue their own ends, it neither advances nor inhibits religion. *Amos*, 483 U.S. at 336-37; *Medina*, 2017 WL 6459961, at *13 (citing *Amos* and concluding that

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

29

MOTION TO DISMISS
CASE NO. 13-C-1450

1    "exempting religious organizations from complying with a regulatory scheme dos not convey an

2    impermissible message that religion is favored or preferred").  The Tenth Circuit also found that

3    "far from entangling the government in the affairs of religious institutions, the church-plan

4    exemption avoids the entanglement that would likely occur in its absence."  *See id.*; *see also*

5    *Overall*, 23 F. Supp. 3d 833 (dismissing claim because plaintiff lacked Article III standing to

6    raise it).

7        D.    **Plaintiffs' State Law Claims Fail.**

8        1.    **The Court Should Not Exercise Supplemental Jurisdiction.**

9        The district court for the Southern District of Illinois recently considered and rejected the

10   Plaintiffs' request to exercise supplemental jurisdiction over essentially identical state law claims

11   plead in the alternative in another church plan challenge.  *Smith v. OSF HealthCare Sys.*, No. 16-

12   CV-467-SMY-RJD, 2017 WL 6021625 (S.D. Ill. Dec. 5, 2017).

13       In *Smith*, the court reasoned as follows:

14           ERISA is the only basis for this action to be in federal court.  Plaintiffs have pled
             the state law claims "in the alternative" to the ERISA counts because they
15           recognize the two approaches are mutually exclusive. If the Court were to find that
             ERISA applies, the state law claims must be dismissed as preempted. On the other
16           hand, if the Court finds that ERISA does not apply, then the state law claims are
             not preempted, but lack any basis for federal jurisdiction and the Court must
17           dismiss the case. In either case, the result is the state law counts being dismissed.

18           Given the absolute conflict between complete preemption and supplemental
             jurisdiction, the state law claims are poisonous to federal subject-matter
19           jurisdiction. Plaintiffs can either proceed on their state law claims or they can be in
             federal court, but not both. There is no point in continuing to litigate these claims
20           in this Court because they are going to be dismissed sooner or later. The Court will
             therefore exercise its discretion and dismiss them without prejudice now for lack
21           of subject matter jurisdiction. *Id.*

22       The same conclusion applies here.  Plaintiffs allege the same state law claims in the

23   alternative and the same conflict exists.  Although Plaintiffs' attempt to allege facts establishing

24   jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), that

25   attempt fails for the reasons discussed below.  Therefore, the Court should dismiss Plaintiff's

26   state law claims.  *See Mousa v. Harris*, No. 13-CV-00140-JST, 2013 WL 6185526, at *4 (N.D.

27   Cal. Nov. 26, 2013) (citing 28 U.S.C. § 1367(c))("When a district court has dismissed all claims

28   over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

30

MOTION TO DISMISS
CASE NO. 13-C-1450

1    the remaining claims").

2           **2.      Plaintiffs Cannot Establish Jurisdiction Under CAFA.**

3           "A Rule 12(b)(1) jurisdictional attack may be facial or factual.  In a facial attack, the

4    challenger asserts that the allegations contained in a complaint are insufficient on their face to

5    invoke federal jurisdiction.  By contrast, in a factual attack, the challenger disputes the truth of the

6    allegations that, by themselves, would otherwise invoke federal jurisdiction." *Retiree Support*

7    *Grp. of Contra Costa Cty. v. Contra Costa Cty.*, 944 F. Supp. 2d 799, 803 (N.D. Cal. 2013)

8    (*citing Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)).

9           "In resolving a factual attack on jurisdiction, the district court may review evidence

10   beyond the complaint without converting the motion to dismiss into a motion for summary

11   judgment.  The court need not presume the truthfulness of the plaintiff's allegations." *Safe Air*,

12   373 F.3d at 1039.  Under the "local controversy" exception to CAFA, the Court "shall decline to

13   exercise jurisdiction" over a class action where: (1) greater than two-thirds of the proposed class

14   are citizens[26] of the State in which the action was filed; (2) at least one defendant from whom

15   significant relief is sought is a citizen of the State in which the action was originally filed; (3) the

16   principal injuries were incurred in the State in which the action was filed; and (4) no other similar

17   class action has been filed against the defendants by or on behalf of the same person within the

18   prior three years.  *See Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1023 (9th Cir. 2007) (*citing*

19   28 U.S.C. § 1332(d)(4)(B)).

20          Here, the Declaration of Elizabeth Meckenstock ("Meckenstock Decl.") establishes the

21   falsity of Plaintiffs' allegation "on information and belief, that fewer than two-thirds of the

22   members of all proposed plaintiff classes in the aggregate are citizens of California."  (FAC, ¶

23   15.)  Based upon an analysis of the mailing addresses of 101,704 Plan participants, including

24   active, terminated, and retired employees and beneficiaries, at least 70,118 – or 68.9% - have

25   California mailing addresses.  (Meckenstock Decl., ¶ 14-17.)  This is not surprising.  Over 80% of

26

27   _____
     [26]  A party's residence is "prima facie" proof of that person's domicile unless rebutted with

28   sufficient evidence of change. *Bey v. SolarWorld Indus. Am.*, 904 F. Supp. 2d 1096, 1102 (D. Or.
     2012) (*citing Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571 (5th Cir. 2011)).

1  Dignity Health's hospitals are located in California.[27]  Dignity Health's primary corporate office

2  is located in San Francisco, California, and two other large corporate offices are located in

3  Sacramento and Pasadena.  *Id.*, 17.  Dignity Health and the Sub-committee are citizens of the

4  State of California.  (FAC, ¶¶ 21-24, 128.)  The principal alleged injuries were incurred in

5  California, where the Plan is indisputably maintained (regardless of the dispute over who

6  maintains it), and there have been no similar prior class actions.  Accordingly, dismissal of the

7  state law claims is mandatory.[28]

8                   **3.       Plaintiffs Lack Article III Standing To Pursue State Law Claims.**

9        Plaintiffs do not allege that they have suffered any injury or that Dignity Health has failed

10  to pay any benefit payment, or any breach that is unrelated to the alleged failure to fully fund the

11  Plan.  Nor do they allege any facts to support the conclusion that there is any imminent risk of

12  default.  Therefore, the Court should dismiss the state law claims.  Fed. R. Civ. P. 12(b)(1).

13        The "irreducible minimum requirements" requirements of Article III standing are (1)

14  injury in fact, (2) causation, and (3) redressability.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555,

15  560-61 (1992).  Plaintiffs lack Article III standing to seek relief under their state law claims

16  because they have not suffered any injury in fact, "the first and foremost" of standing's three

17  elements.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  "To establish injury in fact, a

18  plaintiff must show that he or she suffered an invasion of a legally protected interest that is

19  concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Id.* at 1548

20  (citing *Lujan*) (internal quotations omitted).  Plaintiffs, however, have not pled a "a legally

21  protected interest" that was injured by Defendants.  *See, e.g., Rudgayzer v. Yahoo! Inc.*, No. 5:12-

22  CV-01399 EJD, 2012 WL 5471149, at *7 (N.D. Cal. Nov. 9, 2012) ("Plaintiff has failed to show

23  an injury-in-fact for the purposes of Article III standing for the same reasons as he has failed to

24  satisfy the damages element of a breach of contract claim.").

---

25  [27]  https://www.dignityhealth.org/ourlocations.

26  [28]  Alternatively, even if less than 66.6% of Plan participants are California citizens, the Court maintains discretion to dismiss the state law claims under 28 U.S.C. § 1332(d)(3).  *See Serrano*,

27  478 F.3d at 1023.  The Court should do so because the significant majority of proposed class members are California citizens.  The claims will be governed by California law, and do not

28  involve national or interstate interest.  The federal district court has no distinct nexus with the class, the defendants, or the alleged harm.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

32

MOTION TO DISMISS
CASE NO. 13-C-1450

1    Plaintiffs' lack of Article III standing is due to three legal principles regarding the nature

2    of defined benefit plans, like the Plan here.

3                    **a.        Plaintiffs Do Not Allege Individualized Harm.**

4        In a defined benefit plan, the individual has no claim to, or interest in, the assets of the

5    plan generally.   *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 439-40 (1999) ("A defined

6    benefit plan . . . consists of a general pool of assets rather than individual dedicated accounts.

7    Such a plan, 'as its name implies, is one where the employee, upon retirement, is entitled to a

8    fixed periodic payment.'"); *see also Saks v. Damon Raike & Co.*, 7 Cal. App. 4th 419, 427

9    (1992).  Plaintiffs do not allege that they (or any other participants) have experienced

10   individualized harm.  Neither Plaintiff alleges that she (or anyone else) has ever been denied any

11   benefit or payment owed under the Plan.

12       Harm allegedly suffered by the Plan itself is not an "injury" sufficient to confer Article III

13   standing on an individual plan participant seeking to recover money for the plan.  "Diminution of

14   plan assets, without more, is insufficient to establish actual injury to any particular participant."

15   *Perelman v. Perelman*, 793 F.3d 368, 374 (3rd Cir. 2015); *see also Lee v. Verizon*

16   *Communications, Inc.*, 954 F. Supp. 2d 486, 498 (N.D. Tex 2013), *aff'd* 837 F.3d 523 (5th Cir.

17   2016) (citing *David v. Alphin,* 704 F.3d 327, 338 (4th Cir. 2013)); *see also Slack v. International*

18   *U. of Operating Engineers*, No. C-13-5001 EMC, 2014 WL 4090383 at *11 (N.D. Cal. Aug. 19,

19   2014)  ("even where a plan trustee breaches his fiduciary duty, a plan participant may not sue for

20   that breach unless that breach has caused *the plan participant* a cognizable injury that could be

21   redressed by court action") (emphasis in original); *Glanton ex rel. ALCOA Prescription Drug*

22   *Plan v. AdvancePCS, Inc.,* 456 F.3d 1123, 1126-27 (9th Cir. 2006).

23       Plaintiffs try to avoid dismissal under Article III by seeking only equitable remedies of

24   specific performance, declaratory, and injunctive relief for their state law claims.  (FAC, ¶¶ 293,

25   307, 320.)  Yet, Plaintiffs' Prayer for Relief establishes that these are in fact monetary claims.

26   (FAC, Prayer ¶ Q ("an order requiring Defendant Dignity to make contributions to the Dignity

27   Plan trust . . ."); ¶ R ("ordering Dignity to disgorge and pay to the Dignity Plan trust . . ."); ¶ T

28   ("requiring Defendants, as trustees and fiduciaries of the Dignity Plan, to make the Dignity Plan

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

33

MOTION TO DISMISS
CASE NO. 13-C-1450

whole . . .")).  Where monetary relief is sought, a plaintiff must allege individual loss to satisfy Article III.  *Wells v. California Physicians' Serv.*, No. C05-01229 CRB, 2007 WL 926490, at *4 (N.D. Cal. Mar. 26, 2007).[29]  Plaintiffs' prayer for equitable remedies is just a poorly disguised request for monetary relief, which requires Plaintiffs to plead individualized harm.

> **b.     A Beneficiary Has No Standing to Sue on Behalf of the Trust**

Second, Plaintiffs' state law claims relate to alleged breaches of the obligation to fund the plan.  (FAC, ¶¶ 287, 288, 297, 303, 318.)  "Traditionally, trust law, on which ERISA is based, does not allow beneficiaries to bring suit on behalf of the trust."  *Glanton*, 465 F.3d at 1126 n.2 (citing Restatement (Second) of Trusts § 214 cmt. b. - "A particular beneficiary cannot maintain a suit for a breach of trust which does not involve any violation of duty to him.").  California law of trusts is in accord: "[T]he beneficiary of a trust generally is not the real party in interest and may not sue in the name of the trust . . . .  Thus, absent special circumstances, an action prosecuted for the benefit of a trust estate by a person other than the trustee is not brought in the name of a real party in interest and is demurrable."  *Saks*, 7 Cal. App. 4th at 427 (internal citations and quotations omitted).

Any monetary recovery here would inure only to the Plan itself, not to any individual plan participant or beneficiary.  *Paulson v. CNF, Inc.,* 559 F.3d 1061, 1073 (9th Cir. 2009) ("The Supreme Court has held that recovery for a violation of 29 U.S.C. § 1109 for breach of fiduciary duty inures to the benefit of the plan as a whole, and not to an individual beneficiary."); *see also Impress Commc'ns v. Unumprovident Corp.*, 335 F. Supp. 2d 1053, 1059 (C.D. Cal. 2003) (dismissing breach of contract theory where the alleged injury was "necessarily predicated on the

---

[29] In some cases involving ERISA's disclosure requirements, where, unlike here, the plaintiffs did not claim monetary loss or seek monetary relief, Courts have found that participants have standing under Article III to seek equitable remedies.  *See Shaver v. Operating Engineers Local 428 Pension Tr. Fund*, 332 F.3d 1198, 1203 (9th Cir. 2003) (plaintiff could pursue claim for injunctive relief seeking removal of trustees or requiring them to keep better records in the absence of allegations of loss or injury); *Friend v. Sanwa Bank California*, 35 F.3d 466, 469 (9th Cir. 1994) (where monetary relief is sought "ERISA holds a trustee liable for a breach of fiduciary duty only to the extent that losses to the plan result from the breach"); *Wells.*, No. C05-01229 CRB, 2007 WL 926490, at *5  ("Plaintiff seeks only injunctive relief wholly unrelated to any monetary loss."); *New Orleans ILA Pensioners Ass'n v. Bd. of Trustees of New Orleans Employers Int'l Longshoremen's Ass'n AFL-CIO Pension Fund*, No. CIV. A. 07-6349, 2008 WL 215654, at *4 (E.D. La. Jan. 24, 2008) (plaintiffs' claims for restitution and constructive trust sought monetary relief and required plaintiff to allege individual loss to satisfy Article III).

1   anticipated denial of future benefits. Such injury was purely speculative and insufficient to confer

2   standing under Article III.").

3       The mere fact that a plaintiff is a participant in a plan does not suffice to confer Article III

4   standing to claim an injury to that plan.  In *Palmason v. Weyerhaeuser Co.*, No. C11-0695RSL,

5   2013 WL 4511361, at *5 (W.D. Wash. Aug. 23, 2013), the court rejected the contention that the

6   plaintiffs' status as beneficiaries of the plan, and thus their beneficial interest in the plan assets,

7   was sufficient to confer Article III standing:

8       Plaintiffs assert that they have a protectable interest in the assets of the plan, not
        just in the payments to which they are entitled under the plan.  The Supreme Court

9       disagrees. . . . *The question for standing purposes is not who has a beneficial
        interest in the assets, but whether those interests were adversely affected in a way*

10      *that gives rise to standing to pursue a remedy.* . . . . Simply stating that plaintiffs
        are beneficiaries of the trust is insufficient to give rise to standing if the

11      beneficiaries will not benefit from the suit.

12              **c.      Plaintiffs' Theory is Speculative.**

13      In a defined benefit plan the employer is legally obligated to ensure that a plan has

14  adequate assets to pay out the benefits that have accrued to plan participants.  "[T]he employer

15  typically bears the entire investment risk and . . . must cover any underfunding as a result of a

16  shortfall that may occur from the plan's investments. . . . The structure of a defined benefit plan

17  reflects the risk borne by the employer.  Given the employer's obligation to make up any

18  shortfall, no plan member has a claim to any particular asset that composes a part of the plan's

19  general asset pool.  Instead, members have a right to a certain defined level of benefits, known as

20  'accrued benefits.'"  *Hughes*, 525 U.S. at 440; *Lee*, 837 F.3d at 545 ("absent plan termination, the

21  employer must cover any shortfall resulting from plan instability").

22      Accordingly, "standing for defined benefit plan participants requires imminent risk of

23  default by the plan."  *Lee,* 837 F.3d at 546.  Accordingly, "for the [plaintiff] Class to establish a

24  particularized, concrete, and actual or imminent injury, it must show more than the mere loss of

25  Plan assets.  It must show an effect on its members' benefits payments."  *Lee*, 954 F. Supp. 2d at

26  498; *see Perelman*, 793 F.3d at 374 (same).  A plaintiff would have to plausibly allege both an

27  underfunding and the employer's inability to make up the shortfall in order to claim Article III

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

35

MOTION TO DISMISS
CASE NO. 13-C-1450

standing.  *See Harley v. Minnesota Mining & Mfg.*, 284 F.3d 901, 906 (8th Cir. 2002) ("plan participants cannot establish standing to seek monetary damages where the plan has substantial surplus assets or the plan sponsor is financially capable of making up any losses suffered by the plan"); *Lee*, 954 F. Supp. 2d at 498 (same); *Perelman*, 919 F. Supp. 2d at 519 (no Article III standing where plaintiff failed to allege plan sponsor lacked financial ability to make necessary contributions).  Here, as noted, the Plan is not improperly funded; if it were, Plaintiffs admit that Dignity Health has sufficient resources to make up any shortfall.  (FAC, ¶ 37 ("As of fiscal 2016 year end, Dignity had approximately $17 billion in assets, and operating revenues of approximately $12.6 billion.").

Conclusory and speculative allegations that a plan "might" be at risk of default are insufficient to create Article III injury.[30]  *Slack*, 2014 WL 4090383, at *15-16 (to allege standing, plaintiff must allege facts that plausibly establish a real risk to the health of the plan such that participants suffered an injury and noting that conclusory statement of risk unsupported by factual allegations is not enough); *Lee,* 837 F.3d at 546 ("regardless of whether the plan is allegedly under- or overfunded, the direct injury to a participants' benefits is dependent on the realization of several additional risks, which collectively render the injury too speculative to support standing"); *Perelman*, 793 F.3d at 375 (same); *David*, 704 F.3d at 338 (same).

### 4.    Plaintiffs' Breach of Contract Claim Fails.

The elements for a breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff.  *Oasis v. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).  Plaintiffs' claim that Dignity Health breached its obligation under the Plan to fund the Plan with "an amount which is sufficient on an actuarial basis to provide for the retirement benefits and other benefits provided under the Plan" fails for multiple reasons.  RJN, Exh. 8, § 6.01; FAC, ¶¶ 280 and 290.

First, Plaintiffs fail to allege that the Plan is insufficiently funded *on an actuarial basis* to provide for the benefits provided under the Plan.  Plaintiffs cite no authority for their attempt to

---

[30] Mere allegations of risk also create an Article III ripeness problem.  *See Boba v. City of Medford*, 564 F.3d 1093, 1097 (9th Cir. 2009) ("a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all").

1   equate "fully funded" with the contractual obligation to fund in an amount "sufficient on an

2   actuarial basis" to provide for the benefits under the Plan.  Indeed, the fact that the Plaintiffs have

3   never alleged that Dignity Health ever failed to pay a single benefit demonstrates that at all

4   relevant times, the Plan has been funded to provide the benefits due.  *Cf. McGuigan v. City of San*

5   *Diego*, 183 Cal. App. 4th 610, 619 (2010) (underfunding occurs "by failing to contribute the

6   actuarially-determined amounts of employer contributions that were due to the retirement system

7   during that period").  Plaintiffs do not allege that Dignity Health failed to make the actuarially

8   determined amounts of contributions required for any period.

9        Instead, Plaintiffs attempt to mislead the Court when they allege that "as of June 30,

10   2016," the Dignity Plan was underfunded by $1.8 billion."[31] (FAC, ¶ 76.)  Courts have rejected

11   prior attempts to use irrelevant financial statement accounting figures, rather than actuarial

12   figures.  *See Palmason v. Weyerhaeuser Co.*, No. C11-0695RSL, 2013 WL 4511361, at *8 (W.D.

13   Wash. Aug. 23, 2013) (rejecting Plaintiff's reliance on SEC reports to establish underfunding of

14   plan).  Moreover, this allegation is legally inadequate because Plaintiffs do not – and cannot

15   allege that Dignity Health has failed to adequately fund the plan *on an actuarial basis*.

16        Second, "Where, as here, the pension fund trustees are granted vast discretionary powers

17   to interpret the pension document and administer the pension fund, the scope of court review of

18   the trustees' actions is limited to determination whether a particular interpretation by the trustees

19   is unreasonable, arbitrary, capricious, or has been made in bad faith."  *Lix v. Edwards*, 82 Cal.

20   App. 3d 573, 578 (1978).  Here, the Plan gives the Sub-Committee broad authority to interpret

21   and administer the Plan.  RJN, Exh. 8, § 11.08.  In the context of their FAC, which fails to allege

22   that any participant has suffered an injury, Plaintiffs have not and cannot allege that the Sub-

23   Committee's interpretation of the Plan's funding requirement is "unreasonable, arbitrary,

24   capricious, or has been made in bad faith."  To the contrary, no authority stands for the

25

26

27   [31] Plaintiffs apparently obtained these figures form Dignity Health's publicly available audited
     financial statements, which on page 28 reflect a $1.775 billion funding gap.
28   https://www.dignityhealth.org/-
     /media/cm/media/documents/Financial/2017DignityHealthConsolidatedSecured.ashx?la=en.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

37

MOTION TO DISMISS
CASE NO. 13-C-1450

1    proposition that a Plan must be fully funded.  Certainly, ERISA imposes no such requirement.[32]

2         Third, Plaintiffs' claim for equitable relief is merely a disguised claim for damages, which

3    Plaintiffs do not seek.  *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210–11

4    (2002) ("[A]n injunction to compel the payment of money past due under a contract, or specific

5    performance of a past due monetary obligation, was not typically available in equity."); *see also*

6    *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 954 (9th Cir. 2014) (*citing Knudson*); *Nat'l*

7    *Rural Telecommunications Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1040, 1051 (C.D. Cal.

8    2003) ("injunction for specific performance for the payment of past due amounts*"* is not available

9    remedy); *Wilkison v. Wiederkehr*, 101 Cal. App. 4th 822, 834–35 (2002) ("[E]quity will not grant

10   quasi-specific performance of [an] agreement when [adequate legal] remedies are available").

11        Courts have specifically rejected attempts to cast claims for monetary relief as equitable

12   claims.  *See, e.g., Fox v. McCormick*, 20 F. Supp. 3d 133, 143 (D.D.C. 2013) (holding plaintiffs

13   lacked Article III standing to pursue disguised claim for equitable relief, which was "plainly

14   intertwined with Plaintiffs' demand for monetary relief," where they sought a "declaration that

15   the Trustees of the [Central Pension Fund] have breached their ERISA fiduciary duties to the

16   [Fund] and its plan participants by failing to pursue delinquent contributions to the [Fund]."); *see*

17   *generally Mertens v. Hewitt Assocs.*, 508 U.S. 248, 258-59 (1993).  Plaintiffs make the same

18   claim for monetary relief here.  (FAC, ¶ 320 ("Plaintiffs seek an order . . . directing the

19   Retirement Committee . . . to require Dignity to make contributions to the Dignity Plan . . . .")).

20   Not only do Plaintiffs fail to allege any facts demonstrating the absence of a legal remedy,[33] but it

21   [32] Under ERISA, a defined benefit plan is not considered to be "at risk" or "underfunded" "unless
     the value of plan assets is less than 80% of the plan's funding target."  *Perelman,* 793 F.3d at
22   374-75; *Palmason*, 2013 WL 4511361, at *8 (rejecting argument that plan was underfunded
     based upon financial statement accounting); *Harley*, 284 F.3d at 907 ("Here, the ongoing Plan
23   had a substantial surplus before and after the alleged breach and a financially sound settlor
     responsible for making up any future underfunding.  The individual pension rights of Plan
24   participants are fully protected.") *cf. In re Ret. Cases*, 110 Cal. App. 4th 426, 458 (2003) ("there
     was no evidence that the underfunding would in any way jeopardize the financial integrity of any
25   retirement system").
     [33] The availability of the remedy of specific performance is premised upon well-established
26   requisites.  These requisites include a showing by plaintiff of (1) the inadequacy of his legal
     remedy; (2) an underlying contract that is both reasonable and supported by adequate
27   consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are
     sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial
28   similarity of the requested performance to that promised in the contract.  *See Henderson v.*

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

MOTION TO DISMISS
CASE NO. 13-C-1450

1    is beyond dispute that an award of damages for a claim for monetary relief is sufficient.

2         Plaintiffs' own allegations belie the availability of specific performance.  Although

3    improper because not calculated on an actuarial basis, Plaintiffs' have fixed the Plan's alleged

4    damages at $1.8 billion, the amount of the alleged underfunding.  FAC, ¶ 76; *See Robinson v.*

5    *C.R. Bard, Inc.*, No. 16-CV-00942-JST, 2016 WL 3361825, at *3 (N.D. Cal. June 17, 2016) ("A

6    plaintiff seeking equitable relief in California must establish that there is no adequate remedy at

7    law available.") (internal quotation omitted); *Canova v. Trustees of Imperial Irr. Dist. Employee*

8    *Pension Plan,* 150 Cal. App. 4th 1487, 1494 (2007) ("Although the operative complaint does not

9    directly ask for money or damages, it seeks a transfer of additional funds into the Contribution

10   Plan accounts of each plaintiff.  This is a form of monetary relief that would fully compensate

11   Plaintiffs for Defendants' alleged improper modifications and render any equitable relief

12   superfluous."); *see also Wehen v. Lundgaard*, 41 Cal. App. 2d 610, 612–13 (1940).  Plaintiffs

13   want money, and therefore have an adequate remedy at law.

14              **5.      Plaintiffs' Unjust Enrichment Claim Fails.**

15        Where there is a valid and enforceable contract, a party cannot bring a claim for unjust

16   enrichment.  The Ninth Circuit noted in *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d

17   1151, 1167 (9th Cir. 1996) that "[u]nder both California and New York law, unjust enrichment is

18   an action in quasi-contract, which does not lie when an enforceable, binding agreement exists

19   defining the rights of the parties."  *See also Wal–Noon Corp. v. Hill*, 45 Cal. App. 3d 605, 613

20   (1975).  Though a plaintiff may plead a quasi-contract theory in the alternative when the

21   existence of a contract is in dispute, here there is no dispute that the Amended & Restated Plan

22   (RJN, Exh. 8) is a valid and enforceable contract.  Therefore, the Court should dismiss the unjust

23   enrichment claim.  *See Klein v. Chevron U.S.A., Inc.,* 202 Cal. App. 4th 1342, 1387–89 (2012)

24   (dismissing unjust enrichment claim where "the parties have an enforceable agreement regarding

25   a particular subject matter"); *California Medical Association v. Aetna U.S. Healthcare of*

26   *California*, 94 Cal. App. 4th 151, 173-74 (2001) (dismissing action where plaintiff could "not

27   *Fisher*, 236 Cal.App.2d 468, 473 (1965); *see also Real Estate Analytics, LLC v. Vallas*, 160 Cal.
     App. 4th 463, 472 (2008); *Doe 1 v. Xytex Corp.*, No. C 16-02935 WHA, 2017 WL 1112996, at *7
28   (N.D. Cal. Mar. 24, 2017).

proceed on its quasi-contract claim because the subject matter of such claim . . . was governed by express contracts").

### 6.   Plaintiffs' Breach of Fiduciary Duty Claim Fails.

Plaintiffs allege that the Plans' fiduciaries breached their duties by failing to take reasonable steps to hold Dignity Health "to make contributions in an amount which is sufficient, on an actuarial basis, to fund all accrued benefits under the Dignity Plan."  This claim fails for the same reason Plaintiffs' breach of contract claim fails; Plaintiffs have not alleged any damage or any facts that show that the Plan was not sufficiently funded *on an actuarial basis*.[34]  Nor would Plaintiffs fare better under ERISA.[35]

## VI.   **CONCLUSION**

For the forgoing reasons, the Court should grant Defendants' motion, and dismiss all causes of action in the Complaint.

Dated: December 22, 2017                  MANATT, PHELPS & PHILLIPS, LLP

                                         By: s/ Barry S. Landsberg
                                             Barry S. Landsberg
                                             Harvey L. Rochman
                                             Craig S. Rutenberg
                                             Colin M. McGrath
                                             David L. Shapiro (*pro hac vice*)

                                             *Attorneys for Defendants*

319627304.2

---

[34] In fact, a lawsuit against plan fiduciaries by a plaintiff with no standing actually causes injury to the plan itself, where the Plan would incur more harm from costly litigation.  *See Alphin,* 704 F.3d at 336; *Harley,* 284 F.3d at 907.
[35] ERISA "'does impose a general fiduciary duty to comply with ERISA, but it does not confer a right to every plan participant to sue the plan fiduciary for alleged ERISA violations without a showing that they were injured by the alleged breach of the duty.'"  *Slack,* 2014 WL 4090383 at *11-12 (quoting *Kendall v. Employees Retirement Plan of Avon Products,* 561 F.3d 112, 118 (2d Cir. 2009)); *see also Lee v. Verizon Communications, Inc.*, 954 F. Supp. 2d 486, 498 (N.D. Tex 2013), *aff'd* 837 F.3d 523 (5th Cir. 2016).

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

40                              MOTION TO DISMISS
CASE NO. 13-C-1450