UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STARLA ROLLINS, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>DIGNITY HEALTH, et al.,<br><br>   Defendants. | Case No. 13-cv-01450-JST<br><br>**ORDER DENYING WITHOUT PREJUDICE MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Re: ECF Nos. 283, 284 |

Before the Court is Plaintiffs Starla Rollins and Patricia Wilson's unopposed motion to preliminarily certify a class and approve a class action settlement. ECF No. 284. The parties have also filed a motion to file certain exhibits to the settlement agreement under seal. ECF No. 283. The Court will grant the motion to seal and deny the motion for preliminary approval without prejudice.

**I. BACKGROUND**

 **A. Parties and Claims**

Plaintiffs bring this putative class action on behalf of all participants, former participants, and beneficiaries of the Dignity Health Pension Plan ("the Dignity Plan" or "the Plan"). Second Amended Complaint ("SAC"), ECF No. 268 ¶ 3. Defendant Dignity Health ("Dignity Health" or "Dignity") "operates a health care conglomerate in California, Arizona and Nevada and ancillary care facilities in nineteen states." *Id.* ¶ 1. Defendant Herb Vallier was the Chief Human Resources Officer for Dignity Health from at least 2010 until January 2013; Defendant Darryl Robinson has held the position since August 2013. *Id.* ¶¶ 22-23. Defendant Dignity Health

Retirement Plans Subcommittee (the "Subcommittee") administers the Plan. *Id.* ¶ 24.[1]

Plaintiffs contend that, contrary to Defendants' position, the Plan does not qualify for the church plan exemption to the Employee Retirement Income Security Act of 1974 ("ERISA"). *Id.* ¶ 4. Plaintiffs bring claims alleging violations of ERISA, *id.* ¶¶ 171-265, and, alternatively, state law claims for breach of contract, unjust enrichment, and breach of common law fiduciary duty, *id.* ¶¶ 277-321. Plaintiffs also bring a claim for declaratory relief that the church plan exemption violates the Establishment Clause of the First Amendment. *Id.* ¶¶ 266-276.

### B.     Procedural History

This case was filed on April 1, 2013 and assigned to Judge Thelton E. Henderson. ECF Nos. 1, 16. On December 12, 2013, Judge Henderson denied Defendants' motion to dismiss. ECF No. 84. Judge Henderson concluded that only a church or a convention or association of churches may establish a church plan under the exemption. *Id.* at 9. On July 22, 2014, Judge Henderson granted Plaintiffs' motion for partial summary judgment, finding that there was no dispute that the Plan was not established by a qualifying entity. ECF No. 175. Judge Henderson then granted Defendants' motion to stay the case and to certify the partial summary judgment order for interlocutory appeal. ECF No. 205.

On July 26, 2016, the Ninth Circuit issued an opinion affirming the district court's interpretation of the church plan exemption. *Rollins v. Dignity Health*, 830 F.3d 900 (9th Cir. 2016). The Supreme Court granted writs of certiorari in this case and two other cases reaching similar conclusions, and subsequently issued an opinion reversing those three circuits, holding that "a plan maintained by a principal-purpose organization . . . qualifies as a 'church plan,' regardless of who established it." *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1663 (2017).

The case was reassigned to the undersigned on August 14, 2017. ECF No. 225. Plaintiffs filed an amended complaint on November 3, 2017. ECF No. 243. On September 6, 2018, the Court denied in large part Defendants' motion to dismiss the amended complaint, concluding that

---

[1] In their complaint, Plaintiffs also named as Doe Defendants any "individuals who through discovery are found to have fiduciary responsibilities with respect to the Dignity Plan," but have not moved to add such individuals. SAC ¶ 25.

Plaintiffs had adequately alleged that the Plan did not qualify as a church plan under the *Stapleton* Court's construction of the exemption. ECF No. 267.

On April 23, 2019, the parties informed the Court that they had reached a settlement. ECF No. 278. On June 27, 2019, Plaintiffs filed this unopposed motion for preliminary approval of the settlement agreement and to preliminarily certify the class. ECF No. 284.

**C.     Terms of Settlement**

The proposed settlement agreement ("Settlement") resolves claims between Defendants and "[a]ll participants, former participants, or beneficiaries of the Dignity Health Pension Plan." Settlement, ECF No. 284-1 § 1.30. In the Settlement, the parties stipulate that no party concedes whether the Plan is a church plan or subject to ERISA. *Id.* § 4.1.

Nonetheless, under the Settlement, Dignity Health agrees to make contributions to the Plan for five years, in the following amounts:

> 2020:  $50 million;
>
> 2021: $50 million or "the amount of the Minimum Contribution Recommendation calculated by the Plan's Actuaries in the Pension Contribution Report for that calendar year";
>
> 2022, 2023, and 2024: The Minimum Contribution Recommendation.

*Id.* §§ 7.1.2-.3.

The Settlement also provides for direct payments to two subgroups of class members based on particular claims they hold. First, Dignity Health will pay a total of $660,000 to class members who terminated their employment between April 1, 2013 (the filing of the complaint) and March 27, 2019, "and completed at least (3) but less than five (5) years of vesting service." *Id.* § 7.1.6. The share that these class members ("Former Participant Vesting Claimants") receive will vary depending on under which of two plans each individual accrued benefits. *Id.* The parties estimate that 744 class members accrued benefits under the Value Protection Plan and will receive $113.40 each; they estimate that 2,538 class members accrued benefits under the Guaranteed Growth Account formula and will receive $226.80 each. *Id.*

Second, Dignity Health will pay a total of $825,000 to the PEP Plus Subclass, defined as

3

follows:

> All participants, former participants, or beneficiaries of the Dignity Health Pension Plan as of January 1, 2014, whose benefit accruals were calculated using the "PEP Plus" formula and who, between January 1 and April 1, 2014, were not members of the labor union that collectively bargained with Dignity Health regarding the 2014 changes to the PEP Plus accrual formula and who were negatively impacted by the 2014 changes.

*Id.* § 1.22; *see also id.* § 7.1.7. "The allocation of this amount among PEP Plus Claimants who were negatively impacted by the alleged change in benefits shall be made based upon the vesting years of service of the impacted PEP Plus Claimants, taking into account that PEP Plus Claimants with between six and twenty years of vesting service were most impacted." *Id.* § 7.1.7. The Settlement allocates the PEP Plus payments as follows:

> Group One: The 119 PEP Plus Claimants with 1-5 years of service will each receive a 22.5% share, equal to cash in the sum of $548.60.
>
> Group Two: The 625 PEP Plus Claimants with 6-20 years of service will each receive a 40% share, equal to cash in the sum of $975.32.
>
> Group Three: The 209 PEP Plus Claimants with 21-30 years of service will each receive a 22.5% share, equal to cash in the sum of $548.60.
>
> Group Four: The 97 PEP Plus Claimants with 31 or more years of service will each receive a 15% share, equal to cash in the sum of $365.75.

*Id.* Dignity Health will make payments to members of both subgroups by check; members will have 120 days to cash their payments. *Id.* §§ 7.1.6-.7. Payments not cashed by that deadline will be contributed to the Plan. *Id.*

The Settlement also includes non-monetary relief related to the Plan's administration, including Defendants' agreement that (1) an amendment to the Plan will never reduce a participant's accrued benefit; (2) upon termination of the Plan, all benefits will be 100 percent vested; and (3) for a period of ten years, Defendants will not enter into any transfer, merger, or consolidation that would reduce a participant's accrued benefit. *Id.* §§ 8.1-.2. The Settlement also implements certain procedures, such as requiring that the Plan Administrator make available summary plan descriptions, an annual report, and pension benefit statements. *Id.* § 8.4.1-.3.

Defendants also agree that, for the next five years, at least two of the members of the Subcommittee will be individuals who are not employed by Dignity Health or its affiliates. *Id.* § 8.4.5.

Finally, Defendants agree not to oppose Plaintiffs' counsel's motion for attorney's fees, provided that the request does not exceed $6.15 million. *Id.* § 7.1.8. Any fee award will not reduce the other payments required by the Settlement. *Id.* Counsel also intends to seek incentive awards of $10,000 each for Rollins and Wilson as part of the fee request. ECF No. 284-5 ¶ 32.

In exchange, Plaintiffs agree to release the following claims:

> Any and all known or unknown, actual or potential claims, actions, causes of action, demands, obligations, liabilities, attorneys' fees, expenses and costs arising out of or related to the allegations of the Complaint that were brought or could have been brought as of the date of the Settlement Agreement by any member of the Settlement Class, including any current or prospective challenge to the Church Plan status of the Plan . . . .

Settlement § 3.1.1. The Settlement specifically exempts claims (1) for breach of the Settlement; (2) for individual benefits under state law; (3) under any other plan added to the Dignity Plan before the Settlement becomes effective; and (4) future ERISA claims in the event of a change in the law, or election by Dignity Health, that results in the Plan not being treated as a church plan. *Id.*

To inform class members of the Settlement, Plaintiffs propose the following notice plan. The Settlement Administrator[2] will mail the Class Notice to class members within 30 days of preliminary approval. *See* ECF No. 284 at 38; ECF No. 284-4 (Class Notice). Plaintiffs' counsel will also publish the Settlement and the Class Notice on their firm websites. ECF No. 284 at 37. Under the parties' proposed schedule, Plaintiffs will file their motions for final approval and attorney's fees 60 days after preliminary approval. *Id.* at 38. The deadline for class members to object to the Settlement or the fees motion is 75 days after preliminary approval. *Id.*

---

[2] Defendants, who will bear the cost of notice independent of any Settlement payments, *see* Settlement § 2.2.3, have retained Angeion Group to implement the notice plan, ECF No. 284-5 ¶ 34.

5

## II. LEGAL STANDARD

### A. Class Certification

Class certification under Federal Rule of Civil Procedure 23 is a two-step process. First, a plaintiff must demonstrate that the four requirements of Rule 23(a) are met: numerosity, commonality, typicality, and adequacy. "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542-43 (9th Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).

Second, a plaintiff must establish that the action meets one of the bases for certification in Rule 23(b). Plaintiffs invoke Rule 23(b)(1) and (b)(2). Therefore, Plaintiffs must establish that prosecuting separate actions would create a risk of either "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class," or "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1). Alternatively, Plaintiffs must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

When determining whether to certify a class for settlement purposes, a court must pay "heightened" attention to the requirements of Rule 23. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.* At the same time, trial "manageability is not a concern in certifying a settlement class where, by definition, there will be no trial." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556-57 (9th Cir. 2019) (en banc).

### B. Preliminary Settlement Approval

The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class

actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Rule 23 requires courts to employ a two-step process in evaluating a class action settlement. First, the parties must show "that the court will likely be able to . . . (i) approve the proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B). In other words, a court must make a preliminary determination that the settlement "is fair, reasonable, and adequate" when considering the factors set out in Rule 23(e)(2). Fed. R. Civ. P. 23(e)(2). The court's task at the preliminary approval stage is to determine whether the settlement falls "within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (citation omitted); *see also* Manual for Complex Litigation, Fourth ("MCL, 4th") § 21.632 (FJC 2004) (explaining that courts "must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the certification, proposed settlement, and date of the final fairness hearing"). "The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." *City of Seattle*, 955 F.2d at 1276 (citation omitted). Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

If no class has yet been certified, a court must likewise make a preliminary finding that it "will likely be able to . . . (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). If the court makes these preliminary findings, it "must direct notice in a reasonable manner to all class members who would be bound by the proposal." *Id.* Second, courts must hold a hearing pursuant to Rule 23(e)(2) to make a final determination of whether the settlement is "fair, reasonable, and adequate."

Within this framework, preliminary approval of a settlement is appropriate if "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *In re Tableware*, 484 F. Supp. 2d at 1079 (citation omitted). The proposed settlement need not be ideal, but it must be fair

7

and free of collusion, consistent with counsel's fiduciary obligations to the class. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."). To assess a settlement proposal, courts must balance a number of factors:

> [T]he strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Id.* at 1026 (citations omitted).[3] The proposed settlement must be "taken as a whole, rather than the individual component parts," in the examination for overall fairness. *Id.* Courts do not have the ability to "delete, modify, or substitute certain provisions"; the settlement "must stand or fall in its entirety." *Id.* (citation omitted).

### III.  MOTION TO FILE UNDER SEAL

#### A.  Legal Standard

A party seeking to seal a document filed with the court must (1) comply with Civil Local Rule 79-5; and (2) rebut the "strong presumption in favor of access" that applies to all documents other than grand jury transcripts or pre-indictment warrant materials. *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (citation and internal quotations omitted).

With respect to the first prong, Local Rule 79-5 requires, as a threshold, a request that (1) "establishes that the document, or portions thereof, are privileged, protectable as a trade secret or otherwise entitled to protection under the law"; and (2) is "narrowly tailored to seek sealing only of sealable material." Civil L.R. 79-5(b). An administrative motion to seal must also fulfill the requirements of Civil Local Rule 79-5(d). "Reference to a stipulation or protective order that

---

[3] These factors are substantially similar to those articulated in the 2018 amendments to Rule 23(e), which were not intended "to displace any factor [developed under existing Circuit precedent], but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *4 (N.D. Cal. Dec. 18, 2018) (quoting Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment).

8

1  allows a party to designate certain documents as confidential is not sufficient to establish that a
2  document, or portions thereof, are sealable." Civil L.R. 79-5(d)(1)(A).

3        With respect to the second prong, the showing required to overcome the strong
4  presumption of access depends on the type of motion to which the document is attached. "[A]
5  'compelling reasons' standard applies to most judicial records. This standard derives from the
6  common law right 'to inspect and copy public records and documents, including judicial records
7  and documents.'" *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) (quoting
8  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 n.7 (1978)). To overcome this strong
9  presumption, the party seeking to seal a judicial record must "articulate compelling reasons
10  supported by specific factual findings that outweigh the general history of access and the public
11  policies favoring disclosure." *Kamakana*, 447 F.3d at 1178-79 (internal citations omitted).

12        On the other hand, records attached to motions that are only "tangentially related to the
13  merits of a case" are not subject to the strong presumption of access. *Ctr. for Auto Safety v.*
14  *Chrysler Grp., LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016). Instead, a party need only make a
15  showing under the good cause standard of Rule 26(c) to justify the sealing of the materials. *Id.* at
16  1097. A court may, for good cause, keep documents confidential "to protect a party or person
17  from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c).

18        A district court must "articulate [the] . . . reasoning or findings underlying its decision to
19  seal." *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1162 (9th Cir. 2011), *cert. denied*, 132 S. Ct.
20  2374 (2012).

21        **B.**    **Discussion**

22        Here, Plaintiffs seek to file under seal exhibits to the Settlement, redacting the names of
23  individuals who are members of the PEP Plus Subclass or Former Participant Vesting Claimants.
24  ECF No. 283 at 3. Because preliminary approval of a settlement is an issue more than tangentially
25  related to the merits of the case, the "compelling reasons" standard applies. *See Kiersey v. eBay,*
26  *Inc*, No. 12-cv-01200-JST, 2013 WL 5609318, at *2 (N.D. Cal. Oct. 11, 2013) ("[A] motion
27  seeking the Court's preliminary approval of the settlement of the case may be effectively
28

dispositive.").[4]

In the context of this motion, the redacted information reveals not only class members' names, but also details of their pensions and vesting status. "[C]ompelling reasons exist to protect confidential financial and medical records." *Van v. Language Line Servs., Inc.*, No. 14-cv-03791-LHK, 2016 WL 3566980, at *2 (N.D. Cal. June 30, 2016) (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1137 (9th Cir. 2003)). The confidentiality interests underlying those records are further increased where, as here, class members have no opportunity to opt out of the litigation. *Cf. Ralston v. Mortg. Inv'rs Grp., Inc.*, No. 8-cv-00536-JFP (SGX), 2013 WL 12175069, at *3 (N.D. Cal. June 19, 2013) (requiring list of opt-outs to be filed under seal to protect their privacy interests).

The Court therefore grants the motion to file under seal.

## IV.  PRELIMINARY SETTLEMENT APPROVAL

Many of the relevant factors support a finding that the Settlement falls within the range of possible approval. Nonetheless, there are several obvious deficiencies that prevent the Court from granting preliminary approval at this time.[5]

### A.  Attorney's Fees

Under the terms of the Settlement, Defendants agree not to oppose Plaintiffs' counsel's motion for attorney's fees, provided that the request does not exceed $6.15 million. ECF No. 284-1 § 7.1.8. The fee award will be paid directly by Defendants and will not alter the amount of the Settlement's mandated Plan contributions or direct payments to certain subgroups. *Id.* Although the fact is not explicitly stated in the Settlement, if the Court awards less than $6.15 million in fees, Defendants keep the amount of the difference and those funds are not distributed

---

[4] Plaintiffs' contention that good cause applies, ECF No. 283 at 5, is based on a mistatement of *Center for Auto Safety*, which explains that the question is "whether the motion" – not the information to be sealed – "is more than tangentially related to the merits of a case." 809 F.3d at 1101.

[5] Based on Plaintiffs' motion, the Court does not foresee obstacles to preliminarily certifying the class for settlement purposes, besides the subclass issue discussed below. But the Court will defer ruling on preliminary class certification until the parties have adequately addressed the need for subclasses and corrected the Settlement's other deficiencies.

to the class. The Court concludes that this arrangement, which potentially denies the class money that Defendants were willing to pay in settlement – with no apparent countervailing benefit to the class – renders the Settlement unreasonable.[6]

Plaintiffs' explanation for this provision is unconvincing. They contend that, "[s]hould the Court approve less than $6.15 million, there will be no 'reversion' to Defendants, because there is nothing to revert; the Settlement itself remains intact whatever the outcome on fees." ECF No. 284 at 31. As the Ninth Circuit has recognized, however, this type of argument masks the underlying reality. "Ordinarily, 'a defendant is interested only in disposing of the total claim asserted against it,' and 'the allocation between the class payment and the attorneys' fees is of little or no interest to the defense.'" *In re Bluetooth*, 654 F.3d at 949 (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003)). Accordingly, "[i]f the defendant is willing to pay a certain sum in attorneys' fees as part of the settlement package, but the full fee award would be unreasonable, there is no apparent reason the class should not benefit from the excess allotted for fees." *Id.* Stated differently, "[t]he clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id.*

The Seventh Circuit has expressed similar reservations:

> Our final concern is the reversion, or kicker, clause in the settlement agreement. This is the clause that provides that if the judge reduces the amount of fees that the proposed settlement awards to class counsel, the savings shall enure not to the class but to the defendant. This is a gimmick for defeating objectors. If the class cannot benefit from the reduction in the award of attorneys' fees, then the objector, as a member of the class, would not have standing to object, for he would have no stake in the outcome of the dispute. The simple and obvious way for the judge to correct an excessive attorney's fee for a class action lawyer is to increase the share of the settlement received by the class, at the expense of class counsel. This route is barred unless the judge invalidates the kicker clause.
>
> Class counsel claim that often they negotiate for the benefits to the members of the class first, selflessly leaving for later any consideration of or negotiation for their award of attorneys' fees.

---

[6] The Court recently reached a similar conclusion in another case, although that order has not yet been made available on commonly used legal research databases. *See Stromberg v. Ocwen Loan Servicing, LLC*, No. 15-cv-04719-JST (N.D. Cal.), ECF No. 245.

> That claim is not realistic. For we know that an economically rational defendant will be indifferent to the allocation of dollars between class members and class counsel. Caring only about his total liability, the defendant will not agree to class benefits so generous that when added to a reasonable attorneys' fee award for class counsel they will render the total cost of settlement unacceptable to the defendant. We invited class counsel to explain how, therefore, negotiating first for class benefits could actually benefit a class, and were left without an answer. Neither can we think of a justification for a kicker clause; at the very least there should be a strong presumption of its invalidity.

*Pearson v. NBTY, Inc.*, 772 F.3d 778, 786-87 (7th Cir. 2014) (Posner, J.) (internal quotation marks and citation omitted); *see also In re Dry Max Pampers Litig.*, 724 F.3d 713, 717 (6th Cir. 2013) ("In class-action settlements, the adversarial process . . . extends only to the amount the defendant will pay, not the manner in which that amount is allocated between the class representatives, class counsel, and unnamed class members.").

Despite these considerations, the Ninth Circuit has not held that these clauses are per se unreasonable. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 895 F.3d 597, 612 (9th Cir. 2018) ("[R]eversion clauses can also have perfectly benign purposes and impacts, and so are not per se forbidden. Rather, to exercise its discretion appropriately, a district court must explain why the reversionary component of a settlement negotiated before certification is consistent with proper dealing by class counsel and defendants."); *In re Bluetooth*, 654 F.3d at 949. Nonetheless, these types of clauses require "even greater scrutiny than is ordinarily demanded." *In re Bluetooth*, 654 F.3d at 949. Here, Plaintiffs have offered no reason why "in this particular case, a kicker provision is in the class' best interest as part of the settlement package." *Id.* Instead, Plaintiffs' explanation that the fees are entirely independent of the Settlement, ECF No. 284 at 30-31, is precisely the analysis that the Ninth Circuit rejected as inadequate in *In re Bluetooth*. There, "the district court did not scrutinize the clear sailing attorneys' fee provision because (1) the parties claimed to negotiate the 'core terms' of the settlement agreement with a neutral mediator before turning to fees, (2) the attorneys' fee provision was severable from the agreement, and (3) the fees were to come from a separate fund and thus would have no bearing on the amount of class recovery." 654 F.3d at 947-48. This provision requires a far more robust explanation than Plaintiffs have provided.

12

1  The Court acknowledges that, unlike in *In re Bluetooth*, the amount of fees for which counsel received "clear sailing" is not disproportionate at first glance. Dignity Health must contribute at least $100 million to the Plan, Settlement § 7.1.2, and the clear sailing provision applies to a proposed fee award constituting just over 6 percent of that amount. *Cf. Rodman v. Safeway Inc.*, No. 11-CV-03003-JST, 2018 WL 4030558, at *3 (N.D. Cal. Aug. 23, 2018) ("For more than two decades, the Ninth Circuit has set the 'benchmark for an attorneys' fee award in a successful class action [at] twenty-five percent of the entire common fund.'" (quoting *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997))). Further, counsel state that the award will represent a negative multiplier on their current lodestar of $8,864,690. ECF No. 284-5 ¶ 33.

Nonetheless, the Court will not now declare that the clear sailing provision passes muster as a matter of law. Blessing a clear sailing and implied reversion clause based on a premature assessment of the reasonableness of attorney's fees makes little sense. As of now, the Court has the benefit of neither counsel's fee motion and supporting documentation nor the class's potential objections to that motion. *See* Fed. R. Civ. P. 23(h). If the Court grants preliminary approval and then, upon closer scrutiny and with the class's input, concludes that the requested fees are unreasonable, the Court must either reject the Settlement (starting the approval process all over) or deprive the class of the benefit of those fees. The Court fails to see how limiting the options to these two outcomes serves the class's best interests.

Plaintiffs' counsel appears to be asking the Court to evaluate the reasonableness of the fee as a percentage of the stream of Dignity Health's future payments. *See* ECF No. 284 at 30 n.27 ("The requested fees and expenses are less than one percent of the projected mandatory payments to the Plan, and less than 12% of all payments to be made under the Settlement during its first year." (citation omitted)). The denominator against which attorney's fees should be measured, however, is particularly difficult to estimate at the preliminary stage, and on this record. First, the Settlement's primary monetary relief consists of mandatory Plan contributions. But the baseline scenario, i.e., the contributions that Dignity Health would make absent this litigation, is in flux. Plaintiffs represent that Dignity Health has "previously made voluntary contributions to the Plan,"

13

including "$271 million among all of its plans during fiscal year 2018." ECF No. 284 at 22-23 n.21. The record contains no further information regarding what voluntary contributions Dignity Health might otherwise make to the Plan in the years covered by the Settlement, or the factors influencing the likelihood of such contributions. Of course, Dignity Health's position in this litigation is that it has no mandatory obligation to make these contributions under ERISA, ECF No. 284-11 ¶ 47, and so the mandatory nature of the contributions carries additional value. The point, however, is that the calculus is more complex and uncertain than in a case where a defendant would give class members nothing absent a settlement or judgment on the merits.

Second, the mandatory contributions themselves fall within a wide range of possible outcomes. At the low end, Dignity Health must contribute $100 million between 2020 and 2021. Settlement § 7.1.2. At the high end, Plaintiffs' expert, Daniel Cassidy, projects that Dignity Health would contribute $747 million from 2020 through 2024. ECF No. 284-11 ¶ 35. But Cassidy acknowledges that his methodology differs from "the non-GAAP measurement contained" in the Pension Contribution Reports, under which the Plan is overfunded by 12.1 percent. *Id.* ¶ 45. Outside of the mandated $50 million payments, Dignity Health's remaining payments are similarly based on "the Minimum Contribution Recommendation calculated by the Plan's Actuaries in the Pension Contribution Report." Settlement § 7.1.2. Plaintiffs have not identified any provisions in the Settlement governing how Dignity Health's actuaries calculate the Minimum Contribution Recommendation. *Cf.* ECF No. 284-11 ¶ 25 ("[A] Pension Contribution Report provides information about the recommended range of contribution amounts for the Plan using a methodology selected by Dignity Health with the concurrence of the actuary."). Accordingly, it is difficult for the Court to attribute much value to years where Dignity Health need only contribute the amount recommended in the Pension Contribution Report.

Finally, an analysis of the Settlement's value is further complicated by its various procedural guarantees related to class members' benefits in the event of Plan mergers, amendments, or termination. Settlement §§ 8.1-.2. In determining whether fees are disproportionate at the preliminary approval stage, courts primarily use the Ninth Circuit's benchmark that 25 percent of the common fund is presumptively reasonable. ECF No. 284 at 30.

But "only in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees." *Staton*, 327 F.3d at 974.  Plaintiffs have not shown that the Settlement's injunctive relief provisions meet this standard.  While those provisions may confer substantial value, and ultimately weigh in favor of an upward adjustment, *see id.*, they provide little help in determining whether the parties' stipulated fee request is disproportionate at this preliminary stage.[7]

Of course, at the final approval stage, or in a subsequent motion, Plaintiffs may choose to argue solely that their fee request is reasonable as a percentage of the $100 million that will, in all events, be contributed to the Plan.  *See* ECF No. 284 at 12.

### B.      Subgroup Payments

The Court also has concerns regarding the two subgroups of class members who will receive direct payments: (1) Former Participant Vesting Claimants and (2) PEP Plus Claimants.  Plaintiffs acknowledge that the PEP Plus Claimants were pleaded as a subclass in their complaint, but assert that "[b]ecause the PEP Plus Claimants all share the same interests as other Class members, and merely have an additional claim that does not conflict with the overall Class claims, certification as a subclass under Rule 23(c)(5) is unnecessary."  ECF No. 284 at 15 n.13.  Plaintiffs neither support this proposition with any authority nor elaborate on their reassurance that there is no potential conflict.

The very fact that these subgroup members receive payments beyond the classwide relief for their additional claims creates the potential for the Settlement to either shortchange or disproportionately favor these claims relative to the classwide claims.  *See Ferrington v. McAfee, Inc.*, No. 10-cv-01455-LHK, 2012 WL 1156399, at *7 (N.D. Cal. Apr. 6, 2012) ("[A] judge must

---

[7] In finding the attorney's fees provision unreasonable, the Court does not foreclose the possibility that the case is one in which the relief is so clearly exceptional in relation to the fees that preliminary approval is warranted even in the face of clear sailing and kicker clauses.  *Cf. In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 704 (7th Cir. 2015) ("While the fee aspects of this class settlement include two troublesome features – 'clear-sailing' and 'kicker' clauses, both of which are explained and discussed below – the dominant feature of the settlement is that it provides class members with *essentially complete relief*." (emphasis added)).  But as of yet, Plaintiffs have not demonstrated that this is that case.

15

focus on the settlement's distribution terms (or those sought) to detect situations where some class members' interests diverge from those of others in the class. For example, a settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group." (alteration in original) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 797 (3d Cir. 1995)). Plaintiffs do not address these concerns.

Nor can the Court independently undertake that review, because Plaintiffs have provided the Court with the range of recovery for only the classwide claims. *See* ECF No. 284 at 24-25. Though Plaintiffs explain how the direct payments were allocated *within* the subgroups, *id.* at 25-26, this information does not allow the Court to determine whether the subgroup's claims fared disproportionately well or poorly in comparison to the classwide claims. The Court "has more than once denied motions for approval where the plaintiffs 'provide[d] no information about the maximum amount that the putative class members could have recovered if they ultimately prevailed on the merits of their claims.'" *K.H. v. Sec'y of Dep't of Homeland Sec.*, No. 15-cv-02740-JST, 2018 WL 3585142, at *5 (N.D. Cal. July 26, 2018) (quoting *Cordy v. USS-Posco Indus.*, No. 12-cv-00553-JST, 2013 WL 4028627, at *4 (N.D. Cal. Aug. 1, 2013)); *see also Thomas v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST, 2017 WL 4750628, at *6 (N.D. Cal. Oct. 20, 2017). The same holds true where the Court is being asked to evaluate how the Settlement treats certain claims relative to others.

In short, any future motion should (1) support the propriety of providing payments to these subgroups without subclass certification and (2) provide sufficient information regarding the value of the subgroups' claims for the Court to evaluate whether the Settlement treats those claims equitably.[8]

---

[8] The Court makes two additional observations. First, regardless whether the Court ultimately agrees that no subclass is necessary, it would appear to the Court that neither the Settlement nor the Class Notice should refer to a "PEP Plus *Subclass*," Settlement § 7.1.7 (emphasis added); ECF No. 284-4 at 4, if no subclass will be certified. Second, any renewed motion should address whether notice pursuant to the Class Action Fairness Act of 2005 is required, and if so, the status of the parties' compliance with those requirements. *See* 28 U.S.C. § 1715.

United States District Court
Northern District of California

C. **Incentive Awards**

Finally, Plaintiffs request incentive awards of $10,000 for each of the named plaintiffs, Starla Rollins and Patricia Wilson. ECF No. 140 at 32. This is more than typical incentive award in this Circuit, where $5,000 is presumptively reasonable. *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) ("Several courts in this District have indicated that incentive payments of $10,000 or $25,000 are quite high and/or that, as a general matter, $5,000 is a reasonable amount.") (citations omitted).

Incentive awards "are discretionary . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009) (internal citation omitted). Courts evaluate incentive awards individually, "using relevant factors including the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefited from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation and reasonable fears of workplace retaliation." *Staton*, 327 F.3d at 977 (internal quotations, alterations, and citation omitted). Indeed, "courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013). "To determine the reasonableness of an incentive payment, courts consider the proportionality between the incentive payment and the range of class members' settlement awards." *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 335 (N.D. Cal. 2014).

The Court need not resolve the specific amount of the service award at this time as the matter will be conclusively determined at the final fairness and approval hearing. However, Plaintiffs should be mindful of addressing these issues and providing appropriate detail and documentation in connection with their motion for service awards. The Court does note that both named plaintiffs have filed declarations detailing their work on the case. ECF Nos. 284-9 (Rollins), 284-10 (Wilson).

**CONCLUSION**

For the foregoing reasons, the Court DENIES WITHOUT PREJUDICE the motion for preliminary settlement approval.  The Court defers ruling on preliminary class certification until the parties present a settlement that otherwise merits preliminary approval.

A motion for class certification or, alternatively, a motion for preliminary approval of class settlement, is due by November 25, 2019.

**IT IS SO ORDERED.**

Dated:  October 28, 2019



_____
JON S. TIGAR
United States District Judge