COHEN MILSTEIN SELLERS & TOLL PLLC
Karen L. Handorf (*pro hac vice*)
Michelle C. Yau (*pro hac vice*)
1100 New York Avenue, N.W., Suite 500, West Tower
Washington, D.C.  20005
Tel: (202) 408-4600 / Fax: (202) 408-4699
Email:  khandorf@cohenmilstein.com
myau@cohenmilstein.com

KELLER ROHRBACK L.L.P.
Lynn L. Sarko (*pro hac vice*)
Matthew M. Gerend (*pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900 / Fax: (206) 623-3384
Email: lsarko@kellerrohrback.com
mgerend@kellerrohrback.com

KELLER ROHRBACK L.L.P.
Juli E. Farris (CA Bar No. 141716)
801 Garden Street, Suite 301
Santa Barbara, CA  93101
Tel: (805) 456-1496 / Fax: (805) 456-1497
Email: jfarris@kellerrohrback.com

**Counsel for Plaintiffs**
**Additional Counsel on Signature Page**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| STARLA ROLLINS and PATRICIA WILSON, on behalf of themselves, individually, on behalf of all others similarly situated, and on behalf of the Dignity Plan, <br><br> Plaintiffs, <br><br> v. <br><br> DIGNITY HEALTH, a California Non-profit Corporation, HERBERT J. VALLIER, an individual, DARRYL ROBINSON, an individual, the Dignity Health Retirement Plans Subcommittee, and JOHN and JANE DOES, each an individual, 1-20, <br><br> Defendants. | Case No:  13-cv-01450-JST <br><br> **PLAINTIFFS' RENEWED NOTICE OF MOTION, UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT AND CERTIFICATION OF SETTLEMENT CLASS, AND SUPPORTING MEMORANDUM** <br><br> Date:    January 22, 2020 <br> Time:    2:00 PM <br> Ctrm:   6 – 2nd Flr. <br> Judge:  Hon. Jon. S. Tigar |

1

## **TABLE OF CONTENTS**

PLAINTIFFS' RENEWED NOTICE OF MOTION AND UNOPPOSED MOTION ...................1

FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT......................................1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................1

I. BACKGROUND ..................................................................................................................1

II. THE ISSUES RAISED IN THE DENIAL ORDER ...........................................................2

    A.    The Clear Sailing and Kicker Clauses Have Been Deleted. ....................................2

    B.    The Fee Award Is Reasonable in View of the Benefits Obtained by the Class. ........................................................................................................................3

        1.    The Baseline Scenario Is Uncertain, but the Danger of Default Is Real. ...................................................................................................4

        2.    The Monetary Value of the Settlement Is Far in Excess of $100 Million....................................................................................................6

        3.    Assessing the Fee Award Now Is Premature. ..............................................8

    C.    The Subgroups Need Not Be Certified as Subclasses. ...........................................9

        1.    There Is No Fundamental Conflict Between the Subgroups and the Class ........................................................................................................10

        2.    Subgroup Recoveries Are Necessarily Incidental in Church Plan Litigation....................................................................................................12

        3.    The Court's Analysis in *Ferrington* Is Instructive.....................................13

    D.    The Subgroups' Recoveries Are Adequate.............................................................14

III. THE PROPOSED NEW SETTLEMENT WARRANTS PRELIMINARY APPROVAL ....................................................................................................................17

IV. CONCLUSION.................................................................................................................19

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Advocate Health Care Network v. Stapleton*,
   137 S. Ct. 1652 (2017) ........................................................................................... 15

4

5

*Butler v. Holy Cross Hosp.*,
   No. 16-5907 (N.D. Ill.), ECF No. 46-2 ..................................................................... 5

6

7

*Del Sesto v. Prospect CharterCARE, LLC*,
   No. 18-328 (D.R.I. Oct. 9, 2019) ............................................................................. 5

8

*Feather v. SSM Health Care Corp.*,
   No. 16-1669 (E.D. Mo. May 6, 2019) ..................................................................... 13

9

10

*Ferrington v. McAfee, Inc.*,
   No. 10-1455-LHK, 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012) ............................... 10, 13, 14

11

12

*Griffith v. Providence Health & Servs.*,
   No. 14-1720 (W.D. Wash. Feb. 3, 2017) ................................................................. 13

13

*Hodges v. Bon Secours Health Sys.*,
   No. 16-1079 (D. Md. Oct. 13, 2017) ....................................................................... 13

14

15

*In re Catfish Antitrust Litig.*,
   939 F. Supp. 493 (N.D. Miss. 1996) ....................................................................... 16

16

17

*In re Mercy Health ERISA Litig.*,
   No. 16-441 (S.D. Ohio Oct. 29, 2018) ..................................................................... 13

18

*Lann v. Trinity Health Corp.*,
   No. 14-2237 (D. Md. Apr. 17, 2017) ....................................................................... 13

19

20

*Molski v. Gleich*,
   318 F.3d 937 (9th Cir. 2003) .................................................................................. 11

21

*Nicholson v. Franciscan Missionaries*,
   No. 16-258 (M.D. La. Jan. 11, 2018) ....................................................................... 13

22

23

*Owens v. St. Anthony Med. Ctr.*,
   No. 14-4068 (N.D. Ill.), ECF No. 164 ....................................................................... 5

24

25

*Reynolds v. Direct Flow Med., Inc.*,
   No. 17-204-KAW, 2019 WL 4168959 (N.D. Cal. Sept. 3, 2019) ............................... 16

26

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) .................................................................................. 11

27

28

ii

*Stapleton v. Advocate Health Care Network & Subsidiaries*,
   No. 14-1873 (N.D. Ill. May 16, 2018) ..................................................... 13

*Stromberg v. Ocwen Loan Servicing, LLC*,
   No. 15-4719-JST (N.D. Cal. Sept. 9, 2019) ............................................... 3

*Thorkelson v. Publ'g House*,
   No. 10-1712 (D. Minn. Apr. 9, 2013) ......................................................... 5

*Valley Drug Co. v. Geneva Pharm., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ................................................................ 11

*Viceral v. Mistras Grp., Inc.*,
   No. 15-2198-EMC, 2016 WL 5907869 (N.D. Cal. Oct. 11, 2016) .......... 16

**Statutes**

26 U.S.C. § 401(a)(2) ...................................................................................... 6

28 U.S.C. § 1715 .............................................................................................. 2

29 U.S.C. §§ 1021-26 .................................................................................... 12

29 U.S.C. § 1053 ............................................................................................ 12

29 U.S.C. § 1053(a)(2)(A)(ii) .......................................................................... 9

29 U.S.C. §1053(a)(2)(B)(ii) ........................................................................... 9

29 U.S.C. §§ 1081-86 ...................................................................................... 4

29 U.S.C. § 1083 ............................................................................................ 12

29 U.S.C. § 1109 ............................................................................................ 12

29 U.S.C. § 1307 ............................................................................................ 12

29 U.S.C. § 1322 ............................................................................................ 12

**Rules**

Fed. R. Civ. P. 23(a) ...................................................................................... 17

Fed. R. Civ. P. 23(b)(1) .................................................................................. 17

Fed. R. Civ. P. 23(b)(2) .................................................................................. 17

**Other Authorities**

Adam Geller, *Workers Find Retirement Money Jeopardized by Loophole Treating
   Hospitals, Agencies as Churches*, Associated Press (Oct. 5, 2013) ........... 5

iii

Hazel Bradford, *Former Hospital Workers Sue Archdiocese of Newark in Pension Shortfall Case*, Pensions & Investments (May 9, 2019)...................................................... 5

Hazel Bradford, *Puerto Rico Archdiocese Files for Bankruptcy After Teachers' Pension Award*, Pensions & Investments (Aug. 30, 2018)........................................... 5

James A. Wooten, *The Employee Retirement Income Security Act of 1974: A Political History* (Cal. 2004)............................................................................................. 4

Larry Rulison, *More than Half of St. Clare's Pensioners Won't Get a Dime*, Albany Times Union (Sept. 12, 2019)............................................................................................ 5

Mary E. O'Leary, *New Haven's St. Raphael Workers Face Decision on Pensions*, New Haven Reg. (July 18, 2013)...................................................................................... 5

*Pension and Employee Benefit Law* (6th ed. 2015) ...................................................... 4

William B. Rubenstein, 3 *Newberg on Class Actions* (5th ed. 2019) .......................... 10

**PLAINTIFFS' RENEWED NOTICE OF MOTION AND UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT**

Please take notice that on January 22, 2020, at 2:00 p.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Jon S. Tigar, United States District Judge for the Northern District of California, at the United States District Courthouse, 1301 Clay Street, Oakland, California 94612, Plaintiffs will submit their Unopposed Renewed Motion for Preliminary Approval of Settlement Agreement and Certification of Settlement Class (the "Renewed Motion") that the Court enter an order: (1) preliminarily approving the Restated and Amended Class Action Settlement Agreement ("New Settlement" or "New Settlement Agreement")[1]; (2) preliminarily certifying the proposed Settlement Class and appointing Class Counsel; (3) approving the form and method of Class Notice[2]; and (4) setting a date and time for a hearing ("Final Approval Hearing") for consideration of final approval of the New Settlement, payment of attorneys' fees and expenses, and grant of Incentive Awards to the Named Plaintiffs. While Defendants do not agree with all of the factual statements and legal arguments in the following Memorandum, they do not oppose the relief requested by Plaintiffs.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. BACKGROUND

In their original Unopposed Motion for Preliminary Approval of Settlement Agreement (the "Original Motion"), ECF No. 284, Plaintiffs moved this Court for preliminary approval of a

---

[1] Capitalized terms not otherwise defined in this Renewed Motion shall have the same meaning ascribed to them in the New Settlement Agreement, attached hereto as Exhibit 1. "Exhibit" or "Ex." refer to the exhibits attached to this Renewed Motion. Exhibits attached to supporting declarations are identified by reference to the particular declaration.

[2] The Revised Notice of Proposed Settlement of Class Action, Final Approval Hearing, and Motion for Attorneys' Fees and Reimbursement of Litigation Expenses, and Incentive Awards ("Revised Class Notice") is attached hereto as Exhibit 3.

1  settlement agreement reached by the parties on June 27, 2019 (the "Original Settlement"). This

2  Court denied the Original Motion without prejudice, Order Denying Without Prejudice Motion for

3  Preliminary Approval of Class Action Settlement ("Denial Order"), ECF No. 289, on October 28,

4  2019. In the Denial Order this Court identified four areas of concern: (a) the "clear sailing" and

5  "kicker" clauses in connection with the requested award of attorney fees, expenses, and Incentive

6  Awards (the "Fee Award"), *id.* at 10-13; (b) the amount of the requested Fee Award in relation to

7  the value of the benefits to be obtained by the Class, *id*. at 13-15; (c) whether payments to the two

8  subgroups are appropriate without subclass certification, *id*. at 15-16; and (d) the value of the

9  subgroups' claims in relation to the amounts that will be paid to members of the subgroups,

10  *id*. at 16.[3] We address these issues in turn in Section II. In Section III we briefly review the

11  New Settlement as a whole and argue that it merits this Court's preliminary approval.

## II. THE ISSUES RAISED IN THE DENIAL ORDER

### A.  The Clear Sailing and Kicker Clauses Have Been Deleted.

The Court questioned whether the Defendants' agreement not to oppose a total fee award

of $6.15 million (the "clear sailing" clause), and the absence of a provision for Defendants to

contribute to the Dignity Health Pension Plan (the "Plan") any difference between $6.15 million

---

[3] The Court also raised a few other issues:

(a) With respect to CAFA compliance, Denial Order at 16 n.8, the parties previously agreed that CAFA notice pursuant to 28 U.S.C. § 1715 is required in this case. Defendants have agreed that they will provide the notices following the filing of the New Settlement Agreement.

(b) With respect to the use of the term "subclass," for the PEP Plus subgroup, Plaintiffs agree that they used that term in error. Denial Order at 16 & 16 n.8. They will not seek certification of a subclass, and the term has been removed from the New Settlement Agreement and the Notice. *E.g.*, Ex. 1 § 1.22.

(c) The Court also questioned the proposed $10,000 incentive awards for the two class representatives, but did not require further information about the awards at this time. Denial Order at 17.

and the amount actually awarded (the "kicker" clause), were in the best interests of the Class. Denial Order at 10-13. The parties have agreed to eliminate the clear sailing and kicker clauses. As provided in the New Settlement, Class Counsel will apply to the Court for approval of a total award of $6.15 million, for attorney fees, expenses, and Incentive Awards. Ex. 1 § 7.1.8. Dignity Health is free to oppose the application, but will pay whatever amount is awarded, provided it does not exceed $6.15 million. *Id.* §§ 7.1.8, 7.1.10. If the Court awards less than the requested amount, Dignity Health has agreed to pay the balance into the Plan's Trust. *Id.* § 7.1.8. Thus, this issue is now moot. *See* Approval Order at 11, *Stromberg v. Ocwen Loan Servicing, LLC*, No. 15-4719-JST (N.D. Cal. Sept. 9, 2019), ECF No. 252 (approving deletion of "clear sailing" and "kicker" clauses).

## B. The Fee Award Is Reasonable in View of the Benefits Obtained by the Class.

Excluding the cash payments to the two subgroups, discussed below, the benefits received by the Class through this settlement fall into three categories. First, $100 million in cash will be contributed to the Plan's Trust, $50 million in 2020 and $50 million in 2021. Ex. 1 § 7.1.2. Second, additional sums, the "Minimum Contribution Amounts," will be contributed in 2021 (to the extent the Minimum Contribution Amount for that year is in excess of $50 million) and in 2022-24. *Id.* §§ 7.1.2(b), 7.1.3. This amount is not a definite lump sum, but was estimated by Daniel Cassidy, Plaintiffs' actuarial expert, at approximately $647 million.[4] Third, the New Settlement provides for certain procedural guarantees to Plan participants. Ex. 1 § 8.

In the Denial Order the Court notes it lacks two types of information to assess the reasonableness of the requested Fee Award in relation to the value of the relief obtained: first, the "baseline scenario, i.e., the contributions that Dignity Health would make absent this litigation,"

---

[4] Decl. of Daniel P. Cassidy in Supp. of Approval of Class Action Settlement Agreement ¶ 35, ECF No. 284-11 (Exhibit 4 to Original Motion).

Denial Order at 13; and second, the monetary value of the settlement beyond the specified $100 million cash payment. *Id.* at 13-14. We address these in turn.

### 1.   The Baseline Scenario Is Uncertain, but the Danger of Default Is Real.

The major premise of the church plan litigation is that the "baseline scenario"—the amount that the sponsor of a church plan would *voluntarily* contribute to the church plan—is unknown. This requires some context. Before 1974 plan sponsors were typically under no federal law obligation to fund their plans currently, and they often did not do so. "Pay-as-you-go" funding of benefits was commonplace. *See generally* James A. Wooten, *The Employee Retirement Income Security Act of 1974: A Political History* 21-23 (Cal. 2004). ERISA changed this. The statute compels the sponsors of private sector pension plans to make regular contributions to their plans pursuant to the detailed provisions of the funding provisions of Title I of ERISA, 29 U.S.C. §§ 1081-86.

It is impossible to know what an ERISA plan sponsor would contribute were it not required to do so by these provisions of federal law. Likewise, it is impossible to know what a church plan's sponsor will contribute even though it has no federal law obligation to do so. We do know that Congress enacted ERISA in large part because of the frequency with which pre-1974 plans defaulted because they had not set aside adequate funding for the employees. *See generally* Wooten, *supra*, at 4-5 (discussing "default risk"); John A. Langbein et al., *Pension and Employee Benefit Law* 71-77 ("Legislative History of ERISA") (6th ed. 2015).

Just as pre-ERISA plans commonly defaulted, so have church plans. In fact, church plans are akin to pre-1974 pension plans. Without ERISA's protections, it is hardly surprising that church plans default. Among church plans that recently defaulted on their promised benefits are those sponsored by:

- St. Joseph's Hospital, Providence, RI[5]
- St. Anthony Medical Center, Chicago, IL[6]
- Holy Cross Hospital, Chicago, IL[7]
- St. Mary's Hospital, Passaic, NJ[8]
- St. Raphael Hospital, New Haven, CT[9]
- St. Clare's Hospital, Schenectady, NY[10]
- St. James Hospital, Newark, NJ[11]
- Catholic Schools of San Juan, San Juan, PR[12]
- Augsburg Publishing Co., Minneapolis, MN[13]

What plaintiffs' counsel have attempted to do in the church plan litigation is, first, to bring the plans into compliance with ERISA and, failing that, second, to obtain some protection for participants by settlements that require contributions of capital to the plans' trusts and other non-

---

[5] *See* Memorandum & Order, *Del Sesto v. Prospect CharterCARE, LLC*, No. 18-328 (D.R.I. Oct. 9, 2019), ECF No. 164.

[6] *See* Class Action Settlement Agreement, *Owens v. St. Anthony Med. Ctr.*, No. 14-4068 (N.D. Ill.), ECF No. 303-2.

[7]*See* Class Action Settlement Agreement, *Butler v. Holy Cross Hosp.*, No. 16-5907 (N.D. Ill.), ECF No. 46-2.

[8] *See* Adam Geller, *Workers Find Retirement Money Jeopardized by Loophole Treating Hospitals, Agencies as Churches*, Associated Press (Oct. 5, 2013), https://www.foxnews.com/us/workers-find-retirement-money-jeopardized-by-loophole-treating-hospitals-agencies-as-churches.

[9] *See* Mary E. O'Leary, *New Haven's St. Raphael Workers Face Decision on Pensions*, New Haven Reg. (July 18, 2013), https://www.nhregister.com/connecticut/article/New-Haven-s-St-Raphael-workers-face-decision-on-11394002.php.

[10] *See* Larry Rulison, *More than Half of St. Clare's Pensioners Won't Get a Dime*, Albany Times Union (Sept. 12, 2019), https://www.timesunion.com/business/article/More-than-half-of-St-Clare-s-pensioners-won-t-14431480.php.

[11] *See* Hazel Bradford, *Former Hospital Workers Sue Archdiocese of Newark in Pension Shortfall Case*, Pensions & Investments (May 9, 2019), https://www.pionline.com/article/20190509/ONLINE/190509846/former-hospital-workers-sue-archdiocese-of-newark-in-pension-shortfall-case.

[12] *See* Hazel Bradford, *Puerto Rico Archdiocese Files for Bankruptcy After Teachers' Pension Award*, Pensions & Investments (Aug. 30, 2018), https://www.pionline.com/article/20180830/ONLINE/180839977/puerto-rico-archdiocese-files-for-bankruptcy-after-teachers-pension-award.

[13] *See* Judgment, *Thorkelson v. Publ'g House*, No. 10-1712 (D. Minn. Apr. 9, 2013), ECF No. 157.

financial plan administration protections. It is never possible to know whether those payments would have been made absent the litigation. However, we do know that once the contributions are made, federal tax law prohibits even a church plan from returning the contributions to the sponsor. 26 U.S.C. § 401(a)(2). Thus, once contributions have been made, the participants are automatically more secure than they were before they were made.

Under this settlement, Dignity Health will make substantial contributions to the Plan for five years, in an amount we estimate to exceed $700 million. It is true that Dignity Health has made sizeable contributions in the past, though it is also true that the funded status of the Plan has at times dipped as low as 66% under GAAP.[14] We do not know what the decision-makers at Dignity Health would have contributed to the Plan absent this litigation; we do know that if this settlement is approved there will be a federal court order that it must contribute the amounts specified. Under the circumstances, a court-ordered obligation to contribute a hundred million dollars over two years, and hundreds of millions of dollars over five years, is an immensely valuable benefit to the Class.

### 2. The Monetary Value of the Settlement Is Far in Excess of $100 Million.

None dispute that the first benefit conferred on the Class, the $100 million cash contribution to the Plan's Trust, is indeed worth $100 million. As to the second benefit to the Class, Plaintiffs concede that there is no readily available way to value the non-monetary relief, such as the guarantees in the event of mergers, amendments, and termination. These are valuable rights that add substantially to Plan participants' security that their retirement benefits will be there for them at retirement.[15] However, for purposes of this Renewed Motion, especially given the size

---

[14] Catholic Healthcare West [now Dignity Health] & Subordinate Corps., Consolidated Fin. Statements, June 30, 2010, 2009, & 2008, https://emma.msrb.org/EP515715-EP402703-EP799974.pdf

[15] In addition to protection of accrued benefits in the event of mergers or Plan termination, the New Settlement requires, as did the Original Settlement, for the provision of summary plan

6                PLS.' RENEWED UNOPPOSED MOT. FOR
                                                                        PRELIM. APPROVAL OF SETTLEMENT

of the cash contributions to the Plan's Trust, Plaintiffs do not attempt to monetize the value of the non-monetary relief. *See* Denial Order at 15 (discussing case law on valuing injunctive relief). This leaves the valuation of the third benefit conferred on the Class, the Minimum Contribution Recommendation.

The Court noted that Plaintiffs "have not identified any provisions in the Settlement governing how Dignity Health's actuaries calculate the Minimum Contribution Recommendation." *Id.* at 14. In his Supplemental Declaration,[16] Daniel Cassidy, Plaintiffs' actuary, provides the Court with additional information on this subject, and reiterates his original opinion that this promise, backed by a federal court order, is most likely worth over $600 million. His explanation begins with the Pension Contribution Report ("PCR") itself. In his Supplemental Declaration, Mr. Cassidy puts the PCR in context. This is the type of report commonly used by actuaries for all corporate pension plans, and it has in fact been used for years by Dignity Health. Ex. 5 ¶¶ 37-39, 42. Even though the Plan is not an ERISA-regulated plan, the actuaries who generated the report still must comply with the standards of their profession. *Id.* ¶ 45. Among those are the obligations to satisfy themselves that the data and assumptions are reasonable. *Id.* ¶¶ 46-47. According to Mr. Cassidy, even though the interest rate assumption used to value the Plan assets is determined by Dignity Health, and therefore theoretically might be unjustifiably increased to substantially reduce the Minimum Contribution Recommendation, the three actuaries who sign off on the PCR are responsible for the overall reasonableness of the PCR, and "[t]o sign a PCR that reflects an unreasonably high return on assets assumption would not only be a reputational risk to each of the

descriptions, annual reports, and pension benefit statements; a claim review procedure; and, for the five-year duration of the obligations under the New Settlement, that the Dignity Health Retirement Plans Sub-Committee will include at least two members who are not employees of Dignity Health or its affiliates. Ex. 1 ¶¶ 8.1, 8.2, 8.4.

[16] Supplemental Declaration of Daniel P. Cassidy in Support of Approval of Class Action Settlement Agreement ("Supplemental Declaration"), Exhibit 5 hereto.

7

three signing actuaries, but it could result in discipline, including suspension or expulsion from actuarial membership." *Id.* ¶¶ 49-51.

This is not a perfect valuation, of course. Dignity Health could stop using PCRs. In that event, however, the New Settlement requires that Dignity Health make a contribution based on the previous year's PCR. Theoretically, Dignity Health might seek to persuade its actuaries to sign off on a bogus report, with unreasonable assumptions, in order to avoid making any contribution to the Plan. While such a hypothetical scenario is possible, it is quite unlikely that reputable actuaries would agree to such a course of action, and there is no evidence that Dignity Health has ever sought to do so in the past.[17] And if they did, Dignity Health would still have to disclose the details of the pension plan funding level in its public financial statements.[18] At bottom, it is highly unlikely that Dignity Health will somehow circumvent the provisions of the New Settlement Agreement so as to contribute little or nothing to the Plan beyond the $100 million.

### 3. Assessing the Fee Award Now Is Premature.

As the Court notes, this is not the time for a final determination of the reasonableness of the requested Fee Award. Denial Order at 13. Moreover, because the clear sailing and kicker clauses have been removed, the Court is free at the final approval hearing to set the Fee Award at whatever amount the Court deems warranted, confident that the balance will be contributed to the Plan. And while Plaintiffs have provided a sound basis for valuing the New Settlement at hundreds of millions of dollars, if the Court elected to focus solely on the liquidated cash amounts that, including the payments to the subgroups discussed below, exceed $100 million, those amounts alone would support the requested Fee Award. Thus, as a matter of preliminary approval, the

---

[17] To be clear, Plaintiffs have no reason to believe that either Dignity Health or its actuaries would engage in such bad faith conduct.

[18] *See, e.g.*, Dignity Health & Subordinate Corps., Consolidated Fin. Statements, June 30, 2018 & 2017 at 31-34, https://emma.msrb.org/ER1155405-ER903577-ER1304062.pdf.

requested $6.15 million is, Plaintiffs submit, eminently reasonable.

**C. The Subgroups Need Not Be Certified as Subclasses.**

The Settlement Class consists of "[a]ll participants, former participants, or beneficiaries of the Dignity Health Pension Plan as of the date of full execution of the Settlement Agreement." Ex. 1 § 1.30. Vested members of the Plan will, under the New Settlement Agreement, be benefitted by participating in a plan that has been financially strengthened by the $100 million payment and the additional relief described above. The Settlement Class consists of over 90,000 people, current and former employees of Dignity Health who participate in the Plan.

In this case there are two small groups (totaling less than 5% of the Settlement Class) which might be entitled to additional or other relief if the Plan were deemed to be an ERISA plan. First, there are 3,282 former employees who participated in the "cash balance" portions of the Plan and who have more than three but less than five years of service. They are not vested under the terms of the Plan, but because they were participants in the "cash balance" portions of the Plan, they would be vested if the Plan had been an ERISA plan at the time of their employment.[19] Second, there are 1,050 non-unionized nurses who accrued benefits under a formula, the "PEP Plus" formula, that was "backloaded" (that is, substantial benefits would not start accruing until after many years of employment) in a manner that is impermissible under ERISA. Second Am. Class Action Compl. ¶¶ 248-65 (Count IX), ECF No. 268.

The Court points out that the existence of subgroups like this "creates the potential for the Settlement to either shortchange or disproportionately favor these claims relative to classwide

---

[19] This three year/five year distinction is a recent addition to ERISA. Since ERISA was adopted, an ordinary defined benefit plan may provide for five-year vesting, ERISA § 203(a)(2)(A)(ii), 29 U.S.C. § 1053(a)(2)(A)(ii). However, since 2006, the Pension Protection Act has required that a "cash balance" defined benefit plan must vest at three years. ERISA § 203(a)(2)(B)(ii), 29 U.S.C. §1053(a)(2)(B)(ii).  Here, the Plan provided for five-year vesting for all participants, including those in the cash balance portions of the Plan. Second Am. Class Action Compl. ¶ 65.

claims." Denial Order at 15. In the words of Judge Koh, quoted in the Denial Order (at 16), such a settlement "may be trading the claims" of one group to enrich another. Class Counsel take this concern seriously, but with respect, we submit that it does not preclude preliminary approval here for three reasons discussed below.

First, any conflict between the subgroups and the class as a whole is not fundamental so as to require subclasses. Second, any such conflict is, in a sense, inevitable in church plan litigation and subclassing would not solve the problem. Third, this District's decision in *Ferrington v. McAfee, Inc.*, No. 10-1455-LHK, 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012), illustrates why this is not a case, like that one, in which the conflict between subgroups is such that a single class simply cannot be certified. We take these in turn.

### 1.   There Is No Fundamental Conflict Between the Subgroups and the Class

All classes contain disparate members, and minor conflicts between class members are inevitable; class members are not clones of one another. Subclassing is the typical solution to the problem of intraclass conflicts. William B. Rubenstein, 3 *Newberg on Class Actions* § 7:31 (5th ed. 2019). But "not all intraclass conflicts—only a truly fundamental conflict of interest—requires subclassing." *Id.*

This is a tall order:

> A conflict is fundamental when, for example, some class members claim to have been harmed by the same conduct that benefitted other class members. In such a situation, the named representative cannot vigorously prosecute the interests of the class because their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members. But when class members' interests are not actually divergent, providing separate representation for all possible interests is unnecessary.

*Id.* (citations and ellipses omitted).

Here, there is no fundamental conflict because no class members' interests are antagonistic to the interests of other class members. In fact, all members of the Settlement Class assert the same

central claim: that they are harmed by Defendants' failure to maintain the Plan in compliance with

ERISA. As a result, there is an "absence of antagonism" and a "sharing of interests between

[Class] representatives and absentees." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 960 (9th Cir.

2009) (*quoting Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003) and finding class

representatives adequate).

Moreover, the Settlement terms themselves do not pit the interest of the larger class against

the interest of the subgroups. The PEP Plus group will benefit from the increased retirement

security provided by the hundreds of millions of dollars of plan contributions and the significant

injunctive relief required by the Settlement. There is likewise no fundamental conflict between the

vesting group and the greater class because, while this subgroup may not directly benefit from the

funding contributions and the injunctive relief, their interests are not harmed by the Settlement

providing for this relief. *Cf. Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1190 (11th

Cir. 2003) (noting "no circuit has approved of class certification where some class members derive

a net economic benefit from the very same conduct alleged to be wrongful by the named

representatives of the class").

Comparing the settlement recovery for the subgroups with that for the Class as a whole

makes clear there has been no trading of claims. The recovery for the Class as a whole, as

described in the Original Motion, represented the appropriate discount for recovery on the ultimate

issue—is the Plan an ERISA-regulated plan? The recovery for the subgroups includes that

discount *plus* the additional discount reflecting the likelihood of obtaining additional retrospective

relief even if Plaintiffs prevailed on the ERISA issue (see discussion below). Viewed in this way

the total settlement structure appropriately contains major relief for the Class as a whole and much

discounted relief for the subgroups. The balance is a reasonable one.

### 2.   Subgroup Recoveries Are Necessarily Incidental in Church Plan Litigation.

In a church plan case like this one, the ultimate relief requested is that the plan come into compliance with ERISA. Were that to happen, then all of ERISA's protections would prospectively be activated. The plan would have to meet ERISA's funding, vesting, and other requirements, and it would be obliged to purchase insurance from the Pension Benefit Guarantee Corporation (the "PBGC").[20] With current funding and PBGC insurance, the risk to current participants of default—the main problem ERISA sought to solve—would be minimal.[21] The centerpiece of the judgment would be prospective, that the plan and its sponsor comply with ERISA on a going-forward basis.

However, some church plan cases also involve subgroups who are no longer participants in the plan. They have "lumped out," taking their benefits in a lump sum, or they left before they vested under the terms of the plan. If the lawsuit is 100% successful, they may very well be entitled to retrospective relief if the terms on which the lump-out was calculated, or the vesting schedule in place when they left, are not ERISA compliant. These people will be, or may be, beneficiaries of a successful church plan lawsuit, even though the long-term integrity of the plan is no longer important to them.

In short, the claims of these subgroups are inevitably dependent on the success of the broader case in church plan litigation. No class counsel would take on the subgroups' claims alone—to prevail, counsel would have to prevail in the case as a whole, and then make the

---

[20] *See, e.g.*, ERISA §§ 303 (funding), 203 (vesting), 101-06 (disclosure and reporting), 4007 and 4022 (PBGC obligation), 29 U.S.C. §§ 1083, 1053, 1021-26, 1109, 1307, 1322.

[21] Although one sometimes sees references in the press to the PBGC's possible "insolvency," those are references to the Multi-Employer Program. The Single-Employer Program of the PBGC, which handles the insurance for plans like Dignity Health's, is $8.7 billion in surplus. Pension Benefit Guaranty Corporation Annual Report 2019 at 24, https://www.pbgc.gov/sites/default/files/pbgc-fy-2019-annual-report.pdf (last visited Nov. 21, 2019).

additional case for retroactive relief. Seven of the church plan settlements to date have included subgroups like these, relatively small groups of participants or former participants who would be entitled only to incidental relief.[22] In no case has a district court found it necessary to certify those subgroups as separate subclasses. In this case, as in those, neither the Named Plaintiffs nor Class Counsel had any fundamental conflict in attempting to get some relief for these subgroups. Certification of subclasses is therefore not practical, and is not, we submit, required.

### 3. The Court's Analysis in *Ferrington* Is Instructive.

The contrast between the situation here, with these two subgroups, and that in *Ferrington*, one of the cases cited by the Court, Denial Order at 15-16, is illustrative. Purchasers of McAfee anti-virus software claimed that they had been incorrectly charged for another software product offered by another company, Arpu, Inc., which advertised on McAfee's website. Those who inadvertently clicked on the Arpu icon were charged for the Arpu software. Those who did not download the Arpu software were plainly damaged because they were charged by Arpu for something they did not want and never even downloaded. However, some who clicked on the Arpu icon and downloaded the software were also damaged because they did not want the software either; they thought they were downloading the McAfee software. And a third group was

---

[22] Class Action Settlement Agreement, *Griffith v. Providence Health & Servs.*, No. 14-1720 (W.D. Wash. Feb. 3, 2017), ECF No. 54-1 (vesting claimants received $500 each, $1,901,000 in total); Class Action Settlement Agreement, *Hodges v. Bon Secours Health Sys.*, No. 16-1079 (D. Md. Oct. 13, 2017), ECF No. 112-2 (vesting claimants received average of $566 each, $300,000 in total); Class Action Settlement Agreement, *Lann v. Trinity Health Corp.*, No. 14-2237 (D. Md. Apr. 17, 2017), ECF No. 102-2 (vesting claimants received average of $176 per person, $1,300,00 in total; lump-sum claimants received $550 each, $120,450 in total); Class Action Settlement Agreement, *Feather v. SSM Health Care Corp.*, No. 16-1669 (E.D. Mo. May 6, 2019), ECF No. 123-2 (lump-sum claimants received $115 each, $615,710 in total); Class Action Settlement Agreement, *Stapleton v. Advocate Health Care Network & Subsidiaries*, No. 14-1873 (N.D. Ill. May 16, 2018), ECF No. 169-1 (vesting claimants received $300 each, $673,500 in total); Class Action Settlement Agreement, *In re Mercy Health ERISA Litig.*, No. 16-441 (S.D. Ohio Oct. 29, 2018), ECF No. 98-4 (lump-sum claimants received $450 each, or $625,500 in total); Class Action Settlement Agreement, *Nicholson v. Franciscan Missionaries*, No. 16-258 (M.D. La. Jan. 11, 2018), ECF No. 94-10 (lump-sum  claimants receive $450 each, totaling $939,150).

not damaged at all because they did indeed want the Arpu software they deliberately downloaded.

This presented a conflict between the "non-downloaders," who had the stronger claims, and the "downloaders," whose claims were concededly weaker. The plaintiffs were all non-downloaders and their settlement provided nothing at all for the downloaders, even though the downloaders' claims were to be released. Counsel for the downloaders, who was pursuing a separate action on behalf of the downloaders, objected to the settlement, and, at the final approval hearing, the court sustained the objection.

The court cited several factors in support of its decision: the size of the downloader subgroup was unknown; counsel who represented the downloaders in separate litigation formally objected to the settlement; there was a disproportionately high fee award; the unawarded fees reverted to defendants; and the downloaders' claims were released for literally nothing. *Ferrington*, 2012 WL 1156399, at *13.

None of these factors is presented here. We know exactly how many vesting claimants and PEP Plus claimants there are, there is no separate counsel and separate lawsuit, and the New Settlement Agreement dispenses with the clear sailing and kicker clauses; any unawarded fees will be paid into the Plan. And the vesting claimants and the PEP Plus claimants are not receiving nothing. As is explained below, their benefit is based on the strength of their claims and is in line with the amounts received by similar claimants in other church plan litigation. Unlike *Ferrington*, there is no indication here that counsel or the class representatives have ignored the claims of a subgroup of the class.

### D.  The Subgroups' Recoveries Are Adequate.

The subgroups' claims, even in the aggregate, are, as explained above, very modest compared to the litigation as a whole. Nevertheless, the class representatives and their counsel did their best to recover as much as possible for the members of the subgroups. Unfortunately, it

wasn't much. There are two reasons for this.

First, as explained above, the two subgroups' claims are claims for retrospective relief. Class Counsel have litigated church plan cases for almost ten years. Based on that experience, including colloquies with district and magistrate judges in a variety of settings, settlement negotiations with skilled mediators, interaction with pension plan academics and with leaders in pension plan non-profit organizations (e.g., the AARP and the Pension Rights Center), they now assess the likelihood that a district judge would award retrospective relief in a church plan case as very small, on the order of 1% to 10%. Thus, the first reason for the small recovery is that Class Counsel now believes that given the circumstances of the church plan litigation, the likelihood of success is very small.[23]

The second reason is the simple fact of the negotiation history. The vesting group presented the more difficult case. In many of the church plan lawsuits there were vesting groups because of the same non-compliant cash balance five-year vesting provision as found in this Plan. By the time this case was negotiated, no less than four cases with vesting groups had been resolved. *See supra* note 22. The cases involved different defense counsel and, of course, different sets of plaintiffs. In some of the cases one of the named plaintiffs was a vesting group member; in others, as in this case, none was. But in all the cases, the plaintiffs and their counsel were able to negotiate for a recovery of no more than a few hundred dollars per person. This backstory, well known to defense counsel and the mediator in this case, made it essentially impossible to negotiate for a larger

---

[23] Early in the church plan litigation that assessment was quite different. Before the Supreme court's decision in *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017), the argument that hospital pension plans were not church plans was very simple: those plans had concededly not been established by a church as (the plaintiffs argued) the statute plainly required. Counsel believed it likely that the simplicity of the argument, especially after three Courts of Appeal had unanimously accepted it, might lead many district judges to entertain with sympathy some forms of retrospective relief. However, once the Supreme Court rejected that argument, and the inquiry turned to more technical issues, Class Counsel concluded that the rationale for retrospective relief became much more difficult.

recovery in this case.

The PEP Plus group was positioned differently. Because none of the earlier cases had a backloading issue like the PEP Plus issue, there was no history with which Plaintiffs' counsel had to contend, which made negotiations easier. Nonetheless, the discount due to the risk of seeking retrospective relief was still profound because the PEP Plus claimants had an additional hurdle to clear: Relief for the PEP Plus group depended not only on the Plan as a whole being an ERISA plan, but also on the specific notice at issue being defective under ERISA.

As to the numbers, based on the assessment of our actuary, the percentage recovery for the vesting group is on the order of 5%; that is, the aggregate amount devoted to settling the vesting group's claims, $660,000, is about 5% of the estimated average of all such claims ($13.8 million). Ex. 5 ¶¶ 12, 21.[24] With the PEP Plus group, the recovery is slightly larger, but still very small, about 10%. Thus, the amount devoted to settling the PEP Plus group's claims, $825,000, is about 10% of the estimated total of all such claims, $8 million. *Id.* 5 ¶ 28. The available details are provided in Mr. Cassidy's Supplemental Declaration. *Id.* §§ II-III.

The case law recognizes that in some circumstances deep discounts are appropriate, and therefore are "fair, adequate, and reasonable." *Reynolds v. Direct Flow Med., Inc.*, No. 17-204-KAW, 2019 WL 4168959, at *5 (N.D. Cal. Sept. 3, 2019) (deep discount warranted); *Viceral v. Mistras Grp., Inc.*, No. 15-2198-EMC, 2016 WL 5907869, at *8 (N.D. Cal. Oct. 11, 2016) (91.2% discount warranted); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 499 (N.D. Miss. 1996)

---

[24] $13.8 million is the sum of the averages of claims for the two cash balance plans, the GGA plan and the VPP plan. Mr. Cassidy concludes a range of value for the vesting group with claims under the GGA cash balance plan of between $6 million and $18 million, Ex. 5 ¶ 10, with hypothetical average participants holding total claims of $12 million, *id.* ¶ 12. Mr. Cassidy concludes a range of value for the vesting group with claims under the VPP cash balance plan of between $900,000 and $2.7 million, *id.* ¶ 19, or an average of $1.8 million, *id.* ¶ 21. Using the low end of these ranges, the recovery would average about 9.5%; using the high end, it would average about 3%.

(settlement approved though recovery was "pennies on the dollar"). *See generally* Rubenstein, *supra*, § 13:15 (even recoveries of one percent or less may be fair, reasonable, and adequate). We regret that the recoveries are so small, but we submit they still warrant this Court's preliminary approval.

## III. THE PROPOSED NEW SETTLEMENT WARRANTS PRELIMINARY APPROVAL

The proposed New Settlement Agreement is attached as a clean copy and in redline at Exhibits 1 and 2. The changes are few. The clear sailing and kicker clauses have been removed from sections 7.1.8 and 7.1.10, and "subclass" has been deleted throughout. The same changes are made in the Class Notice, attached in clean and redline versions at Exhibits 3 and 4. The exhibits to the New Settlement Agreement are unchanged, and are attached in redacted form as previously authorized by the Court. Denial Order at 10.

The Court has already reviewed, in its Denial Order (at 6-8), the law on preliminary approval in this Circuit. We submit that with the changes in the New Settlement Agreement, and the additional information provided to the Court above, the New Settlement merits preliminary approval. The key points are these:

**Preliminary Approval of the Settlement Class:** We argued in our Original Motion that the Settlement Class meets the requirements of Rules 23(a), 23(b)(1), and 23(b)(2). In its Denial Order the Court stated that it "does not foresee obstacles to preliminarily certifying the class for settlement purposes, besides the subclass issue." *Id.* at 10 n.5. We have addressed that issue above, and we urge the Court to preliminarily certify the Settlement Class.

**Preliminary Approval of the New Settlement Agreement:** The New Settlement Agreement is plainly the result of "'serious, informed, non-collusive negotiations,'" *id.* at 7 (citation omitted), and, as is evidenced by the data provided to the Court on other similar church plan settlements, Original Motion Ex. 3-C, "'falls within the range of possible approval.'" Denial

Order at 7 (citation omitted). We have addressed above the Court's concerns about the size of the Fee Award, the adequacy of the consideration, and that the New Settlement Agreement does not "'improperly grant preferential treatment to . . . segments of the class.'" *Id*. (citation omitted). The New Settlement Agreement is, we submit, an excellent result for the Settlement Class and we urge the Court to preliminarily approve it.

**Proposed Final Approval and Notice Schedule:**  Plaintiffs propose the following schedule:

| Event | Time for Compliance |
|---|---|
| Deadline for CAFA Notice to be Served by Defendants | 10 days after filing the Renewed Motion |
| Deadline for Mailing of Class Notice and Posting Class Notice to Website | 30 days after entry of the Preliminary Approval Order |
| Deadline for Filing Plaintiffs' Motion for Final Approval, Attorneys' Fees and Expenses, and Incentive Awards for Named Plaintiffs | 60 days prior to the Proposed Final Approval Hearing |
| Deadline for the Settlement Class to Comment upon or Object to the Proposed Settlement | 25 days prior to the Proposed Final Approval Hearing |
| Deadline for Filing Plaintiffs' Reply in Support of Motion for Final Approval, Attorneys' Fees and Expenses, and Incentive Awards for Named Plaintiffs, and for the Parties to Respond to Any Comments or Objections | 7 days prior to the Proposed Final Approval Hearing |
| Proposed Final Approval Hearing | 100 days after entry of the Preliminary Approval Order |

**Proposed Forms of Order:**  Proposed forms of Order granting preliminary approval and final approval are attached as Exhibits 6 and 7 hereto.

**Other Information:** Finally, to the extent the Court requires any further information to do its duty as a district judge in assessing the New Settlement, we will do our duty as the lawyers

before the Court and provide it. Whatever we can do to assist the Court in assessing this settlement, we will do.

## IV. CONCLUSION

Plaintiffs respectfully request, based on the materials submitted in connection with the Original Motion, ECF Nos. 284 – 284-13, and this Renewed Motion that the Court preliminarily approve the New Settlement, provisionally certify the Settlement Class, conditionally appoint the undersigned as Class Counsel and the Plaintiffs as the Class Representatives, order dissemination of notice to Settlement Class Members, set a date for the Final Approval Hearing, and grant such other and further relief as the Court may deem appropriate.

Respectfully submitted this 25th day of November, 2019.

KELLER ROHRBACK L.L.P.

By: */s/ Ron Kilgard*
Ron Kilgard (*pro hac vice*)
Christopher Graver (*pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel.: (602) 248-0088 / Fax: (602) 248- 2822
rkilgard@kellerrohrback.com
cgraver@kellerrohrback.com

KELLER ROHRBACK L.L.P.
Lynn L. Sarko (*pro hac vice*)
Matthew M. Gerend (*pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900 / Fax: (206) 623-3384
lsarko@kellerrohrback.com
mgerend@kellerrohrback.com

KELLER ROHRBACK L.L.P.
Juli E. Farris (CA Bar No. 141716)
801 Garden Street, Suite 301
Santa Barbara, CA  93101
Tel.: (805) 456-1496 / Fax: (805) 456-1497
jfarris@kellerrohrback.com

COHEN MILSTEIN SELLERS & TOLL PLLC
Karen L. Handorf (*pro hac vice*)
Michelle C. Yau *(pro hac vice)*
1100 New York Avenue, N.W., Suite 500, West Tower
Washington, D.C.  20005
Tel.: (202) 408-4600 / Fax: (202) 408-4699
khandorf@cohenmilstein.com
myau@cohenmilstein.com

***Attorneys for Plaintiffs***

PLS.' RENEWED UNOPPOSED MOT. FOR
PRELIM. APPROVAL OF SETTLEMENT

## CERTIFICATE OF SERVICE

I, Christopher Graver, hereby certify that on November 25, 2019, a true copy of the above document was served on the Defendants, through their counsel of record, via ECF.

*/s/  Christopher Graver*