UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STARLA ROLLINS, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>DIGNITY HEALTH, et al.,<br><br>    Defendants. | Case No. 13-cv-01450-JST<br><br>**ORDER DENYING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Re: ECF No. 290 |

Before the Court is Plaintiffs Starla Rollins and Patricia Wilson's renewed, unopposed motion for preliminary approval of settlement agreement and certification of settlement class. ECF No. 290. The Court will reluctantly deny the motion without prejudice.

## I.  BACKGROUND

### A.  Factual and Procedural Background

The factual and procedural background to this putative class action is described more fully in the Court's prior order denying without prejudice Plaintiffs' motion for preliminary approval. *See* ECF No. 289. In short, Plaintiffs sued Defendants Dignity Health and Dignity Health Retirement Plans Subcommittee as well as two individual Defendants over the administration of the Dignity Health Pension Plan ("the Plan"). Second Amended Complaint ("SAC"), ECF No. 268 ¶ 3. The crux of the dispute is whether the Plan qualifies for the church plan exemption to the Employee Retirement Income Security Act of 1974 ("ERISA"). *Id.* ¶ 4.

Plaintiffs filed suit in 2013. ECF No. 1. In 2019, after proceedings in the District Court, Ninth Circuit, Supreme Court, and then the District Court again, the parties reached a settlement. ECF No. 278. On June 27, 2019, Plaintiffs filed an unopposed motion for preliminary approval of the settlement agreement and to preliminarily certify the class. ECF No. 284. On October 28,

2019, the Court denied preliminary approval without prejudice and deferred ruling on preliminary class certification. ECF No. 289. On November 25, 2019, Plaintiffs filed this renewed unopposed motion for preliminary approval and class certification. ECF No. 290. The Court took the matter under submission without a hearing. ECF No. 291.

**B.     Terms of Settlement**

The proposed amended settlement ("Settlement") resolves claims between Defendants and "[a]ll participants, former participants, or beneficiaries of the Dignity Health Pension Plan." Settlement, ECF No. 290-1 § 1.30. In the Settlement, the parties stipulate that no party concedes whether the Plan is a church plan or subject to ERISA. *Id.* § 4.1.

Nonetheless, under the Settlement, Dignity Health agrees to make contributions to the Plan for five years, in the following amounts:

>2020:  $50 million;
>
>2021: $50 million or "the amount of the Minimum Contribution Recommendation calculated by the Plan's Actuaries in the Pension Contribution Report for that calendar year," whichever is greater;
>
>2022, 2023, and 2024: The Minimum Contribution Recommendation.

*Id.* §§ 7.1.2-.3.

The Settlement also provides for one-time payments to two subgroups of class members based on particular claims they hold. First, Dignity Health will pay a total of $660,000 to class members who terminated their employment between April 1, 2013 (the filing of the complaint) and March 27, 2019, "and completed at least (3) but less than five (5) years of vesting service." *Id.* § 7.1.6. The share that these class members ("Former Participant Vesting Claimants," or "the vesting subgroup") receive will vary depending on under which of two plans each individual accrued benefits. *Id.* The parties estimate that 744 class members accrued benefits under the Value Protection Plan and will receive "Vesting Payments" of $113.40 each; they estimate that 2,538 class members accrued benefits under the Guaranteed Growth Account formula and will receive $226.80 each. *Id.*

Second, Dignity Health will pay a total of $825,000 to the PEP Plus Claimants, defined as

2

follows:

> All participants, former participants, or beneficiaries of the Dignity Health Pension Plan as of January 1, 2014, whose benefit accruals were calculated using the "PEP Plus" formula and who, between January 1 and April 1, 2014, were not members of the labor union that collectively bargained with Dignity Health regarding the 2014 changes to the PEP Plus accrual formula and who were negatively impacted by the 2014 changes.

*Id.* § 1.22; *see also id.* § 7.1.7. "The allocation of this amount among PEP Plus Claimants who were negatively impacted by the alleged change in benefits shall be made based upon the vesting years of service of the impacted PEP Plus Claimants, taking into account that PEP Plus Claimants with between six and twenty years of vesting service were most impacted." *Id.* § 7.1.7. The Settlement allocates the one-time PEP Plus payments as follows:

> Group One: The 119 PEP Plus Claimants with 1-5 years of service will each receive a 22.5% share, equal to cash in the sum of $548.60.
>
> Group Two: The 625 PEP Plus Claimants with 6-20 years of service will each receive a 40% share, equal to cash in the sum of $975.32.
>
> Group Three: The 209 PEP Plus Claimants with 21-30 years of service will each receive a 22.5% share, equal to cash in the sum of $548.60.
>
> Group Four: The 97 PEP Plus Claimants with 31 or more years of service will each receive a 15% share, equal to cash in the sum of $365.75.

*Id.* Dignity Health will make payments to members of both subgroups by check; members will have 120 days to cash their payments. *Id.* §§ 7.1.6-.7. Payments not cashed by that deadline will be contributed to the Plan. *Id.*

The Settlement also includes non-monetary relief related to the Plan's administration, including Defendants' agreement that (1) an amendment to the Plan will never reduce a participant's accrued benefit; (2) upon termination of the Plan, all benefits will be 100 percent vested; and (3) for a period of ten years, Defendants will not enter into any transfer, merger, or consolidation that would reduce a participant's accrued benefit. *Id.* §§ 8.1-.2. The Settlement also implements certain procedures, such as requiring that the Plan Administrator make available summary plan descriptions, an annual report, and pension benefit statements. *Id.* §§ 8.4.1-.3.

3

Defendants also agree that, for the next five years, at least two of the members of the Subcommittee will be individuals who are not employed by Dignity Health or its affiliates. *Id.* § 8.4.5.

Finally, counsel intends to seek incentive awards of $10,000 each for Rollins and Wilson as part of the fee request. ECF No. 290-5 at 9.

In exchange, Plaintiffs agree to release the following claims:

> Any and all known or unknown, actual or potential claims, actions, causes of action, demands, obligations, liabilities, attorneys' fees, expenses and costs arising out of or related to the allegations of the Complaint that were brought or could have been brought as of the date of the Settlement Agreement by any member of the Settlement Class, including any current or prospective challenge to the Church Plan status of the Plan . . . .

Settlement § 3.1.1. The Settlement specifically exempts claims (1) for breach of the Settlement; (2) for individual benefits under state law; (3) under any other plan added to the Dignity Plan before the Settlement becomes effective; and (4) future ERISA claims in the event of a change in the law, or election by Dignity Health, that results in the Plan not being treated as a church plan. *Id.*

To inform class members of the Settlement, Plaintiffs propose the following notice plan. The Settlement Administrator will mail the Class Notice to class members within 30 days of preliminary approval. *See* ECF No. 290 at 23; ECF No. 290-5 (Class Notice). The Administrator will use "appropriate measure to locate corrected addresses and re-mail the Class Notice" to any Plaintiffs whose mail is returned. ECF No. 284 at 37. Plaintiffs' counsel will also publish the Settlement and the Class Notice on their firm websites. *Id.* Under the parties' proposed schedule, Plaintiffs will file their motions for final approval and attorney's fees 40 days after preliminary approval. *Id.* at 38. The deadline for class members to object to the Settlement or the fees motion is 75 days after preliminary approval. *Id.* Lastly, the renewed approval motion indicates that the parties have agreed that notice is required under the Class Action Fairness Act of 2005. *See* 28 U.S.C. § 1715; ECF No. 290 at 7 n.3. Defendants have agreed to provide such notice within ten days of the filing of the renewed motion. ECF No. 290 at 23.

4

## II. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1332(d).

## III. LEGAL STANDARD

### A. Preliminary Settlement Approval

The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Rule 23 requires courts to employ a two-step process in evaluating a class action settlement. First, the parties must show "that the court will likely be able to . . . (i) approve the proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B). In other words, a court must make a preliminary determination that the settlement "is fair, reasonable, and adequate" when considering the factors set out in Rule 23(e)(2). Fed. R. Civ. P. 23(e)(2). The Court's task at the preliminary approval stage is to determine whether the settlement falls "within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (citation omitted); *see also* Manual for Complex Litigation, Fourth ("MCL, 4th") § 21.632 (FJC 2004) (explaining that courts "must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the certification, proposed settlement, and date of the final fairness hearing"). "The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." *City of Seattle*, 955 F.2d at 1276 (citation omitted). Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

If no class has yet been certified, a court must likewise make a preliminary finding that it "will likely be able to . . . (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). If the court makes these preliminary findings, it "must direct notice in a reasonable manner to all class members who would be bound by the proposal." *Id.* Second, courts must hold a hearing pursuant to Rule 23(e)(2) to make a final determination of whether the

5

settlement is "fair, reasonable, and adequate."

Within this framework, preliminary approval of a settlement is appropriate if "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *In re Tableware*, 484 F. Supp. 2d at 1079 (citation omitted). The proposed settlement need not be ideal, but it must be fair and free of collusion, consistent with counsel's fiduciary obligations to the class. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."). To assess a settlement proposal, courts must balance a number of factors:

> [T]he strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Id.* at 1026 (citations omitted).[1] The proposed settlement must be "taken as a whole, rather than the individual component parts," in the examination for overall fairness. *Id.* Courts do not have the ability to "delete, modify, or substitute certain provisions"; the settlement "must stand or fall in its entirety." *Id.* (citation omitted).

**B.    Class Certification**

Class certification under Federal Rule of Civil Procedure 23 is a two-step process. First, a plaintiff must demonstrate that the four requirements of Rule 23(a) are met: numerosity, commonality, typicality, and adequacy. "Class certification is proper only if the trial court has

---

[1] These factors are substantially similar to those articulated in the 2018 amendments to Rule 23(e), which were not intended "to displace any factor [developed under existing Circuit precedent], but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *4 (N.D. Cal. Dec. 18, 2018) (quoting Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment).

6

concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542-43 (9th Cir. 2013) (quoting *Dukes*, 564 U.S. at 351).

Second, a plaintiff must establish that the action meets one of the bases for certification in Rule 23(b). Plaintiffs invoke Rule 23(b)(1) and (b)(2). Therefore, Plaintiffs must establish that prosecuting separate actions would create a risk of either "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class," or "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1). Alternatively, Plaintiffs must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

When determining whether to certify a class for settlement purposes, a court must pay "heightened" attention to the requirements of Rule 23. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.* At the same time, trial "manageability is not a concern in certifying a settlement class where, by definition, there will be no trial." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556-57 (9th Cir. 2019) (en banc).

**IV.  DISCUSSION**

In its order on Plaintiffs' first motion for preliminary approval, the Court noted that "many of the relevant factors support a finding that the Settlement falls within the range of possible approval." ECF No. 289 at 10. However, it denied the motion for three main reasons: 1) the Settlement contained clear sailing and implied reversion clauses that raised concerns of collusion; 2) the Court could not evaluate the reasonableness of the amount Plaintiffs planned to seek in attorney's fees without a more precise "denominator against which attorney's fees should be measured," because the class's total recovery was insufficiently certain; and 3) Plaintiffs had not

7

adequately shown why certification of two subgroups was not required. ECF No. 289 at 10-16.

The new Settlement eliminates the clear sailing and reversion clauses, resolving the first issue. See ECF No. 290 at 7-8. Plaintiffs now provide additional explanation and evidence regarding the other two issues, which the Court will address below.

### A.      Range of Recovery

In its prior order denying preliminary approval, the Court raised questions about class members' range of recovery in considering the reasonableness of the projected fee request. ECF No. 289 at 13-15. The parties have now provided additional information that resolves the Court's concerns on this issue.

To evaluate the adequacy of a settlement amount, "courts primarily consider plaintiffs' expected recovery [at trial] balanced against the value of the settlement offer." *In re Tableware*, 484 F. Supp. 2d at 1080. "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 628 (9th Cir. 1982). Nonetheless, "any fraction has a denominator, and without knowing what it is the Court cannot balance plaintiffs' expected recovery against the proposed settlement amount." *Cordy v. USS-Posco Indus.*, No. 12-CV-00553-JST, 2013 WL 4028627, at *4 (N.D. Cal. Aug. 1, 2013).

The adequacy of this Settlement is especially difficult to evaluate because the amount Dignity Health will be required to contribute under the Settlement is unknown. Aside from $100 million in baseline contributions – $50 million for 2020 and at least $50 million for 2021 – Dignity Health's contributions will depend on what Minimum Contribution Recommendations are made by the Pension Contribution Reports ("PCRs"). In its last order, the Court noted that Plaintiffs had "not identified any provisions in the Settlement governing how Dignity Health's actuaries calculate the Minimum Contribution Recommendation." ECF No. 289 at 14.

Plaintiffs have remedied this problem by providing another declaration from Daniel P. Cassidy, the actuarial expert who estimated the Minimum Contribution Recommendations Plaintiffs cite in their motion. ECF No. 290-7. In this declaration, Cassidy explains how the PCRs – whose primary purpose is "to determine contribution requirements for the plan for the

8

plan year beginning January 1, 2019," *id.* ¶ 38 – are generated.  Prepared by actuaries retained by Dignity Health in accordance with generally accepted actuarial principles ("GAAP"), the PCRs value the Plan as a whole in order to recommend minimum funding contributions.  *Id.* ¶¶ 37-39; *see also* Settlement §§ 1.21, 1.26, 7.1.  Central to this valuation is the assumed expected return on assets, which is set by Dignity Health rather than the actuaries.  ECF No. 290-7 ¶¶ 40, 43.  A higher expected return would produce a lower recommended minimum contribution, and vice versa.  *Id.* ¶ 43.  Cassidy explains, however, that "it is highly unlikely that the three [actuaries retained by Dignity Health] would sign a PCR that included an unreasonably high expected return on assets assumption that reduced the recommended minimum to an unreasonably low level." *Id.* ¶ 49.  This is because signing off on such a PCR would create a "reputational risk" to the actuaries and could result in professional discipline, "including suspension or expulsion from actuarial membership." *Id.* ¶ 51.  The Court finds that Plaintiffs have sufficiently explained how the Minimum Contribution Recommendations are generated.

With this information, the Court can better evaluate the reasonableness of Plaintiffs' estimate for how much Dignity Health is likely to have to contribute under the terms of the Settlement.  In his declaration in support of Plaintiffs' first motion for preliminary approval, Cassidy projected Minimum Contribution Recommendations for 2021-24 to estimate how much Dignity Health would be required to contribute to the Fund overall.  ECF No. 284-11 ¶ 35.  In addition to the $50 million Dignity Health has agreed to contribute in 2020, Cassidy projected that it would contribute $162 million in 2021, $170 million in 2022, $278 million in 2023, and $187 million in 2024, for a total of $747 million.  *Id.*  The Court recognizes that this outcome is not guaranteed, but Plaintiffs have now provided sufficient support for its likelihood.

In order to evaluate whether this amount falls within the range of approval, however, the Court must compare it to Plaintiffs' "expected recovery" at trial.  *In re Tableware*, 484 F. Supp. 2d at 1080; *Cordy*, 2013 WL 4028627, at *4.  In their prior motion for preliminary approval, Plaintiffs provided extensive analysis of the risks attendant to this litigation, stemming from the unsettled nature of the church plan exemption and the complexities of ERISA litigation more generally.  *See* ECF No. 284 at 19-22.  They also laid out what a "full 'win'" for Plaintiffs would

9

look like, primarily involving declaratory and injunctive relief requiring Dignity Health to "properly fund[] the Plan as required by ERISA, purchas[e] insurance from the Pension Benefit Guaranty Corporation ('PBGC'), provid[e] ERISA-required reports and information, and follow[] ERISA's vesting and benefit accrual rules." *Id.* at 24.  Plaintiffs estimate that the monetary component of this recovery would amount to about $630 million over the five-year period covered by the Settlement, including $230 million in PBGC premiums and $400 million in ERISA-required funding.  *Id.* at 25.  The $400 million figure is based on Cassidy's actuarial estimate of the Plan's unfunded liability under ERISA.  *Id.* at 13 n.11; ECF No. 284-11 ¶ 36.  Compared to this $630 million recovery, the Settlement's high-end value of $747 million provides an excellent outcome for Plaintiffs, to say the least.

Moreover, even if the PCRs recommend far smaller contributions, the Settlement is likely to provide a significant value to the class.  Plaintiffs emphasize that a major part of this value is the fact that a certain level of funding would be *guaranteed*.  ECF No. 290 at 9-11.  Because church plans are exempt from ERISA, their sponsors are not required to regularly fund them.  Plaintiffs argue that, as a result, church plans are especially prone to default, citing nine such plans that have recently defaulted.  *Id.* at 9-10.  Given this context, the fact that Dignity Health has committed to funding the Plan over the next five years is a benefit in itself.  *See Kemp-DeLisser v. Saint Francis Hosp. & Med. Ctr.*, No. 15-cv-1113 (VAB), 2016 WL 6542707, at *10 (D. Conn. Nov. 3, 2016) (finding that guaranteed payments into an alleged church plan "increase[d] the settlement's value in comparison to some speculative payment of a hypothetically larger amount years down the road, had the parties proceeded with litigation") (citation and internal quotation marks omitted).  In addition, the Settlement provides procedural guarantees similar to those Plaintiffs would be entitled to if they prevailed at trial – for example, protection of accrued benefits in the event of merger or termination of the Plan, summary plan descriptions, annual reports, and pension benefit statements.  *See id.* at 11 n.15.

For these reasons, the Court finds that the Settlement falls within a reasonable range of recovery.  While the Court need not resolve the question of attorney's fees, costs, and incentive awards at this time, it now has sufficient information about the range of recovery to be able to

evaluate Plaintiffs' fee request upon further motion.

### B. Subgroups

In its prior order denying preliminary approval, the Court noted concerns about the Former Participant Vesting Claimant subgroup and the PEP Plus Claimant subgroup. The Court instructed Plaintiffs that any future motion should "support the propriety of providing payments to these subgroups without subclass certification" and "provide sufficient information regarding the value of the subgroups' claims for the Court to evaluate whether the Settlement treats those claims equitably." ECF No. 289 at 16.

Where a class action involves groups of plaintiffs with "significantly conflicting interests," sub-classing is "one mechanism, though not the only one, by which courts can solve conflict of interest problems." William B. Rubenstein, 3 *Newberg on Class Actions* § 7:31 (5th ed.); *see also Amchem*, 521 U.S. at 627. However, "only a truly fundamental conflict of interest" requires sub-classing. Rubenstein, *supra*, § 7:31. "A conflict is fundamental when it goes to the specific issues in controversy." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015). Such a conflict exists where the interests of certain claimants are directly opposed to those of other claimants. *See Amchem*, 521 U.S. at 627. "Beyond that straightforward proposition, [however], defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1768 (3d ed. 2005). "Although the creation of subclasses is sometimes necessary under Rule 23(a)(4) to avoid a fundamental conflict, there is no need to create subclasses to accommodate every instance of differently weighted interests." *In re Deepwater Horizon*, 739 F.3d 790, 813 (5th Cir. 2014) (citation and internal quotation marks omitted). A court should not insist on the creation of a subclass unless it serves a necessary purpose since it adds to the cost and complexity of a class action. *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 269 (D. Mass. 2008).

*Amchem* involved an attempted global settlement of current and future asbestos-related claims. *Id.* at 597. More than half of the named plaintiffs were already sick, while the others had been exposed and might become sick in the future. *Id.* at 603. The complaint did not divide the

plaintiffs into subclasses. *Id.* The Court held that this arrangement did not satisfy Rule 23's adequacy requirement, which "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* at 625. Such a conflict existed here because, "for the currently injured, the critical goal is generous immediate payments[,]" while "the interest of exposure-only plaintiffs [is] in ensuring an ample, inflation-protected fund for the future." *Id.* at 626. *See also Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 188 (3d Cir. 2012) (finding conflict where all representative plaintiffs were in a subgroup that "had an interest in excluding other plaintiffs" from that subgroup); *Ferrington v. McAfee, Inc.*, No. 10-cv-01455-LHK, 2012 WL 1156399, at *13 (N.D. Cal. Apr. 6, 2012) (finding conflict where settlement "would require an unknown subset of the class to relinquish its claims against Defendants for no consideration").

In its prior order, the Court noted that "[t]he very fact that these subgroup members receive payments beyond the classwide relief for their additional claims creates the potential for the Settlement to either shortchange or disproportionately favor these claims relative to the classwide claims." ECF No. 289 at 15 (citing *Ferrington*, 2012 WL 1156399, at *7 ("[A] settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group.") (citation omitted)). In their renewed motion, Plaintiffs have provided additional detail to support their argument that the subgroups do not have a fundamental conflict of interest with the rest of the class and that the subgroups' recoveries are adequate. The Court addresses these arguments subgroup by subgroup.

### 1. PEP Plus Claimant Subgroup

The PEP Plus Claimant Subgroup is comprised of 1,050 non-unionized nurses who accrued benefits under the backloaded "PEP Plus" formula. ECF No. 290 at 14. ERISA prohibits most "backloaded" formulas. *See* SAC ¶ 111. In 2014, Dignity Health amended the Plan to change or eliminate this backloading, which Plaintiffs allege had a significant negative impact on the PEP Plus claimants. *Id.* ¶ 113. This subgroup, which was pleaded in the SAC as a subclass, brought an additional ERISA claim for impermissible backloading of benefits. SAC ¶¶ 150, 248-265. Were the Plan deemed subject to ERISA, these Plaintiffs might thus be entitled to retrospective relief in addition to any prospective relief for the class as a whole. *Id.* Under the

12

Settlement, the PEP Plus claimants will benefit from the prospective class-wide relief as well as receiving one-time cash payments ranging from $365.75 to $975.32, depending on their years of service. *See* Settlement § 7.1.7. Plaintiffs estimate that this recovery is about 10 percent of the total value of the PEP Plus subgroup's claims. ECF No. 290 at 21; ECF No. 290-7 at 7-10.

Like members of the broader class, PEP Plus claimants have an interest in obtaining robust prospective relief that will maximize the benefits available to them under the Plan going forward. Unlike the other class members, they also have an interest in obtaining cash relief for the additional risk they took on under the Plan. Unlike the sick and not-yet-sick plaintiff groups in *Amchem*, the PEP Plus claimants are not incentivized to reduce relief for the rest of the class because they too will benefit from that relief. And unlike the group of plaintiffs in *Ferrington* who would have received no benefit under the settlement, the PEP Plus claimants here will receive an *additional* benefit. For these reasons, the Court does not see any conflict between these interests and finds that certification of a subclass is not necessary. The Court acknowledges some tension between the PEP Plus claimants' desire to maximize their overall recovery, the Defendants' interest in limiting their overall recovery, and the fact that a settlement dollar spent on PEP Plus claims by definition cannot be spent on the larger class's claims. Nonetheless, the Court concludes that this potential conflict is not so substantial as to require the establishment of a subclass and the additional cost and complexity that would entail. *See Natchitoches,* 247 F.R.D. at 269.

The Court also notes that, while the Settlement affords PEP Plus claimants only 10 percent of the value of their additional claims, this discount does not undermine the fairness, reasonableness, or adequacy of the Settlement under the circumstances. As evidenced by the shifting law on the ERISA church plan exemption, Plaintiffs face significant risk, not to mention expense, in taking this case to trial. The PEP Plus claimants face the additional hurdle of needing to prove that Dignity Health failed to provide the notice ERISA requires to amend accrual formulas that significantly reduce future benefits. *See* SAC ¶¶ 119-20. Courts in similar circumstances have "approved settlements below the 10% threshold that reflect the plaintiffs' judgment that 'a deeply discounted recovery is better than the substantial likelihood of recovering

13

nothing.'" *In re MyFord Touch Consumer Litig.*, No. 13-cv-03072-EMC, 2019 WL 1411510, at *10 (N.D. Cal. Mar. 28, 2019) (listing cases). The Court thus holds that the PEP Plus subgroup's recovery under the Settlement is adequate.

### 2. Vesting Subgroup

The vesting subgroup is made up of 3,282 former employees who participated in the "cash balance" portion of the Plan and served more than three but less than five years of service. ECF No. 290 at 14. The Plan had a five-year vesting period, whereas ERISA requires that "cash balance" plans must vest at three years. *Id.* Accordingly, these Plaintiffs would be entitled to Plan benefits only if the Plan were deemed subject to ERISA. While the Settlement does not entitle these Plaintiffs to future benefits under the Plan, *see* ECF No. 290 at 16, it does provide one-time cash payments of $113.40 for those who accrued benefits under the Value Protection Plan and $226.80 for those who accrued benefits under the Guaranteed Growth Account formula, Settlement § 7.1.6. Plaintiffs estimate that this recovery constitutes 3 to 9.5 percent of the vesting subgroup's total claims. ECF No. 290 at 21; ECF No. 290-7 at 6-7.

Plaintiffs claim that this subgroup's interests "are not harmed by the Settlement," citing the Eleventh Circuit's statement that "no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class." ECF No. 290 at 16 (citing *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003)). But the *Valley Drug* scenario is not the only kind of situation that can create a fundamental conflict. Because the non-vested Plaintiffs in this case will not benefit from class-wide prospective relief, their predicament resembles that of the sick plaintiffs in *Amchem*, who were incentivized to seek "generous immediate payments" while the rest of the class had an interest "in ensuring an ample, inflation-protected fund for the future." *Amchem*, 521 U.S. at 626. In this way, the Settlement is an example of one that, by "offer[ing] considerably more value to one class of plaintiffs than to another," risks "trading the claims of the latter group away in order to enrich the former group." *Ferrington*, 2012 WL 1156399, at *7.

Plaintiffs distinguish their agreement from the *Ferrington* settlement, in which the size of

14

1  the subgroup was unknown, the subgroup was represented in separate litigation by an attorney
2  who objected to the settlement, there was a disproportionately high fee award and a reversion
3  clause, and the relevant subgroup's claims were "released for literally nothing." ECF No. 290 at
4  19 (citing *Ferrington*, 2012 WL 115639, at *13). Plaintiffs are correct that none of these factors
5  are present here. They also argue that "the likelihood that a district judge would award
6  retrospective relief in a church plan case [i]s very small, on the order of 1% to 10%." ECF No.
7  290 at 20. Plaintiffs cite no authority for this estimate other than class counsel's extensive
8  experience litigating church plan cases. *Id.*

9  They also note that seven church plan cases involving similar vesting subgroups have
10 settled in the past three years, and in all of the cases "the plaintiffs and their counsel were able to
11 negotiate for a recovery of no more than a few hundred dollars per" member of the vesting
12 subgroup. *Id.* at 20; *see also id.* at 18 n.22 (listing cases). Plaintiffs argue that "[t]his backstory,
13 well known to defense counsel and the mediator in this case, made it essentially impossible to
14 negotiate for a larger recovery in this case." *Id.* at 20-21. The Court has reviewed the final
15 approval orders in these cases; none of them even considered whether there might be an intraclass
16 conflict, much less resolved the question in favor of certification. *See Feather v. SSM Health
17 Care Corp.*, No. 16-1669, ECF No. 133 (E.D. Mo. May 6, 2019); *In re Mercy Health ERISA
18 Litig.*, No. 16-441, ECF No. 107 (S.D. Ohio Nov. 28, 2018); *Stapleton v. Advocate Health Care
19 Network & Subsidiaries*, No. 14-1873, ECF No. 159 (N.D. Ill. June 27, 2018); *Nicholson v.
20 Franciscan Missionaries*, No. 16-258, ECF No. 99 (M.D. La. Feb. 6, 2018); *Hodges v. Bon
21 Secours Health Sys.*, No. 16-1079, ECF No. 117 (D. Md. Dec. 21, 2017); *Lann v. Trinity Health
22 Corp.*, No. 14-2237, ECF No. 111 (D. Md. May 31, 2017); *Griffith v. Providence Health & Servs.*,
23 No. C14-1720-JCC, 2017 WL 1064392, at *2 (W.D. Wash. Mar. 21, 2017). Because "[a] case . . .
24 is not authority for a proposition it did not consider," *Persson v. Smart Inventions, Inc.*, 125 Cal.
25 App. 4th 1141, 1172 (2005), these prior orders do not assist the Court. *See also People v.
26 Rusconi*, 236 Cal. App. 4th 273, 280 (2015) ("It is of course axiomatic that a case is not precedent
27 for an issue which the court did not consider."). It would substantially help Plaintiffs' cause if
28 they could cite a case approving a unitary class in the face of a conflict of similar magnitude,

15

1  regardless of whether the case involved a defined benefit plan. But they do not, and the Court has
2  not found one.
3        The Court acknowledges the predicament that members of the vesting subgroup find
4  themselves in. Their number is small enough and their claims minimal enough that few lawyers
5  are likely to take their case on absent a larger class context. However, the Court must give
6  "heightened scrutiny to cases in which class members may have claims of different strength."
7  *Hanlon*, 150 F.3d at 1020. And here, the vesting subgroup's claims are clearly weaker than those
8  of the rest of the class, as reflected by the fact that these claimants are receiving just 3 to 9.5
9  percent of the value of their claims. As discussed above, such a discount does not necessarily
10 render the settlement unreasonable. But because of the underlying conflict between the vesting
11 subgroup and the rest of the class, the Court cannot find that its interests have been adequately
12 protected.
13       The Court does not doubt that "vigorous, arm's length negotiations" occurred between the
14 parties. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768,
15 797 (3d Cir. 1995). However, in order to certify a class as adequate under Rule 23, especially for
16 the purpose of settlement, the Court must find that the named Plaintiffs and their attorneys were
17 negotiating "on behalf of the *entire* class, assumptions which are clearly unjustified in a context
18 where the potential for intra-class conflict further emperils the class's representation." *Id.*
19 (internal citation omitted).
20       For this reason, the Court finds a fundamental conflict of interest between the vesting
21 subgroup and the rest of the class that must be addressed by subclass certification. Because the
22 Court cannot certify the class, it cannot grant preliminary approval of the Settlement. It makes this
23 finding reluctantly, given the age of the case, the extensive litigation that has already taken place,
24 and the good work of counsel on both sides to this point. But Rule 23 requires it.
25 / / /
26 / / /
27 / / /
28 / / /

16

**CONCLUSION**

For the reasons stated above, the Court denies the motion for preliminary certification and settlement approval without prejudice.

**IT IS SO ORDERED.**

Dated: June 12, 2020



JON S. TIGAR
United States District Judge